# 16-1376

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

HANNA BOUVENG,

*Plaintiff-Appellee,*

—against—

NYG CAPITAL LLC, doing business as NEW YORK GLOBAL GROUP, INC.
doing business as FNL MEDIA LLC, BENJAMIN WEY, FNL MEDIA LLC,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLANTS NYG CAPITAL LLC, DOING BUSINESS AS NEW YORK GLOBAL GROUP, INC., FNL MEDIA LLC, AND BENJAMIN WEY

GLENN COLTON
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

*Attorneys for Defendants-Appellants
NYG Capital LLC, doing business
as New York Global Group, Inc.,
FNL Media LLC, and Benjamin Wey*

**FEDERAL RULE OF APPELLATE PROCEDURE 26.1**
**CORPORATE DISCLOSURE STATEMENT**


Pursuant to Fed. R. App. P. 26.1, Defendants-Appellants NYG Capital LLC

and FNL Media LLC state that they have no parent corporation, and that no public

company owns more than 10% of the stock of either.

101640256\V-1

# TABLE OF CONTENTS

**Page**

FEDERAL RULE OF APPELLATE PROCEDURE 26.1 CORPORATE
DISCLOSURE STATEMENT ........................................................................i

TABLE OF CONTENTS ............................................................................ ii

**PRELIMINARY STATEMENT** ............................................................... 1

STATEMENT OF JURISDICTION ............................................................3

**STATEMENT OF THE ISSUES PRESENTED** ...................................5

STATEMENT OF THE CASE .....................................................................7

**SUMMARY OF ARGUMENT** ..............................................................27

**ARGUMENT** ...........................................................................................31

I.     THE DEFAMATION JUDGMENT SHOULD BE VACATED AND A
NEW TRIAL ORDERED ...............................................................31

    A.    The Court Below Erred In Applying Mere Negligence Instead
Of A Grossly Irresponsible Standard Of Fault...................................31

        1.    "Grossly Irresponsible" is Required For Matters "Arguably
Within The Sphere Of Legitimate Public Concern".................31

        2.    Many Of The Alleged Defamatory Statements At Issue
Fall Within The Broad *Chapadeau* Test...................................32

            a.    Statements Referring To Plaintiff As An Extortionist
Fall Within The Public Concern Test.............................33

            b.    Statements About Drug Use At Work Fall Within
The Public Concern Test .................................................35

            c.    Statements Referring To Criminal Conduct Fall
Within The Public Concern Test ....................................36

        3.    If Any Of The Alleged Defamatory Statements Meet The
Public Concern Test, A New Trial Must Be Ordered...............38

        4.    Irrespective Of Whether the Public Concern Test Was Met,
The "Grossly Irresponsible" Standard Should be Applied.......38

    B.    The Court Should Have Considered The Entire Article As
Context When Determining Whether Statements Were Opinions .....40

1.     All Statements Referring To Plaintiff As An Extortionist In Articles Discussing The Lawsuit Are Opinions ..................41

        a.     The Law Required The Court To Consider The Articles As A Whole For Proper Context.......................42

        b.     Statements About Extortion Or Blackmail In The Context Of Legal Proceedings Are Considered Opinions.........................................................44

2.     It Was Error To Find Extortion Statements Factual Unless Surrounded By Words Discussing The Lawsuit..........46

C.     The Court Below Erred In Finding Multiple Statements Fell Within The Injury To Trade or Profession *Per Se* Category ..............50

    1.     A "Marketing" Background Does Not Constitute A Trade Or Profession For Defamation *Per Se* Purposes.......................50

    2.     Statements Regarding Alcohol/Drug Use Are Not Specific Enough To Constitute Trade or Profession Injury...................52

D.     The Court Below Erroneously Excluded Evidence of Plaintiff's Admitted Illegal Drug Use ..................................................53

II.     PLAINTIFF FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUPPORT HER SEXUAL HARASSMENT CLAIM..................................56

A.     No Reasonable Jury Could Have Concluded That Plaintiff Submitted To Unwelcome Sexual Contact, But Found Against Plaintiff On Battery ...........................................................57

B.     The Evidence Does Not Establish Sexual Harassment Based Upon Alleged Rejection Of Unwelcome Sexual Advances................60

III.     THE DISTRICT COURT ERRED IN ONLY REDUCING THE SEXUAL HARASSMENT JURY AWARD TO $150,000..........................63

A.     A New Trial Or Remittitur Is Proper If The Jury's   Award "Deviates Materially" From Comparable Cases ..................................64

B.     The District Court Properly Found Plaintiff's Injury To Constitute No More Than "Garden Variety" Emotional Distress, For Which An Award Of $500,000 Is Excessive.................................66

C. The District Court's $150,000 Award Is Excessive; Courts Award No More than $30,000 For Cases Involving Comparable Injuries .................................................................................68

    1. Injuries In Cases With Low Six-Figure Awards Are Materially Different From Plaintiff's Alleged Injury ..............69

    2. Plaintiff's Alleged Injuries Are Comparable To Injuries In Cases With Awards Of $30,000 Or Less ..................................71

    3. The District Court's Bases For Disregarding All The Cases In The $30,000 Range Are Without Merit ...............................77

IV. THE DISTRICT COURT ERRED IN FAILING TO ORDER A REMITTITUR OR NEW TRIAL ON THE JURY'S EXCESSIVE COMPENSATORY DAMAGES AWARD FOR DEFAMATION .............83

A. As The District Court Found, Plaintiff Did Not Present The Type Of Evidence Required To Recover For Injury To Business Reputation On A Defamation Claim ...................................................85

    1. The Law Requires Evidence Of Existence Of A Business Reputation And How It Was Altered By Defamation ..............85

    2. No Evidence Of An Injured Business Reputation Was Introduced At Trial .................................................................88

B. It Was Error For The District Court To Substitute A Speculative Presumption About Damage To Plaintiff's Future Reputation For Actual Evidence Of Injury ..........................................................90

C. Plaintiff Cannot Recover Presumed Damages Because The Jury Did Not Receive An Actual Malice Instruction ..................................92

D. The Jury's Award Of $1.5 Million Also Should Be Rejected As Inherently Speculative .........................................................................93

E. The Court Should Order Remittitur To No More Than $90,000 For Emotional Distress And Injury To Personal Reputation .............96

    1. Comparable Cases Require An Award At The Low End Of The Garden Variety Damages Range For Plaintiff's Alleged Emotional Distress From Defamation .........................96

101640256\V-1

2.      Plaintiff Is Entitled To At Most a Modest Award For Injury To Her Personal Reputation Or Standing In The Community.............................................................................101

V.    THE DISTRICT COURT ERRONEOUSLY USED THE ENTIRE COMPENSATORY AWARD, AND NOT EACH DEFENDANT'S *PRO RATA* SHARE, WHEN    COMPUTING REMITTITUR OF PUNITIVE DAMAGES UNDER A 1:1 PUNITIVE/COMPENSATORY RATIO....................................................103

A.    Four Circuits Have Rejected Use Of A Full Compensatory Award When Calculating A Punitive-Compensatory Damages Ratio For A Defendant Liable For A Portion Of The Damages.......105

B.    The Court Should Adopt The Eighth Circuit's *Pro Rata* Share Approach To Dividing The Compensatory Award Amongst Jointly And Severally Liable Defendants .........................................109

**CONCLUSION**...................................................................................112

CERTIFICATE OF COMPLIANCE..................................................................113

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*600 W. 115th St. Corp. v. Von Gutfeld*,
  80 N.Y.2d 130 (1992) ....................................................................41

*Abascal v. Fleckenstein*,
  No. 14-1591-CV, 2016 WL 1720421 (2d Cir. Apr. 29, 2016).........52

*Albert v. Loksen*,
  239 F.3d 256 (2d. Cir. 2001) ...................................................31, 37

*Alla v. Verkay*,
  979 F.Supp.2d 349 (E.D.N.Y. 2013) ...........................103, 104, 105

*Allam v. Meyers*,
  906 F.Supp.2d 274 (S.D.N.Y. 2012) ..............................................77

*Angel v. Levittown Union Free School Dist. No. 5*,
  171 A.D.2d 770 (2d Dep't 1991).....................................................97

*Annis v. County of Westchester*,
  136 F.3d 239 (2d Cir. 1998) .....................................................59, 60

*Aronson v. Wiersma*,
  65 N.Y.2d 592 (1985) .....................................................................39

*BMW of North America, Inc. v. Gore*,
  517 U.S. 559 (1996)..................................................... 2, 100, 107

*Brian v. Richardson*,
  87 N.Y.2d 46 (1995) .......................................................................41

*Brown v. Johnson Newspapers Corp.*,
  84 A.D.2d 636 (3d Dep't 1981).......................................................35

*Buckley v. Reynolds Metals Co.*,
  690 F.Supp. 211 (S.D.N.Y. 1988) ..................................................92

*Caravantes v. 53rd St. Partners, LLC*,
  No. 09 CV 7821(RPP), 2012 WL 3631276 (S.D.N.Y. Aug. 23,
  2012) ........................................................................................*passim*

*Celle v. Filipino Reporter Enters.*,
  209 F.3d 163 (2d Cir. 2000) ..........................................40, 46, 47, 48

*Chapadeau v Utica Observer-Dispatch*,
  38 N.Y.2d 196 (1975) ...............................................................*passim*

*Chapman v. Journal Concepts, Inc.*,
  401 F. App'x 243 (9th Cir. 2010) ...................................................51

101640256\V-1

*Clark v. Chrysler Corp.*,
 436 F.3d 594 (6th Cir. 2006) .......................................................... 105

*Cullen v. Nassau County Civil Serv. Comm'n*,
 53 N.Y.2d 492 (1981) ..................................................................... 58

*Dalbec v. Gentleman's Companion, Inc.*,
 828 F.2d 921 (2d Cir. 1987) ............................................ 98, 99, 100

*Davis v. Ross*,
 107 F.R.D. 326 (S.D.N.Y. 1985) ..................................................... 85

*Dejesus v. Village of Pelham Manor*,
 282 F.Supp.2d 162 (S.D.N.Y. 2003) ............................................... 60

*Dotson v. City of Syracuse*,
 No. 5:04-cv-1388, 2011 WL 817499 (N.D.N.Y. Mar. 2, 2011) ......... 76

*Drice v. My Merch. Servs., LLC*,
 No. CV 2015-0395(MKB), 2016 WL 1266948 (E.D.N.Y. Mar. 31,
 2016) ............................................................................................... 79

*El-Bakly v. Autozone, Inc.*,
 No. 04 C 2767, 2008 WL 1774962 (N.D. Ill Apr. 16, 2008) ............ 51

*Fischer v. OBG Cameron Banfill LLP*,
 No. 08 Civ. 7707(RJH), 2010 WL 3733882 (S.D.N.Y. Sept. 24,
 2010) ............................................................................................... 85

*Flamm v. American Ass'n of University Women*,
 201 F.3d 144 (2d Cir. 2000) ........................................................... 47

*Fowler v. New York Transit Auth.*,
 2001 WL 83228 (S.D.N.Y. 2001) ............................................. 63, 70

*Gasperini v. Center for Humanities, Inc.*,
 518 U.S. 415 (1996) ................................................................. 62, 63

*Gentile v. Grand St. Med. Assocs.*,
 79 A.D.3d 1351 (3d Dep't 2010) ..................................................... 44

*Gertz v. Robert Welch, Inc.*,
 418 U.S. 323 (1974) ................................................................ *passim*

*Gleason v. Callanan Indus., Inc.*,
 203 A.D.2d 750 (3d Dep't 1994) ..................................................... 77

*Goldberg v. Levine*,
 949 N.Y.S.2d 692 (2d Dep't 2012) .................................................. 51

*Goldman v. New York Post Corp.*,
 58 A.D.2d 769 (1st Dep't 1977) ...................................................... 36

101640256\V-1

*Grabinski v. Blue Springs Ford Sales, Inc.*,
203 F.3d 1024 (8th Cir. 2000) ..................................................................*passim*

*Greathouse v. JHS Sec. Inc.*,
No. 11 Civ. 7845 (PAE)(GWG), 2015 WL 7142850 (S.D.N.Y.
Nov. 13, 2015) ...............................................................................................80

*Greenberg v. CBS, Inc.*,
69 A.D.2d 693 (2d Dep't 1979) (Titone, J.) ......................................................34

*Gross v. New York Times Co.*
82 N.Y.2d 146 (1993) ......................................................................................46

*Hageman v. City Investing Co.*,
851 F.2d 69 (2d Cir. 1988) .................................................................................3

*Huggins v. Moore*,
94 N.Y.2d 296 (1999) ......................................................................................31

*Immuno AG. v. Moor-Jankowski*,
77 N.Y.2d 235 (1991) ...................................................................40, 41, 42, 46

*Jewell v. NYP Holdings, Inc.*,
23 F.Supp.2d 348 (S.D.N.Y. 1998) ..................................................................49

*Kamerman v. Steinberg*,
891 F.2d 424 (2d Cir. 1989) ...............................................................................3

*Kerik v. Tacopina*,
64 F.Supp.3d 542 (S.D.N.Y. 2014) .............................................................49, 50

*Knuff v. Metro, Int'l S.A.*,
91 A.D.3d 915 (2d Dep't 2012) .........................................................................36

*Konikoff v. Prudential Ins. Co.*,
234 F.3d 92 (2d Cir. 2000) .........................................................................31, 33

*Levitant v. City of New York Human Res. Admin.*,
914 F.Supp.2d 281 (E.D.N.Y. 2012) ...........................................................72, 73

*Liberman v.Gelstein*,
80 N.Y.2d 429 (1992) .................................................................................49, 51

*Lin v. Holder*,
365 F. App'x 311 (2d Cir. 2010) ......................................................................40

*Lompe v. Sunridge Partners, LLC*,
818 F.3d 1041 (10th Cir. 2008) .............................................................105, 106

*Lopes v. Caffe Centrale LLC*,
548 F.Supp.2d 47 (S.D.N.Y. 2008) ..................................................................59

*Lore v. City of Syracuse*,
670 F.3d 127 (2d Cir. 2012) .................................................................65, 66, 67

- viii -

*MacMillan v. Millennium Broadway Hotel*,
  873 F.Supp.2d 546 (S.D.N.Y. 2012) ....................................58, 65, 73

*Makinen v. City of New York*,
  No. 1:11-cv-07535(ALC)(AJP), 2016 WL 880194 (S.D.N.Y. Mar.
  1, 2016) ...............................................................................................80

*Malik v. Carrier Corp.*,
  202 F.3d 97 (2d Cir. 2000) ...............................................................55

*Maloney v. Anton Cmty. Newspapers, Inc.*,
  16 A.D.3d 465 (2d Dep't 2005) .........................................................35

*Mann v. Abel*,
  10 N.Y.3d 271 (2008) ........................................................................42

*Marchuk v. Faruqi & Faruqi, LLP*,
  100 F.Supp.3d 302 (S.D.N.Y. 2015) .............................................42, 44

*Massre v. Bibiyan*,
  No. 12 Civ. 6615 (KPF), 2014 WL 2722849 (S.D.N.Y. June 16,
  2014) ..............................................................................................83, 87

*McIntosh v. Irving Trust Co.*,
  887 F.Supp. 662 (S.D.N.Y. 1995) ................................................69, 70

*Meacham v. Knolls Atomic Power Lab,* 381 F.3d 56 (2d Cir. 2004),
  *vacated on other grounds,* 544 U.S. 957 (2005) .........................65, 67

*Medcalf v. Walsh*,
  938 F.Supp.2d 478 (S.D.N.Y. 2013) .................................................37

*Melius v. Glacken*,
  94 A.D.3d 959 (2d Dep't 2012) .....................................................42, 44

*Michalski v. Home Depot, Inc.*,
  225 F.3d 113 (2d Cir. 2000) ..............................................................37

*Millus v. Newsday, Inc.*,
  89 N.Y.2d 840 (1996) ........................................................................39

*Morsette v. Final Call*,
  278 A.D.2d 81 (1st Dep't 2000) ........................................................36

*Najnin v. Dollar Mountain, Inc.*,
  No. 14CV5758, 2015 WL 6125436 (S.D.N.Y. Sept. 25, 2015).........79

*Nellis v. Miller*,
  101 A.D.2d 1002 (4th Dep't 1984)........................................84, 87, 98

*Nelson v. Globe Int'l, Inc.*,
  626 F.Supp. 969 (S.D.N.Y. 1986) .................................................34, 36

101640256\V-1

*New York State Div. of Human Rights v. Miranda*,
136 A.D.3d 1240 (3d Dep't 2016)........................................................79

*New York Times v. Sullivan*,
376 U.S. 254 (1964)..........................................................................30

*November v. Time Inc.*,
13 N.Y.2d 175 (1963)........................................................................47

*O'Neil v. Peekskill Faculty Ass'n Local No. 2916*,
156 A.D.2d 514 (2d Dep't 1989)........................................................84

*Olsen v. County of Nassau*,
615 F.Supp.2d 35 (E.D.N.Y. 2009) ........................................64, 65, 73

*Patrolmen's Benevolent Ass'n. v. City of New York*,
310 F.3d 43 (2d Cir. 2002) ...............................................................60

*Patterson v. Balsamico*,
440 F.3d 104 (2d Cir. 2006) .............................................65, 66, 67

*Perfect Fit Indus. v. Acme Quilting Co.*,
494 F.Supp. 505 (S.D.N.Y. 1980) ......................................................84

*Planned Parenthood of Columbia/Willamette, Inc. v. American Coal.
of Life Activists*,
422 F.3d 949 (9th Cir. 2005) ...........................................................104

*Pollnow v. Poughkeepsie Newspapers, Inc.*,
107 A.D.2d 10 (2d Dep't 1985)..........................................................35

*Quezada v. Daily News*,
130 Misc. 2d 842 (Sup. Ct. App T. 1st Dep't 1986) .........................35

*Ratajack v. Brewster Fire Dep't, Inc.*,
2016 WL 1274581 (S.D.N.Y. Mar. 31, 2016)............................31, 32

*Reiter v. MTA of N.Y.*,
No. 01 Civ. 2762 (JGK), 2003 WL 22271223 (S.D.N.Y. Sept. 30,
2003) ..................................................................................................72

*Rivera v. Puerto Rican Home Attendants Servs., Inc.*,
930 F.Supp. 124 (S.D.N.Y. 1996) ......................................................56

*Roberts v. UPS, Inc.*,
115 F.Supp.3d 344 (E.D.N.Y. 2015) ..................................................79

*Rodriguez v. Express World Wide, LLC*,
No. 12 CV 4572 (RJD), 2014 WL 1347369 (E.D.N.Y. Jan. 16,
2014) ...........................................................................................*passim*

*Rosemond v. Nat'l R.R. Passenger Corp.*,
No. 85 Civ. 5661(IBC), 1986 WL 10711 (S.D.N.Y. Sept. 19, 1986) ...............52

*Rossignol v. Silvernail*,
   185 A.D.2d 497 (3d Dep't 1992) ...................................................95, 96, 97

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
   86 A.D.3d 32 (1st Dep't 2011) ...................................................................47

*Sheridan v. Carter*,
   48 A.D.3d 447 (2d Dep't 2008) ..................................................................35

*Stampf v. L.I.R.R.*,
   761 F.3d 192 (2014) ...................................................................62, 63, 78

*Stevens v. Rite Aid Corp.*,
   No. 6:13-CV-783, 2015 WL 5602949 (N.D.N.Y. Sept. 23, 2015) ..................80

*Thomas v. IStar Fin., Inc.*,
   508 F.Supp.2d 252 (S.D.N.Y. 2007) ..........................................................92

*Trustco Bank of New York v. Capital Newspaper Div. of the Hearst
   Corp.*,
   213 A.D.2d 940 (1995) ..........................................................................42, 44

*Turley v. ISG Lackawanna, Inc.*,
   774 F.3d 140 (2d Cir. 2014) ....................................................................100

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006) ......................................................................30

*United States v. Rosa*,
   11 F.3d 315 (2d Cir. 1993) ........................................................................53

*United States v. Vulcan Soc'y, Inc.*,
   897 F.Supp.2d 30 (E.D.N.Y. 2012) ............................................................58

*Vera v. Alstom Power*,
   Civ. A. No. 3:12-cv-00382 (VAB), 2016 WL 3014614 (D. Conn.
   May 24, 2016) ...........................................................................................62

*Virelli v. Goodson-Todman Enters., Ltd.*,
   142 A.D.2d 479 (3d Dep't 1989) ................................................................34

*Walia v. Vivek Purmasir & Assoc's, Inc.*,
   160 F.Supp.2d 380 (E.D.N.Y. 2000) ....................................................*passim*

*Ward v. Zelikovsky*,
   643 A.2d 972 (N.J. 1994) ..........................................................................49

*Weiner v. Doubleday & Co.*,
   74 N.Y.2d 586 (1984) ...............................................................................33

*Weldy v. Piedmont Airlines*,
   No. 88-CV-0628, 1995 WL 350358 (W.D.N.Y. May 30, 1995) ...............96, 97

- xi -

*Wharton v. Cty. of Nassau*,
No. 10-CV-0265 (JS)(AYS), 2015 WL 4611974 (E.D.N.Y. July 30, 2015) ...........................................................................80

*Wolf Street Supermarkets, Inc. v. McPartland*,
108 A.D.2d 25 (4th Dep't 1985)................................................84, 87

**Statutes**

28 U.S.C. § 1291 ............................................................................3

28 U.S.C. § 1332 ............................................................................2

**Rules**

CPLR § 5501(c) .......................................................................62, 63

Fed. R. Civ. P. 59 ..........................................................................62

Fed. R. Civ. P. 62(d) ......................................................................4

**Other Authorities**

Restatement (Second) of Torts § 573 comment c (1977) .......................................51

Restatement (Second) of Torts § 621 comment. b (1977) ......................................83

Robert D. Sack, Sack on Defamation
§ 2:8.2 n.466 (4th ed. 2010)........................................................50

Robert D. Sack, Sack on Defamation
§ 6:6 (4th ed. 2010)................................................................38

## **PRELIMINARY STATEMENT**

This appeal presents multiple substantial freedom of speech and due process issues.    The First Amendment rights of Benjamin Wey, NYG Capital LLC d/b/a New York Global Group ("NYGG"), and FNL Media LLC ("FNL") ("Defendants" or "Appellants") were violated when the district court imposed a negligence standard of fault on plaintiff Hanna Bouveng's defamation cause of action.    Since *Chapadeau v Utica Observer-Dispatch*, 38 N.Y.2d 196 (1975), plaintiffs must prove defendants were "grossly irresponsible" in publishing allegedly false statements in articles that are "arguably within the sphere of legitimate public concern."    The articles at issue here fall within that standard, which applies in all but the extremely rare case to strike the balance necessary to sufficiently protect the community's interests in free circulation of information and the state's right to protect against harm done by circulation of defamatory falsehood.

The district court also infringed First Amendment rights by allowing Plaintiff to recover $1,500,000 for a presumed business reputation injury.    In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Supreme Court expressly refused to allow the "countervailing state interest" in compensating private individuals for injury to reputation to extend "further than compensation for actual injury."    Plaintiff did not present evidence of an actual injury; it was error for the

district court to find that the fact that she was college educated and starting out in professional life substantiated such a large award.

Also, this case raises an issue about application of punitive-compensatory awards ratios under *BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996) that neither the Supreme Court nor this Court have addressed. In applying such a ratio to defendants jointly and severally liable for the $1.500,000 defamation award, the district court compared each defendant's individual punitive damages liability to the entire joint and several compensatory award. As the four Circuit Courts of Appeal to expressly address this issue have held, that approach assumed an impossibility -- that each defendant would pay the full compensatory judgment. This Court should follow the Eighth Circuit's rule and determine the punitive damages remittiturs in this case by using each Appellant's *pro rata* share of the compensatory award in the computation.

Appellants respectfully submit that this Court should vacate the judgment below and order a new trial on defamation, or alternatively remit the damages awarded to a level consistent with applicable First Amendment and Due Process requirements, as well as enter relief on a number of additional errors briefed below.

- 2 -

## STATEMENT OF JURISDICTION

Subject matter jurisdiction in this action is based upon 28 U.S.C. § 1332. Plaintiff is a citizen of a foreign state (Sweden) and Appellants are citizens of states in the United States.

Appellants timely filed its Notice of Appeal dated April 28, 2016 from: (1) the March 31, 2016 Memorandum Opinion and Order of the Honorable Paul G. Gardephe, denying Appellants' motion for judgment as a matter of law and for and new trial as to liability and granting in part Appellants' motion for a remittitur as to damage awards; and (2) the Judgment entered July 9, 2015.[1]

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. However, jurisdiction is more complicated than in the typical appeal. The district court issued a judgment and amended judgment even though a breach of contract claim severed from trial of the other claims remains pending below. Appellants assert that the district court intended to enter a final judgment, but inadvertently failed to say so. This matter fits within the purview of *Kamerman v. Steinberg*, 891 F.2d 424, 429 (2d Cir. 1989), where the Court found the district court "clearly intended final judgment to be entered with respect to [the] claims." The district

---

[1] Appellants filed the notice of appeal before the May 10, 2016 Amended Judgment was entered, as the deadline for the filing an appeal on the initial Judgment was fast approaching. Appellants stated in its notice that this appeal would also be from the Amended Judgment, which the district court announced would be forthcoming at a conference on April 7, 2016.

- 3 -

court has permitted substantial collections activity to progress on the amended judgment that is the subject of this appeal -- something the court would be unlikely to allow absent an intent to also allow Appellants to vindicate their rights on appeal. (*See* A.38-39) (docket entries showing substantial collections activities).

The procedural posture of this litigation fits the "highly unusual circumstances" test of *Kamerman* and *Hageman v. City Investing Co.*, 851 F.2d 69, 71 (2d Cir. 1988), for allowing appeals to go forward despite the existence of remaining claims in the district court.   Immediately before trial, Plaintiff took the highly unusual step of moving to sever her own contract claim, a motion granted over Appellants' objection.    (*See* A.350-53).   With Appellants exercising their right to not secure the judgment with a *supersedeas* bond under Fed. R. Civ. P. 62(d), they have been subject to substantial collections efforts.   It would be patently unfair to preclude Appellants from putting an end to those collection efforts through expeditious prosecution of the instant appeal, which seeks reversal of what they believe to be an erroneous judgment.

Plaintiff apparently also believes jurisdiction in this Court is proper. Appellants offered to stipulate with Plaintiff to a dismissal of the instant appeal, without prejudice, so long as all efforts to collect on the amended judgment

- 4 -

ceased.[2]   Plaintiff refused, stating she wished to move forward with the appeal
and that jurisdiction is proper in this Court.   Appellants believe that jurisdiction is
proper, but remain willing to have this appeal dismissed without prejudice if all
collection activity is suspended as it will only truly be "without prejudice" if
collections activity ceases.

## STATEMENT OF THE ISSUES PRESENTED

1.     Whether a court should apply a "grossly irresponsible" standard of
fault, instead of a negligence standard, in a defamation claim based on statements
made in an internet magazine about a plaintiff's filing of a frivolous lawsuit
(already covered by other print media), her drug and alcohol abuse, or her criminal
conduct because such statements, even if made in a tabloid style, are "arguably
within the sphere of legitimate public concern."

2.     When a court reviews allegedly defamatory statements to determine
whether they are non-actionable opinions, whether the court should consider the
context of the entire articles in which such statements appear, as opposed to only
the immediate, surrounding context.

3.     Whether "marketing" can constitute a trade or profession when
determining whether statements constitute the defamation *per se* category of injury

_____

[2]  The Clerk of the Court informed Appellants that there was no mechanism for
unilaterally moving to dismiss the appeal without prejudice.

to trade or profession, and if so, whether statements about a marketer's drug or alcohol abuse constitute the type of specific injury required.

4.     In a case where a plaintiff contends that statements that she was terminated for use of illegal drugs were defamatory, whether evidence of her alleged drug use prior to becoming employed can be excluded, and whether the door to such evidence is opened when the plaintiff questions witnesses about whether they had *ever* seen her use illegal drugs.

5.     Whether a reasonable jury could find in a plaintiff's favor on a claim for *quid pro quo* sexual harassment based on theory that she consented to unwelcome sexual activity, but also find against her on a battery claim based on the same alleged conduct.

6.     Whether, on a claim under the NYSHRL and NYCHRL, remittitur of compensatory damages to $150,000 for garden variety emotional distress is sufficient even though the evidence fails to reflect that the distress resulted in any physical manifestations or psychiatric symptoms.

7.     Whether, on a defamation claim, a court can permit substantial damages for business reputation injury even though plaintiff offered no evidence at trial of the existence of, or loss of, a business reputation.

8.     Whether it is proper to use the entire compensatory award against each jointly and severally liable defendant, or just each defendant's *pro rata* share

- 6 -

of the award, when calculating the punitive-compensatory ratio for determining

constitutional proportionality of punitive damages awards.

## STATEMENT OF THE CASE

### Nature Of The Case And Relevant Procedural History

Trial of this case concerned Plaintiff Hanna Bouveng's attempt to recover

non-economic damages on claims of assault, battery, sexual harassment,

retaliation, and defamation against Appellants Benjamin Wey (her boss), NYGG

(her employer), and FNL (owner of the internet magazine that published

purportedly defamatory statements).   (A.283).[3]

Following a June 2015 trial the jury found:

(i) against Plaintiff on her assault and battery claims;

(ii) for Plaintiff on the sexual harassment claim, awarding $500,000 in

compensatory damages, but declining to award punitive damages;

(iii) for Plaintiff on the retaliation claim, awarding $1 in compensatory

damages and $1 in punitive damages against each Appellant; and

(iv) for Plaintiff on the defamation claim, awarding $1,500,000 in

compensatory damages (jointly and severally against all Appellants) and punitive

---

[3]  Several of the claims in the Second Amended Complaint were dismissed by the
court below, or by agreement of the parties, before trial, and are not relevant on
this appeal.   (*See* A.23 & 399).   Also, the court below granted Plaintiff's request
to sever her own breach of contract claim over Appellant's objection.   (A.350-
53).

101640256\V-1

damages of $10,000,000 against Mr. Wey, $1,000,000 against NYGG, and $5,000,000 against FNL. (A.2033).

Following trial, Appellants moved for judgment as a matter of law, a new trial, and remittitur of damages. In a March 31, 2016 Memorandum Opinion and Order (A.2047), the Honorable Paul G. Gardephe denied Appellants' motion for judgment as a matter of law in all respects, but granted remittitur in part. On the sexual harassment claim, the court remitted the compensatory award from $500,000 to $150,000, instead of to the $30,000 Appellants requested. On the defamation claim, the court declined to reduce the $1,500,000 compensatory damages. And as to punitive damages on the defamation claim, while the court found a 1:1 punitive-compensatory damages ratio was required for constitutional proportionality, it computed the remittitur using the entire compensatory award of $1,500,000 as to each jointly and severally liable defendant (from $10,000,000 to $1,500,000 against Mr. Wey, leaving $1,000,000 in place against NYGG, and from $5,000,000 to $1,500,000 against FNL).

The district court ruled that the motion for a new trial with respect to the compensatory and punitive damages awards would be granted unless Plaintiff accepted a remittitur. (A.2048). On April 11, 2016, Plaintiff accepted the remittitur. (A.35-36).

- 8 -

Appellants appeal from the district court's March 31, 2016 rulings, as well as from the judgments and rulings on certain evidentiary and other matters.

**The Parties**

Appellant Benjamin Wey was born in a small village in Western China to a family of very modest means.    (A.942).    During a routine bus ride, Mr. Wey met an American couple serving as religious missionaries in China.    (A.942).    The missionaries took a liking to Mr. Wey, taught him to speak English, and later arranged for him to attend college on full scholarship at Oklahoma Baptist University, where he earned his undergraduate degree.    (A.942-43)    He later received an MBA from the University of Central Oklahoma in 1999 and an additional Master's degree from Columbia Business School in 2013.    (A.944-45).  Mr. Wey founded Appellant NYGG, a boutique Wall Street advisory firm.    He also served as a reporter and publisher for *The Blot Magazine*, an internet magazine owned by Appellant FNL.    (A.874 & 945).

Plaintiff Hanna Bouveng was born and raised in Sweden.    (A.1038).    She is the granddaughter of the billionaire founder of the Sweden aluminum company SAPA, and is the heir to that fortune.    (A.819, 946, 1048, 1311-12).    Her father is a financial executive in Sweden.    (A.1273).    In her twenties, with funding from the Swedish government, Plaintiff moved to New York to study at Berkeley College on a student visa.    (A.1042).

- 9 -

**Plaintiff's Internship at NYGG**

Plaintiff and Mr. Wey met at a social function in New York in the summer of 2013. (A.783). Plaintiff told Mr. Wey about her family background and claimed to have extensive high-level business connections in Scandinavia. (A.945-46). Mr. Wey was at that time seeking to expand NYGG's business beyond the United States and Asia and into Europe. (A.946). The two discussed possible employment for Plaintiff at NYGG and agreed to meet later that summer while Plaintiff was traveling in Sweden so that Plaintiff could demonstrate the *bona fides* of her business contacts. (A.946-47).

Plaintiff sent Mr. Wey a detailed proposed travel itinerary for their Scandinavia trip that included attendance at parties; it ended with the salutation "kram," Swedish for "hug." (A.947-48,1138-39 & 1969-71). While in Scandinavia, Plaintiff introduced Mr. Wey to family business contacts. Those contacts included individuals involved in with Nordica Life Insurance ("Nordica"), a company Mr. Wey believed could be a prospect for a transaction with NYGG. (A.795-96).

After the Scandinavia trip, Plaintiff was offered and accepted an internship with NYGG. She was given the title of director of communications (A.750), a salary of $1,800 per month (later raised to $2,500) (A.1134-35), and began on October 1, 2013 (A.950). As part of the internship, NYGG agreed to sponsor

- 10 -

Plaintiff's visa which would be valid until February 2015, as long as Plaintiff adhered to certain rules and regulations.    (A.1451-54).

During her internship, Plaintiff attended many meetings and events with Mr. Wey including on business trips to Boston (A.792), Dubai (A.794), Luxembourg (A.975), Sweden (A.975), and China (A.794),    She was introduced to public officials such as a United States Congressman, the Mayor of New York City and Princess Madeleine of Sweden.    (*See* A.1932 & 1938) (pictures of Plaintiff with luminaries).

In a January 2014 trip, Plaintiff, her father and Mr. Wey traveled together from Sweden to Nordica's Luxembourg headquarters.    (A.975).    After that visit, the possibility of a NYGG-Nordica transaction became real -- a formal term sheet was executed.    (A.976-78).    Plaintiff wanted to become director of marketing for Nordica once the transaction closed, but there were steps necessary for her to prepare for serving at a director-level (even a marketing position) of a financial services company.    (A.979).    By her own admission, Plaintiff did not know the difference between the most basic financial instruments - a stock and a bond. (A.992 & 1195).

In an effort to remedy her lack of financial services sophistication, Mr. Wey arranged for Plaintiff to train one-on-one in financial products and markets with James Baxter, NYGG's General Counsel, a 40-year veteran of Wall Street and

- 11 -

former head of Asian investment banking for Merrill Lynch.   (A.987-88 & 1339-40).   Plaintiff failed to invest effort into learning.   For example, she did not read the limited material Mr. Baxter (who was also her boss) assigned.   (A.992-93). Plaintiff claimed she desired a career on Wall Street, but also refused the opportunity to attend classes *for free* at Columbia Business School through a friend of Mr. Wey's.   (A.1318-20).

Plaintiff also failed to take steps necessary to address her immigration status and insure she could continue to work legally in the United States.   An immigration lawyer had advised Plaintiff that she was eligible to become a U.S. Citizen, as her mother was born in the United States.   (A.1206).   Despite a claimed desire for a Wall Street career, Plaintiff did not pursue citizenship. Plaintiff, as a billionaire's granddaughter, did not want to be required to disclose the existence of, and pay U.S. taxes on income from, foreign assets, including bank accounts and trusts.   (A.784, 1141, & 1311-13).

**Termination of Plaintiff's Internship at NYGG**

In February 2014, Plaintiff began coming to work late, keeping her office lights off, making constant restroom trips and, on a nearly daily basis, requesting Tylenol from colleagues.   (A.998-99 & 1328-29).   Also in February, Plaintiff began spending significant time in nightclubs and staying out until the wee hours

- 12 -

of the morning on weekdays. On a Monday night (the night before her last day at NYGG), Plaintiff stayed out until 2:45am. (A.1200).

Mr. Wey testified at trial that Plaintiff's refusal to exert effort in her financial training, failure to secure immigration status necessary to legally continue employment, and frequent lateness and requests for pain medication often associated with late night partying and/or alcohol/drug use all contributed to Mr. Wey's decision to terminate Plaintiff from NYGG on April 22, 2014. (A.783 & 998-1001).

On the morning he terminated Plaintiff's employment, Mr. Wey had entered the corporate apartment at which Plaintiff was staying and found a man, now known to be James Chauvet, in the apartment. (*See* A.774-781). Mr. Wey became upset after an unpleasant encounter with Chauvet, told Chauvet he needed to leave the apartment and left to find Plaintiff. (*See* A.774-781). He found Plaintiff and confronted her about how having guests without permission was a violation of their agreement about use of the corporate apartment. (*See* A.774-781). Mr. Wey then terminated Plaintiff from NYGG and insisted she move out of the apartment.[4] (*See* A.774-781).

---

[4] Mr. Wey testified that violation of their agreement on the corporate apartment, combined with other problems listed above, caused him to terminate Plaintiff's employment, but admitted that the timing and manner of delivery of the message should have been handled better. (*See* A.998-1001).

- 13 -

**Plaintiff's Threats Based On Allegations Of Forced Sexual Relations**

On April 29th, 2014, Mr. Wey received an e-mail attaching a letter from the Morelli Alters Ratner law firm[5] that informed him of their representation of Plaintiff and included threats of "embarrassing litigation" and "law enforcement intervention" against Mr. Wey. (A.1939-40). A second e-mail followed on May 7, 2014, once again threatening expensive and embarrassing litigation if he did not pay a settlement and attaching a draft complaint that, among other things, accused Mr. Wey of having forced sexual relations with Plaintiff. (A.1941-45). Mr. Wey refused to meet Plaintiff's demand.

Plaintiff filed a complaint on July 21, 2014, an amended complaint on August 7, 2014, and a second amended complaint on October 24, 2014. (A.40, A.231 & A.283). Each of these filings contain the incendiary (and as discussed below, admittedly false) allegation of forced sexual relations. New York media, including the *New York Post* and *Daily News*, reported Plaintiff's allegations. (A.2031). As a result, paparazzi and reporters ambushed the Wey family at their home, where Mr. and Mrs. Wey's young children lived. (A.917-19).

Mr. Wey denied he had sexual relations of any kind with Plaintiff. (A.733). He reacted to the highly public accusation of having forced Plaintiff to

---

[5] From at least April 29, 2014 through the verdict in at trial, Plaintiff was represented by Morelli Alters Ratner. Plaintiff is now represented by what appears to be a successor, the Morelli Law Firm.

101640256\V-1

have sexual relations by, among other things, having a series of responsive articles published in *The Blot Magazine* -- a tabloid style news source that reports on traditional news stories as well as other matters of more sensational or hyperbolic nature.    According to trial testimony, *The Blot Magazine* had about 50,000 viewers per month.    (A.568).

Following the publicity of Plaintiff's complaint, *The Blot Magazine* published articles that focused pointedly on Plaintiff in a highly negative fashion. The articles, which are the subject of Plaintiff's defamation claim, discussed her attempt to extort $10 million from Mr. Wey through the threat of a lawsuit based on false accusations of forced sex.    They also refer to her visa status, drug and alcohol abuse, excessive partying, criminal behavior, and promiscuity, all in a near-farcical tabloid tone.    (*See* A.1632-40, 1650-1664, 1680-89, 1714-46, 1780-810, & 1842-76).    While stylistically unusual, the articles report on matters of public concern and interest (crime, drug/alcohol abuse, and dangers lurking in the New York City nightclub scene).

**Pre-Trial Litigation Regarding Alleged Defamatory Statements**

As trial approached, Appellants filed a motion for partial summary judgment on Plaintiff's defamation claim, seeking legal rulings on whether the specific statements Plaintiff would be offering at trial could constitute actionable defamation.    (A.24).    Plaintiff agreed that only statements the court found to fit

- 15 -

within one of the four traditional categories of defamation *per se* would be eligible to go to the jury.   (A.459).   On the eve of trial, the parties presented briefing on three sample articles from *The Blot Magazine,* containing multiple allegedly defamatory statements.

The court rendered rulings on the three sample articles on June 11, 2015, determining (among other things) whether they were statements of fact or non-actionable opinion and whether the statements of fact constituted defamation *per se.*  (A.450).   Some of those rulings are the subject of the instant appeal. Thereafter, the parties agreed on the application of those rulings to the statements in other articles, returning to the court for additional rulings on remaining disputes and on the way in which the articles should be redacted.   The court made additional rulings on June 15, 2015.   (A.497-502).   Ultimately, six redacted articles from *The Blot Magazine,* containing 66 allegedly defamatory statements, were admitted into evidence.[6]

**Motion *In Limine* Regarding Plaintiff's Drug Use**

The parties each filed motions *in limine*.   (A.399).   Pertinent here is Plaintiff's motion to exclude her admitted illegal drug use.   (*See* Dk.176 & 185) (portions of which were filed under seal).   She moved to exclude this evidence

---

[6] Both redacted and unredacted versions of the six articles are necessary to review the rulings on which statements were permitted to go to the jury.   Accordingly, both sets of exhibits are included in the Appendix.   (*See* A.1632-99, 1714-1911).

- 16 -

even though she claimed statements *The Blot Magazine* published referring to her illegal drug use were defamatory.    (A.400).

The court granted Plaintiff's motion, excluding evidence of Plaintiff's drug use prior her NYGG employment.    Appellants, thus, were limited in their "truth" defense on Plaintiff's illegal drug use to evidence that Plaintiff used illegal drugs during her six months at NYGG.    (A.403-4).    The ruling deprived Appellants of the possibility of proving Plaintiff's drug use during her employment through evidence of (a) her admitted illegal drug use shortly before that period, combined with, (b) witness testimony regarding Plaintiff's behavior at work at NYGG consistent with illegal drug or alcohol abuse (lateness, keeping office lights off, repeatedly asking for headache medications, etc.).    Appellants challenge that ruling.

After prevailing on the motion, Plaintiff's counsel nevertheless asked multiple trial witnesses whether they *ever* observed Plaintiff use illegal drugs. (A.586 & 680).    The court denied Appellants' "opened-the-door" argument to admit evidence of her admitted pre-NYGG illegal drug use.    (A.951-56). Appellants also challenge that ruling.

- 17 -

**Trial Evidence Relating To Sexual Harassment Liability**

**The Boston And Dubai Trips:**

Plaintiff claimed that she rejected Mr. Wey's sexual advances on two business trips in which separate hotel rooms had not been booked. In November 2013, Plaintiff, Mr. Wey, and a friend of Plaintiff's traveled to Babson College in Boston where Mr. Wey had been invited to speak. (A.1062). In multiple court filings and pre-trial testimony, Plaintiff claimed she was surprised to find two rooms had not been booked and ended up sharing a room with Mr. Wey for one night in a Boston hotel. (A.1144-45). She testified that she rejected a sexual advance from him that night, but then slept in the same bed. (A.1063). Mr. Wey denied he and Plaintiff shared the room and that any advance took place. (A.733).

When confronted at trial with a hotel bill reflecting it was actually a two-night stay, Plaintiff changed her story. She then testified that she and Mr. Wey spent *two* nights in Boston. She claimed to then recall that on the first night she stayed in the bed with Mr. Wey, and on the second night she stayed on a couch. (A.1144-48).

Plaintiff alleged that she again unexpectedly found herself without her own room when she and Mr. Wey were in Dubai on business a month later. (A.1072-73). In multiple court filings and pre-trial testimony, Plaintiff claimed Mr. Wey

- 18 -

made sexual advances during a two night stay in a Dubai hotel.    (A.1156-57).

(Mr. Wey denied this as well.)    (A.733).    When confronted at trial with evidence

-- Mr. Wey's passport -- reflecting that Mr. Wey could not have stayed in Dubai

second night, Plaintiff changed her story -- the alleged advance happened only one

night.    (A.1156-67).

    **Forced Sex Allegation:**    In three court complaints, Plaintiff alleged she

was "forced" to have sexual relations with Mr. Wey.    (A.1163).    She did not

substantiate that incendiary accusation at trial.    On direct examination, she

claimed she had sexual relations with Mr. Wey on four occasions, but did *not*

testify that Mr. Wey forced her.    (A.1076-77).    She admitted on cross-

examination that she was *not* alleging physical force.    (A.1163).

    Plaintiff also changed her story on when these allegedly distressing

encounters occurred.    In multiple court filings and in sworn testimony at a pre-

trial hearing, Plaintiff expressly identified that she and Mr. Wey first had sex in

late December 2013.    When confronted at her deposition with evidence that the

Wey family was on vacation in Costa Rica in late December, she changed her story

and alleged the encounters began some time in January.    Just three months later,

at trial, Plaintiff claimed that she could not remember any of the dates on which the

alleged sexual encounters took place.    (A.1170-74).

- 19 -

**Plaintiff's January 2014 Conduct Toward Mr. Wey:**    According to Plaintiff's changed story, the allegedly traumatic sexual encounters with Mr. Wey happened in January.    (A.1163).    Plaintiff and Mr. Wey travelled together to her home country of Sweden in late January 2014 and participated in a host of non-business events she arranged (A.1182-1185), taking Mr. Wey to: (1) lunch with her father where she can be seen in a photo sitting next to Mr. Wey, smiling (A.1933); (2) meet her aunt Helena, a member of Swedish parliament, who procured a private tour of parliament for them both (A.1935); and (3) dinner at the suburban home of her close friend's family (A.1936).

## Trial Evidence On Plaintiff's Alleged Injuries

Plaintiff avoided the discovery obligation of producing records relating to her finances by agreeing not to seek economic damages at trial.    (A.383). Plaintiff sought only non-economic damages -- for emotional and reputational injury.    (A.1440).

### Alleged Injury From Sexual Harassment

Plaintiff's emotional distress claim was supported almost entirely through her own testimony about her feelings.    She admitted she did not seek any treatment during or after her employment.    (A.1168).    She attended one therapist session almost a year after leaving NYGG and shortly before her examination by Appellants' expert, Dr. Barbara Ziv.    (A.609).

- 20 -

Plaintiff claimed she did not even tell anyone about the alleged incident in Boston because "it was shameful" (A.1063-64). As for Dubai, Plaintiff testified only that she did not ask for her own room because "I was just in shock and humiliated and ashamed." (A.1073-74). There is no other testimony from Plaintiff, or anyone else, on any alleged injury from these events.

As to allegedly having sex with Mr. Wey, Plaintiff's only testimony concerned her feelings at the time of the incidents themselves -- no lingering feelings, physical issues, or psychiatric symptoms. As to the first incident, she claimed she felt used, weak, and ashamed. (A.1075-76). As to the others, she claimed she felt "more and more weak. That I didn't mean anything. That everything that I felt and thought, that it didn't matter. I felt useless." (A.1077). There is no other evidence of any emotional injury from alleged sexual encounters.

Plaintiff testified that after she was terminated from NYGG, she was in "shock" (A.1105), but also "felt free…. Because I thought that everything was going to be over and that it didn't -- that I wouldn't have to deal with this man in my life ever again." (A.1109). Plaintiff offered no other evidence about her feelings or emotional condition resulting from termination of her employment.

The only other witnesses who testified about Plaintiff's emotional condition during the period in question were her friend, Chemme Koluman and Appellants' expert, Dr. Ziv. Ms. Koluman testified as to a single occasion when, in Mr.

- 21 -

Wey's presence, she noticed Plaintiff being "a little bit uncomfortable" (despite being in their presence often). (A.710). But Ms. Koluman admitted that "[Plaintiff] was happy" about moving into the corporate apartment a couple of weeks after the alleged Boston incident. (A.714). She also testified that she did not find Plaintiff nervous or jumpy around Mr. Wey or notice any tension between them in January 2014, the period during which Plaintiff testified she was coerced into having sex with Mr. Wey. (A.720-21).

Plaintiff did not tell Ms. Koluman about alleged sexual encounters with Mr. Wey until July 2014, after Plaintiff had filed sexual harassment claims accusing him of "forced" sexual relations. Plaintiff "was really upset and sad" and "just broke down and started crying and crying. And I asked her, what's going on, and she could barely get like the words out of her mouth." According to Ms. Koluman, Plaintiff told her that Plaintiff felt "so embarrassed and humiliated and disgusted." (A.729).

Dr. Ziv, an experienced psychiatrist, examined Plaintiff for over five hours in April 2015 and administered a Minnesota Multiphasic Personality Inventory ("MMPI"), a standardized test that assesses (among other things) the presence of psychiatric illness. (A.605-06). Plaintiff did not even mention that she was coerced into sex with Mr. Wey. (A.641-42). Although Plaintiff indicated to Dr. Ziv that she was upset by Mr. Wey's actions, she did not "describe any psychiatric

- 22 -

or psychological or emotional behaviors." (A.605). According to Dr. Ziv, Plaintiff "did not describe any emotional distress[;] [s]he didn't describe that she was depressed … [,] anxious[, or] unhappy[;] [s]he didn't describe really any psychiatric or emotional symptoms." (A.606).

Dr. Ziv opined that Plaintiff did not have any psychiatric or emotional symptoms. (A.606). Dr. Ziv noted that Plaintiff did not display even sub-clinical issues for which persons with concrete emotional distress seek therapy or counseling. (A.612-13). Dr. Ziv concluded that Plaintiff did not suffer any psychiatric symptoms since the time she began working at NYGG and that Plaintiff was "essentially…the same person" after the alleged sexual harassment as she was when arrived in New York. (A.609 & 613). Plaintiff's failure to seek other counseling "is consistent with [Dr. Ziv's] finding that [Plaintiff doesn't] have [psychiatric] problems." (A.605).

Plaintiff took the stand after Dr. Ziv's testimony and did not dispute any of it, including her failure to even mention to Dr. Ziv the allegation she had been coerced or forced to have sex.

### Alleged Emotional Injury From Defamation

As to emotional injury, Plaintiff offered limited testimony regarding her feelings and emotions resulting from allegedly defamatory statements in *The Blot Magazine,* a publication she described as "absurd." (A.1123). Plaintiff testified

- 23 -

that one of the articles made her feel "not good.  It made me feel humiliated…[and] embarrassed."  She found it "just kind of creepy and scary that anyone -- that he -- that Mr. Wey would write this.  And it also made me angry, that everything that's happened, he is the one -- he just gets to continue to try to break me down or destroy my life."  (A.1121-22).

Dr. Ziv testified that Plaintiff suffered no psychiatric condition resulting from *The Blot Magazine* articles, although she agreed Plaintiff was "legitimately upset" by some of the posts.  (A.624, 637-38).  Plaintiff "didn't like the fact that articles were written about her….she wants this to be behind her, she wishes the whole thing never happened," "she wanted things to be taken down off the internet," "she didn't like the fact that they were still on the internet" and she "want[s] to move on with [her] life," but that she did not have any emotional symptoms beyond those.  (A.614, 632-33).[7]

The only other witness to testify about Plaintiff's behavior following *The Blot Magazine* articles was her father, Nils Sundqvist.  Mr. Sundqvist testified that when comparing his daughter at the time of the trial to the period before she worked at NYGG, "she's not as happy as before.  She's not as enthusiastic about the future anymore."  (A.1274).

---

[7]  Dr. Ziv reported that Plaintiff told her during the pre-trial examination, that she felt "paranoid," but at another point during the examination Plaintiff denied feeling paranoid.  (A.614-15).  At trial, Plaintiff did not testify that she felt paranoid at any time.

- 24 -

**Alleged Reputational Injury As To Defamation**

Plaintiff offered no evidence about the *existence* of any business reputation she may have had before starting at NYGG.    As to her educational and work background, Plaintiff obtained a bachelor's degree in media communication from Sweden's Halmstad University.    (A.1038).    During time abroad in Hong Kong she took classes at Hong Kong Baptist University, and worked for a year at Pecto Media, a marketing company in Norway before coming to New York in 2012 on a student visa to study marketing, management, and fashion at Berkeley College. (A.1040-42).

Plaintiff testified that Mr. Wey acknowledged that he hired her because of her "strong language skills," and "prominent family relations and contacts." (A984).    Plaintiff's family connections in Scandinavia helped NYGG pursue a deal with Nordica Life.    There was testimony that Plaintiff's father would become the CFO of Nordica Life if the deal went through.    (A.970).    And Mr. Wey was hoping to have Plaintiff become Director of Marketing at Nordica Life.    (A.797). But Plaintiff showed little interest in learning the business background she would need to succeed in that role, or on Wall Street, even though given opportunities to learn.    (A.992-93 & 1318-20).

- 25 -

Plaintiff also failed to offer any evidence as to the *existence* of a personal reputation, or what her standing in the community was before or after *The Blot Magazine* articles.

Plaintiff offered no evidence of any *injury* to a business or personal reputation (to the extent such reputations existed).   There was no testimony about any actual adverse employment consequences as a result of articles posted in *The Blot Magazine.*   Plaintiff merely speculated that "If I would apply for a job or, if anything, my future employers would see this and what would they think about me and people believe this" (A.1121-22), but admitted that no potential employer told her that anything published in *The Blot Magazine* had an impact on her getting a job.   (A.1240-42)[8]

Plaintiff offered no evidence -- not even in her own testimony -- as to how anyone in her professional or personal life changed their opinion of her as a result of the statements in *The Blot Magazine.*   She did testify that she "lost a lot of friends and people don't want to be around me anymore.   I really don't want to go out and see people either….I have applied for jobs, but I don't feel as confident as I did before.   And I have -- it's been a tough year."   (A.1128-29).   But Plaintiff

---

[8]  Plaintiff testified at trial that she had discussed the articles with a woman at a staffing agency and with a company with which she interviewed.   She was then impeached with prior deposition testimony that no potential employers or staffing agents ever discussed those articles with her.   Plaintiff had no explanation for the inconsistency in her testimony on this point.   (A.1240-42).

- 26 -

reported that she continues to work, to travel with friends, to enjoy her life, and to post pictures of her social life on social media sites. (A.1119, 1235-39 & 2025).

## SUMMARY OF ARGUMENT

On Plaintiff's defamation claim, Appellants ask this Court to vacate the judgment and order a new trial for multiple reasons. The trial failed to follow carefully crafted standards that balance free speech rights with a state's right to protect its citizens from defamation; the jury's finding in Plaintiff's favor abridged Appellants' rights under the First Amendment of the United States Constitution.

First, the court below erroneously instructed the jury to apply a negligence standard of fault, even though the allegedly defamatory statements at issue involved matters "arguably within the sphere of legitimate public concern." Under the broad test established in *Chapadeau,* a grossly irresponsible standard of fault must be applied to such statements. The court below did not consider whether statements about a frivolous lawsuit, drug and alcohol use, or criminal conduct published in *The Blot Magazine,* an internet magazine, fall within the expansive *Chapadeau* test; under well-settled law, they do.

Second, the court below erroneously found statements referring to Plaintiff as an "extortionist" or "blackmailer" to be actionably defamatory, and not opinions, even though such statements were commentary about the merits of Plaintiff's lawsuit. While the court below agreed that such statements ordinarily

- 27 -

are considered opinions as a matter of law, it found the statements to be opinions only if discussion of the lawsuit was in words in close proximity to the statements, violating well-settled law requiring articles to be read as a whole.

Third, the court below erroneously determined that statements referring to Plaintiff's use of illegal drugs and alcohol fall within the defamation *per se* category of injury to trade and profession. The court considered Plaintiff's limited background in entry-level marketing jobs to be the trade or profession "Marketing." The law has not considered such a broad category to be a trade or profession for defamation *per se* purposes. Further, to qualify as injury, the defamation has to concern a particular task or function necessary to the trade or profession. Drug use to a marketing person does not meet that standard.

Fourth, the district court improperly excluded evidence of Plaintiff's admitted illegal drug use because her admission concerned the period prior to beginning work at NYGG. Appellants had the right to present evidence that statements about Plaintiff's illegal drug and alcohol use while at NYGG were true, The excluded evidence supported that defense. For any or all of these reasons, the defamation verdict violated Appellants' First Amendment rights, it should be vacated, and a new defamation trial ordered.

Appellants also seek judgment as a matter of law on Plaintiff's *quid pro quo* sexual harassment claim. Plaintiff contended at trial that she both submitted to

- 28 -

unwelcome sexual contact with Mr. Wey and at other times rejected alleged advances, but Plaintiff cannot prevail. The jury could not have credited Plaintiff's "submission" theory because it found against her on battery. In other words, they could not have found that she submitted to "unwelcome" sexual advances, yet did not suffer "offensive bodily contact" that offended her "personal dignity." And "rejection theory" is unsupported by evidence of injury. The only employment action allegedly taken against her for alleged rejection of advances was employment termination, and she offered no testimony that she suffered any emotional injury -- the only injury she pursued on this claim -- as a result of termination.

Should judgment not be granted on Plaintiff's sexual harassment claim, Appellants seek a further remittitur of the compensatory damages. The only evidence Plaintiff offered of emotional injury supported no more than garden variety emotional distress. The district court properly found the jury's $500,000 award deviated materially from comparable cases, but reduced the award only to $150,000, the upper end of the range for garden variety emotional distress. But unlike claims at that level, Plaintiff suffered no physical manifestations or psychiatric symptoms. Her claim is comparable to cases at the $30,000 level or lower.

- 29 -

The compensatory damages for defamation should be remitted down as well. The jury's award of $1,500,000 was excessive because Plaintiff's emotional injury, again, was only garden variety. And Plaintiff cannot recover substantial damages for injury to business reputation because she presented no supporting evidence, a requirement under well-settled defamation law. The court below declined to reduce this award, contending that a college degree and presumed promising future is enough to award such damages. That ruling is contrary to well-settled law; one cannot presume substantial damages for loss of reputation. The proper damages, based on comparable cases, is no more than $90,000.

Finally, while properly finding no more than a 1:1 punitive to compensatory damages ratio would be constitutionally proportional, the court below improperly calculated the remittitur of punitive damages. The three Appellants were held jointly and severally liable for $1,500,000 in compensatory damages. It was improper to use that entire amount for each Appellant when applying the 1:1 ratio. While the Supreme Court and this Court have not considered this issue, the Eighth Circuit's rule -- using the *pro rata* share of each jointly and severally liable defendant -- should be applied here. Applying a 1:1 ratio, the Court should order a further remittitur such that, for example, if the compensatory award is remitted to $90,000, then punitive damages should be remitted to $30,000 per Appellant.

- 30 -

# ARGUMENT

## I. THE DEFAMATION JUDGMENT SHOULD BE VACATED AND A NEW TRIAL ORDERED

### A. The Court Below Erred In Applying Mere Negligence Instead Of A Grossly Irresponsible Standard Of Fault

The court below instructed the jury:  "The fifth element of Ms. Bouveng's defamation claim is that the defendant you are considering acted negligently in publishing the statement.  To establish negligence, a plaintiff must prove that when the defendant published the statement, the defendant failed to use reasonable care under the circumstances to verify its accuracy."  (A.1435).

The court below provided no reasoning for rejecting Appellants' request for the "grossly irresponsible" standard in a ruling that takes up less than a trial transcript page.  (A.1356).  That ruling was error that necessitates reversal and remand for a new trial on the defamation claim.  The standard of review for jury instructions is *de novo*.  *See United States v. Quattrone,* 441 F.3d 153, 177 (2d Cir. 2006).

#### 1. "Grossly Irresponsible" is Required For Matters "Arguably Within The Sphere Of Legitimate Public Concern"

Under the Supreme Court's decision in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974), Plaintiff, as a private person asserting an actual damages defamation claim, does not have to prove defamatory statements were made with actual malice, the fault standard imposed in *New York Times v. Sullivan*, 376 U.S. 254

- 31 -

(1964), upon public officials (later expanded to public figures). In *Gertz*, the Supreme Court held that "no fault" defamation liability violates the First Amendment, but the Constitution does permit states to exercise their discretion in private plaintiff defamation cases seeking actual damages so long as the required fault level is at least negligence. 418 U.S. at 341-51.

In *Chapadeau v. Utica Observer-Dispatch, Inc.*, the New York Court of Appeals, accepting the invitation in *Gertz,* provided greater freedom of speech protection by requiring that private defamation plaintiffs prove a higher fault standard than negligence. The *Chapadeau* court struck a "fair balance between the interests of the community in free circulation of information and those of individuals in seeking recompense for harm done by the circulation of defamatory falsehood."[9] Specifically, *Chapadeau* held that private plaintiffs must prove a publisher's gross irresponsibility "where the content of the article is arguably within the sphere of legitimate public concern . . . ." 38 N.Y.2d at 199.[10]

### 2. Many Of The Alleged Defamatory Statements At Issue Fall Within The Broad *Chapadeau* Test

This Court has held that "what is 'arguably within the sphere of legitimate public concern' has been held to be extraordinarily broad with great deference paid

---

[9] *Konikoff v. Prudential Ins. Co.*, 234 F.3d 92, 101, n.7 (2d Cir. 2000) (quoting *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 153 (1967)).

[10] This Court has made clear that the *Chapadeau* standard applies to media and non-media defendants. *See e.g., Konikoff*, 234 F.3d at 101-2*; Albert*, 239 F.3d at 269.

- 32 -

to what the publisher deems to be of public interest." *Konikoff*, 234 F.3d at 102, n.9. What is considered of public concern is so broad that "decisions in which *Chapadeau* was held inapplicable because the subject matter was not a matter of legitimate concern are extremely rare." *Albert v. Loksen*, 239 F.3d 256, 269 (2d. Cir. 2001). *See Ratajack v. Brewster Fire Dep't, Inc.*, 2016 WL 1274581, at *27 (S.D.N.Y. Mar. 31, 2016) (reaffirming that cases failing to meet *Chapadeau* standard are *extremely rare*); *see also Huggins v. Moore,* 94 N.Y.2d 296, 303 (1999) ("Absent clear abuse, the courts will not second-guess editorial decisions as to what constitutes matters of genuine public concern.")

Despite the "extraordinarily broad standard" of what is "arguably within the sphere of legitimate public concern," the court below provided no reasoning as to why this case supposedly presented one of the *extremely* rare instances in the forty years since *Chapadeau* that the statements at issue fell outside the standard. (A.1355-56). Indeed, in imposing a negligence fault standard as to *all* the alleged defamatory statements, the court below held that an "extremely rare" occurrence happened not once, but multiple times in this case alone. That decision was error.

### a. Statements Referring To Plaintiff As An Extortionist Fall Within The Public Concern Test

Among other things, *The Blot Magazine* articles reported that Plaintiff attempted to extort money by falsely accusing Mr. Wey of forcing plaintiff to have sexual relations and demanding a settlement of $10 million. (*See* A.1650). The

- 33 -

purported legitimacy of Plaintiff's allegations of forced sexual relations were covered at length in the *New York Post* and *The Daily News* before *The Blot Magazine* articles ran.   (*See* A.724-35 & 2031).   *See Ratajack*, 2016 WL 1274581, at *34 ("Here, there can be little question that the content was arguably in the sphere of legitimate public concern; indeed, Defendants attach a newspaper article concerning Plaintiff's filing of the instant lawsuit.").

In applying a negligence standard to these "extortion" statements, the court below did exactly what governing law instructs courts not to do -- override editorial judgments in deciding what is a matter of public concern.   In other words, the court may not have realized that it was drawing, unfairly, a distinction between what the *New York Post, The Daily News, and The Blot Magazine* chose to publish.

Appellants recognize that *The Blot Magazine* has a style even more sensationalist than the *New York Post* or *The Daily News* and that the articles at issue included hyperbolic details one might not see in periodicals of general distribution.   However, under governing law, style or penchant for the sensational is of no moment.   In *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586 (1984), the New York Court of Appeals rejected an argument that alleged defamatory statements "detour[ed] from legitimate public concern into the realm of mere gossip and prurient interest" as "precisely the sort of line-drawing . . . best left to the judgment

- 34 -

of journalists and editors . . . ." *Id.* at 595.   *See Konikoff*, 234 F.3d at 102 n.9

("great deference [is to be] paid to what the publisher deems to be of public

interest").

In this case, an internet magazine discussed extortion through bad faith

allegations or frivolous complaint filing.   The court below should have been

treated those statements as matters of public interest, requiring Plaintiff to prove

Appellants' grossly irresponsible, not merely negligent, in publishing them.   By

not requiring plaintiff to meet that higher fault standard, the court ran afoul of

Appellants' right to freedom of speech under *Chapadeau* and its progeny.

### b.   Statements About Drug Use At Work Fall Within The Public Concern Test

The jury was presented with allegedly defamatory statements referring to

plaintiff being fired for alleged illegal drug use while working at NYGG.   (*See*

A.1692).   The issue of illegal drug use has to fit within the *Chapadeau* definition

of matters "arguably within the sphere of legitimate public concern."   Numerous

cases have so held.   *See, e.g. Greenberg v. CBS, Inc.*, 69 A.D.2d 693, 706 (2d

Dep't 1979) ("[N]o doubt that   . . . the topic of amphetamine abuse is 'within the

sphere of legitimate public concern' . . . "); *see also Virelli v. Goodson-Todman*

*Enters., Ltd.*, 142 A.D.2d 479, 484 (3d Dep't 1989) (drug abuse "unquestionably a

newsworthy item").

- 35 -

Articles at the heart of the defamation claim here addressed the illegal drug use problem.   (*See* A.1632, 1635) (*The Blot Magazine* article with "Exposed" and "Guns, Drugs, Violence" in the title, noting, "[b]ehind the flashy neon lights and rap music in New York's nightclubs are often problems of prostitution, illegal drug use, [and] illegal gun possessions [sic]").   Again, the tabloid style cannot affect the analysis.   As the Court in *Nelson v. Globe Int'l, Inc.*, 626 F.Supp. 969, 976 (S.D.N.Y. 1986) stated, "[i]nclusion [of a statement] in a publication that some would term a sensational tabloid [does not] entitle it to any less protection." These statements required a "grossly irresponsible" standard as well.

### c.   Statements Referring To Criminal Conduct Fall Within The Public Concern Test

Plaintiff also claimed she was defamed by statements referring to commission of the crimes of visa fraud (A.1739), bank fraud (A.1782) and narcotics sales (A.1784).[11]   Such statements fall squarely within the *Chapadeau* test for matters of public concern.   *See Pollnow v. Poughkeepsie Newspapers, Inc.*, 107 A.D.2d 10, 15 (2d Dep't 1985), *aff'd* 67 N.Y.2d 778 (1986) ("a private person's alleged criminal conduct . . . [is] of legitimate public concern."); *Brown v. Johnson Newspapers Corp.*, 84 A.D.2d 636 (3d Dep't 1981) (criminal conduct of private citizen matter of public concern).   The district court found the statements

---

[11]   The district court also interpreted some statements about "extortion" to be unrelated to lawsuit and, thus, actionable as statements about the crime of extortion.

- 36 -

to be about serious crimes, but apparently failed to consider that articles addressing serious or even minor crimes are matters of public concern. *See, e.g., Sheridan v. Carter*, 48 A.D.3d 447, 481 (2d Dep't 2008) (allegation private person physically abused domestic help a matter of public concern); *Maloney v. Anton Cmty. Newspapers, Inc.*, 16 A.D.3d 465, 466 (2d Dep't 2005) (criminal menacing a matter of public concern); *Quezada v. Daily News*, 130 Misc. 2d 842, 845 (Sup. Ct. App T. 1st Dep't 1986) (criminal drug distribution).

Critically, the accuracy of the reporting is not relevant to which standard of fault should be applied; accuracy is considered in the application of the facts to the standard, not in the selection of a standard. *See Knuff v. Metro, Int'l S.A.*, 91 A.D.3d 915 (2d Dep't 2012) (photograph of innocent 10 year-old pausing to look at crime scene made to look as if child was gang member nonetheless held to address matter of public concern); *Morsette v. Final Call*, 278 A.D.2d 81, 82 (1st Dep't 2000) (superimposing picture of plaintiff in a manner that made it seem that she was a criminal prisoner matter of public concern); *Nelson*, 626 F.Supp. at 976 ("The subject matter of the article, not its accuracy, controls the initial inquiry under *Chapadeau*").[12]

---

[12] Plaintiff also complains of being defamed by being called a prostitute. As with the other topics addressed, articles about prostitution have been held to address matters of public concern. *See Goldman v. New York Post Corp.*, 58 A.D.2d 769 (1st Dep't 1977).

- 37 -

### 3. If Any Of The Alleged Defamatory Statements Meet The Public Concern Test, A New Trial Must Be Ordered

In the verdict form, the jury was asked only: "Has Ms. Bouveng proven . . . that she was subject to defamation by [defendants]" (A.2035). There is no way to know which, or how many, of the allegedly defamatory statements the jury found gave rise to defamation liability.

If the Court finds any of the alleged defamatory statements satisfy the extraordinarily broad public concern test requiring greater freedom of speech protection in New York, the entire defamation verdict must be reversed and a new trial ordered. Any other result creates too great of a risk that Appellants will have been held liable for a statement in an article addressing an issue of public concern on a mere negligence standard -- something New York law has expressly forbid for over four decades.

### 4. Irrespective Of Whether the Public Concern Test Was Met, The "Grossly Irresponsible" Standard Should be Applied

Even if this Court finds all of the alleged defamatory statements outside the *Chapadeau* test, New York law would not require adoption of a mere negligence standard. The New York Court of Appeals has not spoken to the issue of what standard would apply if the alleged defamatory statements did not fall within *Chapadeau* test. *Albert*, 239 F.3d at 270 n.12 (finding analysis of intermediate appellate court applying mere negligence standard non-compelling and expressing

- 38 -

reluctance to view it as binding). *See also Medcalf v. Walsh,* 938 F.Supp.2d 478, 487, n.5 (S.D.N.Y. 2013) (citing *Albert*). With no controlling precedent, this Court, sitting in diversity, must predict what New York's highest court would do were the issue before it. *Michalski v. Home Depot, Inc.,* 225 F.3d 113, 116 (2d Cir. 2000).

In *Albert*, the alleged defamation involved statements made to a very limited audience; still this Court evinced reluctance to approve a negligence standard under New York Law. *See* 239 F.3d at 270. That reluctance speaks volumes and mitigates in favor of rejecting the mere negligence standard here. *The Blot Magazine,* with 50,000 viewers per month (A.568), did not have a limited audience.

Defendants respectfully suggest that the direction of New York law, and the better public policy, is to eliminate the need to delve into what is a public concern, something courts are tempted to do given the possibility of differing applicable standards. A rule that provides the greater degree of freedom of speech protection in private plaintiff defamation cases, at least in cases involving media outlets (whether it be the *New York Times*, *New York Post*, or *The Blot Magazine*) accused of defamation, would eliminate that temptation. Such a holding would give force to a point Judge Sack makes in his learned treatise: "[the] editorial role is one for which courts are not particularly well equipped, and which the Supreme

- 39 -

Court has, from time to time, explicitly eschewed." Robert D. Sack, Sack on Defamation § 6:6 (4th ed. 2010) (citing *Gertz*, 418 U.S. at 347).

**B.     The Court Should Have Considered The Entire Article As Context When Determining Whether Statements Were Opinions**

Plaintiff's defamation claim rests in part on multiple statements in articles published in *The Blot Magazine* referring to her as an "extortionist" or "blackmailer," statements that could fall within the "serious crime" category of defamation *per se.* The alleged extortion concerned Plaintiff's filing of this action and her efforts, with counsel, to obtain a $10 million settlement under threat of public humiliation and of referring Mr. Wey to law enforcement. Appellants sought to exclude those statements under well-settled law that accusations of extortion or blackmail are considered non-actionable opinions when made in connection with reference to a lawsuit.

The court below agreed, finding some of the statements to be opinions. But the court limited the scope of its ruling to only those statements about extortion that were, in the context of a multi-page article, immediately surrounded by a reference to the lawsuit. (A.467). This was error. The governing law requires the reviewing court to treat articles as a whole. As a result, 20 statements in four articles were offered into evidence as potentially defamatory statements of fact when, as a matter of law, they were non-actionable opinions the court below should have refused to allow to go to the jury.

- 40 -

### 1. All Statements Referring To Plaintiff As An Extortionist In Articles Discussing The Lawsuit Are Opinions

Determining whether particular words are defamatory "presents a legal question to be resolved by the court[s] in the first instance." *Aronson v. Wiersma,* 65 N.Y.2d 592, 593 (1985). This Court, relying upon long-standing New York law, has instructed as follows:

> [C]ourts must give the disputed language a fair reading in the context of the publication as a whole. Challenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing.
>
> \*\*\*
>
> Finally, the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed. It is the meaning reasonably attributable to the intended reader that controls.

*Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 177-78 (2d Cir. 2000) (internal citations and quotations omitted).[13]

The district court agreed that its role was to review all statements Plaintiff alleged were defamatory to determine whether they are actionable and should be submitted to the jury. Given the number of articles potentially at issue, the court

---

[13] While this Court in *Celle* failed to state expressly the standard of review employed in reviewing the lower court's rulings, the opinion reflects a *de novo* review. That is not surprising, given that the questions being resolved in the first instance are "legal." Accordingly, a *de novo* review is the applicable standard of reviewing rulings on whether statements can constitute actionable defamation. *See Lin v. Holder,* 365 F. App'x 311, 312 (2d Cir. 2010).

received briefing and held a hearing before trial on three sample articles.    The

court issued rulings on each statement in the three articles, explaining the legal

basis for such rulings.    (A.450-52).    The parties then applied those rulings to

statements in other articles, going back to the court for additional rulings on a few

specific statements for clarification.    (A.490-91).

### a.    The Law Required The Court To Consider The Articles As A Whole For Proper Context

Expressions of opinion are privileged and, no matter how offensive, may not

be the subject of a defamation action.    *Immuno AG. v. Moor-Jankowski*, 77

N.Y.2d 235, 243 (1991); *Millus v. Newsday, Inc*., 89 N.Y.2d 840, 842 (1996).

The Supreme Court summarized the underlying theory behind this principle:

> Under the First Amendment there is no such thing as a
> false idea. However pernicious an opinion may seem, we
> depend for its correction not on the conscience of judges
> and juries but on the competition of other ideas.    But
> there is no constitutional value in false statements of fact.

*Gertz*, 418 U.S. at 339-40.

The key inquiry in differentiating an actionable false statement from non-

actionable, constitutionally protected opinion is whether the challenged expression,

however labeled by defendant, "would reasonably appear to state or imply

assertions of objective fact."    *Immuno AG*., 77 N.Y.2d at 243.    The factors to

consider include: (1) whether specific language at issue has a precise meaning

which is readily understood; (2) whether statements are capable of being proven

- 42 -

true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact. *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995).

Under New York law, this fact versus opinion analysis is distinctly context oriented. The Court must consider the content of the whole communication, its tone and apparent purpose. *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 145 (1992). These factors are particularly important with the exhibits at issue here -- articles in *The Blot Magazine*, a publication with a sensationalist flavor that uses colorful and imprecise language, composite images, and other stylistic features to create its own tone.

Courts, thus, cannot begin by examining each challenged statement individually and determining in isolation whether specific words are couched in loose, figurative or hyperbolic language. *Immuno AG*. 77 N.Y.2d at 254-55. *See also Mann v. Abel*, 10 N.Y.3d 271, 276 (2008). Doing so "without knowing the full context in which [challenged statements] were uttered, indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context." *Immuno AG*. 77 N.Y.2d at 255.

- 43 -

**b.  Statements About Extortion Or Blackmail In The Context Of Legal Proceedings Are Considered Opinions**

In the context of discussing legal proceedings, statements accusing a party of extortion or blackmail routinely have been held to constitute non-actionable opinions.   *See Melius v. Glacken*, 94 A.D.3d 959, 959-60 (2d Dep't 2012) ("[A] reasonable listener would have believed that calling the plaintiff an 'extortionist' who is seeking 'to extort money' was conveying the defendant's opinion as to the merits of the plaintiff's lawsuit and was not a factual accusation of criminal conduct."); *Trustco Bank of New York v. Capital Newspaper Div. of the Hearst Corp.*, 213 A.D.2d 940, 941-43 (1995) (use "extortion" in newspaper interview while discussing plaintiff's legal proceedings was "pure opinion"); *Marchuk v. Faruqi & Faruqi, LLP*, 100 F.Supp.3d 302, 314 (S.D.N.Y. 2015) (characterizing lawsuit as "extortion" not actionable).

*The Blot Magazine* articles contain numerous statements describing Plaintiff as an "extortionist" or part of an extortion or blackmail plot.   These are vague accusations that, in most circumstances, reference the lawsuit in which Plaintiff accused Appellants of sexual harassment and/or Plaintiff's demand, through her attorneys, for a $10 million settlement.   For example, in an article entitled, "Hanna Bouveng, Fake Sexual Harassment Accuser Fled America," the following appears on the first page:

- 44 -

> Hanna Bouveng . . . is on the run.   After blackmailing
> an investigative journalist and Wall Street financier
> Benjamin Wey . . . with a failed $10 million extortion
> plot, frivolous sexual harassment accuser Hanna
> Bouveng . .. caught on the run fleeing America . . . .

A.1650 (internal links to websites omitted).[14]

The article then discusses Plaintiff's lawyers and, on page three, expressly

discusses the lawsuit itself:

> Further, according to public records, there is not a shred
> of evidence that has been presented to the federal court
> that would support any of Hanna Bouveng's "sexual
> harassment" allegations against the well-regarded
> investigative reporter and Wall Street financier.

A.1652.

Read in context, and not in insolation, *The Blot Magazine* statements about

an "extortion plot," or about Plaintiff and her counsel being "extortionists" or

"blackmailers," would not lead a reasonable reader to view the statements as

anything more than Appellant's opinion about the lawsuit's merits.   *See Gentile v.*

*Grand St. Med. Assocs.*, 79 A.D.3d 1351, 1353 (3d Dep't 2010) (statements

following a lawsuit settlement that it was a "shame" several people in the

community wanted to make "easy money" and found a "few lawyers" who made a

living "exploiting hard working people and corporations" were opinion).

---

[14]   Given the redactions the district court deemed necessary to present only the
defamatory statements in context to the jury, unredacted versions of the articles are
needed to give this Court the necessary context for evaluating the lower court's
rulings below.   (*See* A.1632-1699, 1714-1911).

- 45 -

### 2. It Was Error To Find Extortion Statements Factual Unless Surrounded By Words Discussing The Lawsuit

The district court agreed, generally, with the premise that statements about Plaintiff's extortion were non-actionable opinions.    Citing the three cases discussed above (*Trustco Bank, Melius,* and *Marchuk*) with approval, the court held:

> Accordingly, statements in the law referring to plaintiff as an "extortionist" or accusing her of committing extortion are not actionable if it is clear from the context of the article that the statements are referring to her lawsuit or threatened lawsuit.    Where such statements are not clearly linked to her lawsuit or threatened lawsuit, however, the statement is actionable as defamation *per se* because extortion is a "serious crime" under both federal and New York law.

A.465-66.

But when asked what it means to be "clearly linked" to her lawsuit, (A.485-86), the district court drew a distinction that runs afoul of the requirement to read articles as a whole:

> Just so the record is clear, Plaintiff's Exhibit 76 is a 14-page document.    The point is it is a lengthy posting. The fact that if someone were to read through the whole document they might find that there was a lawsuit involved, that is not the standard.    I can't assume that someone is going to read the whole article.    I have to look at the statement in the context of, first of all, the words immediately around it.
>
> I recognize I have to consider the whole article.    But for reasons that I tried to indicate, the hammering of the term "criminal," "co-conspirator," "plot," that suggests a

crime.   It is my conclusion that there is enough here that the jury is entitled to consider whether that is what was communicated, that the plaintiff together with her alleged co-conspirator had committed the crime of extortion.

To the extent that you are arguing that at some later point in the article there is a reference to the lawsuit, I don't conclude that that is a basis for disturbing my finding that the earlier statements, it would be reasonable to conclude by a reader, accuse her of having committed a crime of extortion.

A.486.[15]

As a result, the jury was presented with twenty statements about extortion or blackmail from four separate exhibits as potentially defamatory even though those four articles included a discussion of the lawsuit.[16]   This ruling runs afoul of the New York law requirement that the meaning of allegedly defamatory statements be considered in the context of an article as a whole.

---

[15]  Plaintiff's Exhibit 76 is one of the three sample articles the district court reviewed for purposes of making rulings on categories of statements.   Plaintiff chose not to introduce it into evidence, so only an unredacted version of Exhibit 76 is included in the Appendix.   (A.1700-13).

[16]  Exhibit 63 discusses "blackmailing an investigative journalist" and "saga of extortion plot" (A.1650) in same article as "Hanna bouveng's frivolous 'sexual harassment' lawsuit" and discussion of lack of evidence in suit (A.1651-54); Exhibit 64 discusses "$10 million blackmail attempt" and "extortion attempt" (A.1683) in same article as discussion of "not a shred of evidence that has been presented to the federal court" and "headline-grabbing lawsuit" (A.1682-83). Exhibits Ex. 85 (A.1714-46) and 98 (A.1842-76) contains multiple statements referring to extortion and blackmail (ten in exhibit 85 and 6 in exhibit 98) six separate statements interspersed with multiple paragraphs discussing the lawsuit.

- 47 -

As discussed above, courts must distinguish between factual assertions and nonactionable expressions of opinion in light of "the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross v. New York Times Co.* 82 N.Y.2d 146, 153 (1993) (internal quotations omitted). "It has long been our standard in defamation actions to read published articles in context to test their effect on the average reader, not to isolate particular phrases but to consider the publication as a whole." *Immuno AG*, 77 N.Y.2d at 250. *See also Celle*, 209 F.3d at 178 ("The 'essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were . . . written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion.'") (quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986))); *Flamm v. American Ass'n of University Women*, 201 F.3d 144, 153 (2d Cir. 2000) ("Since *Steinhilber*, the Court of Appeals of New York has consistently focused its analysis on the overall context in which the complained-of assertions were made.").

The district court recognized its duty to consider the articles in full (A.486 quoting *Celle*), but then disregarded that requirement in only considering statements concerning extortion/blackmail "in the context of, first of all, the words

- 48 -

that immediately surround it." (A.486).    That was error.    *See November v. Time Inc.*, 13 N.Y.2d 175, 178 (1963) ("If every paragraph had to be read separately and off by itself plaintiff would fare pretty well.    But such utterances are not so closely parsed by their readers or by the courts and their meaning depends not on isolated or detached statements but on the whole apparent scope and intent.").

In *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 42 (1st Dep't 2011), the court "consider[ed] the email in question as a whole," including hyperlinked articles and photographs as part of the context in "[i]nternet communications, as distinct from that of print media." *Id.* at 43.    With that context, the court found that "the content of the whole communication, its tone and apparent purpose and its very anonymity, would signal to any reasonable reader that the writer's purpose is to foment questioning . . . . Thus, the communication is not actionable." *Id*. at 45 (internal citation omitted).    This Court has indicated that the "whole context" rule could even require reading related publications together. *Celle*, 209 F.3d. at 187.

Again, without jury findings on each statement, the error of allowing the jury to consider statements of opinion as allegedly defamatory infects the entire jury verdict on defamation, curable by a new trial only.

### C. The Court Below Erred In Finding Multiple Statements Fell Within The Injury To Trade or Profession *Per se* Category

As noted above, the parties agreed that only statements the district court ruled constituted defamation *per se* would be deemed sufficient for jury consideration. (A.459). Over Appellants' objections, the court below held: (1) "marketing" a sufficiently established and specific profession capable of supporting a defamation *per se* claim for trade/profession injury, and (2) statements in *The Blot Magazine* referring to Plaintiff's illegal drug/alcohol use constituted trade/profession defamation *per se*. (*See* A.21 & 471). Both rulings were error.[17]

### 1. A "Marketing" Background Does Not Constitute A Trade Or Profession For Defamation *Per Se* Purposes

There is a threshold question of whether Plaintiff had a trade or profession. A generalized background in "marketing" does not constitute a trade or profession capable of supporting a claim of defamation *per se*. The court below erred in instructing the jury otherwise.

In *Liberman v. Gelstein*, 80 N.Y.2d 429, 436 (1992), the New York Court of Appeals described this defamation *per se* category as being "*limited* to defamation of a kind incompatible with the proper conduct of *the* business, trade, profession or office itself." *Id.* at 436 (emphasis supplied). The *Liberman* Court drew a

---

[17] As discussed above, legal rulings determining, in the first instance, whether statements could constitute defamation are to be reviewed *de novo*.

distinction between "'charges against a clergyman of drunkenness and other moral misconduct [that] affect his fitness for the performance of the duties of his profession [and] the same charges against a business man or tradesman do not so affect him.'" *Id.* (quoting Restatement § 573, comment *c).* The New York Court of Appeals and the Restatement drafters sent a message that not all jobs are trades or professions capable of supporting defamation *per se* claims.

Judge Koetl's analysis in *Kerik v. Tacopina,* 64 F.Supp.3d 542 (S.D.N.Y. 2014) is instructive. New York courts have "criticized [defamation] *per se* . . . and consequently have interpreted the categories [of defamation *per se*] restrictively." *Id.* at 569-70; *see Jewell v. NYP Holdings, Inc.*, 23 F.Supp.2d 348, 398 (S.D.N.Y. 1998) (New York law "quite restrictive" in what qualifies as defamation *per se*); *accord Ward v. Zelikovsky*, 643 A.2d 972, 984 (N.J. 1994) (cited in *Kerik* for proposition that "trend should be toward elimination not expansion of the *per se* categories"). Appellants submit that in following New York law, this Court should restrict, not expand the list of professions capable of supporting defamation *per se* claims and obtain the same result as Judge Koetl reached. *See Kerik*, 64 F.Supp.2d at 570 (rejecting claim of defamation *per se* liability for failure to identify qualifying trade or profession).

New York law should not be expanded to include "marketing" as a profession for defamation *per se* purposes. Or if it were to be considered a

- 51 -

profession, the Court should not consider someone like Plaintiff, who had minimal post-college work experience in marketing, as being a member of such a profession.

### 2. Statements Regarding Alcohol/Drug Use Are Not Specific Enough To Constitute Trade or Profession Injury

Even if this Court were to treat Plaintiff' as being in the "marketing profession," for statements to constitute defamation *per se,* they have to detail, specifically, an inability to perform specialized tasks identified with that particular profession.   As Judge Sack noted:

> Disparaging words must affect the plaintiff in some way
> that is peculiarly harmful to one engaged in his trade or
> profession; disparagement . . . equally discreditable to all
> persons, is not enough unless the particular quality is
> peculiarly valuable to the plaintiff's business or
> profession in which he is actually engaged.   It is not
> sufficient that the words be merely injurious to one
> whatever his pursuit, but they must prejudice him in the
> special profession or business in which he is actually
> engaged.

Robert D. Sack, Sack on Defamation § 2:8.2 n.466 (4th ed. 2010) (citations and quotations omitted).   The lower court ruled otherwise, generally concluding that drug use/alcohol use satisfied the injury to trade/profession defamation *per se* test. This runs afoul of Judge Sack's point and contradicts the specific examples in the Restatement (Second) of Torts § 573 comment c (1977) relied upon in *Liberman.* The Restatement notes that labeling a physician or clergyman a drunk would

- 52 -

qualify as defamation *per se,* but that the very same allegation against a "business man or tradesman" would not.

The determinative question, thus, is whether the statement concerned conduct that would make specific requirements of a trade or profession difficult to perform. If allegations of being a drunk would not constitute defamation *per se* as against a business man or tradesman, then *a fortiori* they would not constitute defamation *per se* against a marketer.

### D. The Court Below Erroneously Excluded Evidence of Plaintiff's Admitted Illegal Drug Use

It is axiomatic that when a plaintiff sues for defamation, evidence concerning truth of those statements is relevant and admissible. *See Goldberg v. Levine*, 949 N.Y.S.2d 692, 693 (2d Dep't 2012) ("[t]ruth is an absolute defense to an action based on defamation") (internal citations omitted); s*ee also Chapman v. Journal Concepts, Inc.,* 401 F. App'x 243, 245 (9th Cir. 2010) (evidence of Plaintiff's drug use admissible as relevant to the truth of purported defamatory statements); *El-Bakly v. Autozone, Inc.*, No. 04 C 2767, 2008 WL 1774962, at *12-13 (N.D. Ill Apr. 16, 2008) (evidence of plaintiff's drug use admissible where alleged defamatory statement related to plaintiff's drug use); *Rosemond v. Nat'l R.R. Passenger Corp.*, No. 85 Civ. 5661(IBC), 1986 WL 10711, at *6 (S.D.N.Y. Sept. 19, 1986) (proof of plaintiff's drug use relevant where the alleged defamatory statements about plaintiff's drug use).

- 53 -

Over Appellants' objections, the district court granted Plaintiff's motion *in limine* to exclude Plaintiff's admitted use of illegal drugs before starting at NYGG, permitting only evidence of illegal drug use during employment.    (A.400-6). That ruling was error.[18]    Appellants were entitled to introduce evidence demonstrating alleged defamatory statements referring to Plaintiff's drug use were true and, thus, not defamatory.

Even if the only "drug" issue in the case was whether Plaintiff used illegal drugs during her NYGG employment, her admitted use of illegal drugs shortly before beginning employment was relevant to whether she continued to do so during employment.    The jury could have found statements referring to Plaintiff's illegal drug use to be true by combining this evidence of pre-employment drug use with (1) evidence that during Plaintiff's employment she was known to party late into the night at New York nightclubs -- venues known as havens for illegal drug use, and (2) testimony regarding behavior at work consistent with illegal drug or alcohol abuse (repeatedly arriving late, leaving lights off while in her office, and requesting pain-relief medication).    The jury never got that chance.

Further, Plaintiff's counsel elicited from a number of witnesses that they had *never* seen Plaintiff use illegal drugs.    (A.586 & 680).    This questioning was *not*

---

[18]  The district court's evidentiary rulings should be reviewed under an abuse of discretion standard.   *See Abascal v. Fleckenstein,* No. 14-1591-CV, 2016 WL 1720421, at *2 (2d Cir. Apr. 29, 2016).

- 54 -

limited to Plaintiff's NYGG employment. Patently, Plaintiff opened the door to evidence of drug use outside of the employment period with such questions. But the district court still declined Appellants renewed request to introduce evidence of Plaintiff's prior drug use. (A.951-56).

As this Court has noted, "[t]he rule of opening the door or curative admissibility gives the trial court discretion to permit a party to introduce otherwise inadmissible evidence on an issue (a) when the opposing party has introduced inadmissible evidence on the same issue, and (b) when it is needed to rebut a false impression that may have resulted from the opposing party's evidence." *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir. 1993) (internal quotations and citations omitted). Plaintiff's introduction of evidence of lack of drug use *at any time* opened the door under *Rosa*. The Court below abused its discretion refusing to allow Appellants to "rebut the false impression" Plaintiff created about her pre-employment illegal drug use and introduce evidence of that admitted pre-employment illegal drug use. In so doing, the Court below prejudiced Appellants by allowing a record that was false and misleading.

Since it is impossible to know whether the jury based their verdict upon the alleged defamatory statements about Plaintiff's illegal drug use, erroneous exclusion of critical evidence on that issue warrants a new trial where a fair and accurate record can be presented to the jury.

- 55 -

## II.  PLAINTIFF FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUPPORT HER SEXUAL HARASSMENT CLAIM

Plaintiff's testimony about purported sexual harassment amounted to this oft-changing story that was simply hard to believe: (i) unexpectedly trapped in a hotel room in Boston for *one night* with Mr. Wey, she rejects a sexual advance, but sleeps in his bed anyway; (ii) confronted with evidence that they were in Boston for two nights, Plaintiff suddenly remembers it *was two nights* and that she stayed on the couch on just the second night; (iii) just weeks later, there is only one hotel room for her and Mr. Wey during a Dubai trip, but again conveniently changes her testimony after being confronted with evidence disproving her story; (iv) she is allegedly coerced into having sexual relations with Mr. Wey, but testifies falsely about when this allegedly traumatic event took place until confronted with evidence that such timing was impossible and recants her allegation of force; and (v) allegedly after four such unwelcome sexual encounters, she not only travels with him again, but introduces him to her Aunt in Parliament and takes him to lunch with her father and to a friend's suburban home for dinner.

If the jury had credited Plaintiff's story as told -- that she was coerced into having sexual relations with Mr. Wey -- this jury would have awarded punitive damages for such allegedly reprehensible conduct, and yet it did not.   Nor did it find in Plaintiff's favor on the battery claim.   The jury's verdict appears to be

- 56 -

some kind of compromise, but one that is not supported sufficiently by record evidence and cannot stand.

The court below instructed the jury that there were two possible bases for finding Appellants liable for *quid pro quo* sexual harassment: "(1) [Plaintiff] rejected Mr. Wey's [alleged] unwelcome sexual advances and suffered concrete employment consequences, or (2) [Plaintiff] submitted to his unwelcome sexual advances in order to avoid concrete employment-related consequences." (A.1406). Thus, the verdict could be based on a jury finding that Plaintiff (1) had rejected advances and suffered consequences (a "Rejection" theory), or (2) had submitted to unwelcome advances (a "Submission" theory). No reasonable jury could have concluded that Plaintiff presented sufficient evidence to prove either theory for q*uid pro quo* sexual harassment. The district court's denial of Appellant's motion for judgment as a matter of law was error.[19]

### A.     No Reasonable Jury Could Have Concluded That Plaintiff Submitted To Unwelcome Sexual Contact, But Found Against Plaintiff On Battery

Plaintiff testified she submitted to alleged sexual advances and had sexual relations with Mr. Wey four times on unspecified dates in January 2014. (A.1074-77). The verdict rejecting Plaintiff's assault and battery claims was a

---

[19] Denial of a motion for judgment as a matter of law is reviewed *de novo*. *See Malik v. Carrier Corp.*, 202 F.3d 97, 103 (2d Cir. 2000*)*.

finding that there were no sexual relations or that Plaintiff could not have felt that relations that took place were offensive or unwelcome. Even if the alleged sexual encounters occurred, they could not form the legal basis for *quid pro quo* sexual harassment liability.

Battery, as the court below instructed the jury, occurs when "a person . . . intentionally touches another person, without that person's consent, and thereby causes an offensive bodily contact . . . . " (A.1429). The court explained to the jury that "[a]n offensive bodily contact is one that . . . offends a reasonable sense of personal dignity . . . ." (A.1429). In finding against Plaintiff on a battery claim based on identical alleged conduct, the jury, by definition, specifically rejected the contention that Mr. Wey touched Plaintiff without her consent in a way that caused offensive bodily contact with Plaintiff.

No reasonable jury could conclude that Plaintiff submitted to an *unwelcome* sexual advance by having sexual relations, yet did not suffer any "offensive bodily contact" that offended her "personal dignity." *See Rivera v. Puerto Rican Home Attendants Servs., Inc.*, 930 F.Supp. 124, 133 (S.D.N.Y. 1996) (battery is a "deliberate" touching that is "offensive and *unwelcome*"), citing *O'Reilly v. Executone of Albany, Inc.*, 121 A.D.2d 772 (3d Dep't 1986) (battery includes touching in a sexual manner).

- 58 -

In denying Appellants' motion for judgment as a matter of law, the court below suggested that the jury parsed the instructions and somehow found that Plaintiff had unwelcome sex with Mr. Wey -- unwanted sexual contact -- but, at the same time, did not suffer "offensive bodily contact" that offended her "personal dignity." (A.2089-91). Given the nature of sexual contact, one would have to suspend credulity to consider unwelcome sexual relations to involve no "offensive bodily contact" that offends "personal dignity." The only reasonable interpretation of these inconsistent verdicts is that the jury did not so conclude and, therefore, did not find for Plaintiff on a Submission theory.

The jury's verdict rejecting Plaintiff's claim for punitive damages on the sexual harassment claim corroborates that interpretation. The court below instructed the jury that punitive damages on the sexual harassment claim required proof of reckless indifference to Plaintiff's rights. Thus, the jury had to find Mr. Wey did not act with reckless indifference to Plaintiff's rights -- a rejection of Plaintiff's testimony that she was coerced into having sexual encounters she did not welcome. The only possible, reconcilable legal basis for interpreting the verdict on *quid pro quo* sexual harassment is the Rejection theory. But Plaintiff's evidence failed on that theory as well.

- 59 -

### B. The Evidence Does Not Establish Sexual Harassment Based Upon Alleged Rejection Of Unwelcome Sexual Advances

The court below instructed the jury that Plaintiff could prevail on her *quid pro quo* sexual harassment on a Rejection theory, " by proving "she rejected Mr. Wey's [alleged] unwelcome sexual advances and suffered concrete employment consequences." (A.1406). The court further instructed that Plaintiff must prove that "Mr. Wey took concrete employment actions regarding her employment" and that in taking the concrete action, Mr. Wey "was motivated in part by her reaction to his [alleged] unwelcome sexual advances . . . ." (A.1406-7). As the court below properly found, the only concrete employment action on which Plaintiff could base her claim is termination of employment. (A.2092). Required to present any evidence of injury flowing from that termination, Plaintiff failed.

New York law requires plaintiffs to prove damages to succeed on a NYSHRL discrimination claim. *Cullen v. Nassau County Civil Serv. Comm'n*, 53 N.Y.2d 492, 497-98 (1981) (damages may not be awarded "solely upon a finding that a discriminatory act occurred . . . . "); *see United States v. Vulcan Soc'y, Inc.*, 897 F.Supp.2d 30, 43 (E.D.N.Y. 2012) (citing *Cullen* for proposition that "New York law requires a plaintiff to prove actual emotional injury caused by the discrimination.") Courts have reached the same result in cases brought under both Title VII and the NYCHRL. *See MacMillan v. Millennium Broadway Hotel*, 873 F.Supp.2d 546, 560 (S.D.N.Y. 2012) ("Damages for emotional distress,

- 60 -

however, cannot be assumed simply because discrimination has occurred."); *see also Lopes v. Caffe Centrale LLC*, 548 F.Supp.2d 47, 55 (S.D.N.Y. 2008) (plaintiff must prove entitlement to compensatory damages).

Plaintiff stipulated that she sought only non-economic damages -- emotional distress arising from alleged sexual harassment. Accordingly, the jury was instructed that if it did award damages, to award damages for emotional distress only. (A.1439-40). But Plaintiff offered no evidence at trial that she suffered an emotional injury from being terminated -- the only employment action taken against her that is relevant. Her own testimony makes plain that her feelings were the opposite of distress:

> Q: Now, you were -- April 22, you were just fired; you were just thrown out of your apartment. How did you feel?
>
> A: I felt free.
>
> Q: Why was that?
>
> A: Because I thought that everything was going to be over and that it didn't -- that I wouldn't have to deal with this man in my life ever again.

(A.1109).

In *Annis v. County of Westchester*, 136 F.3d 239 (2d Cir. 1998), this Court found a plaintiff's uncorroborated testimony of emotional distress insufficient:

> Finally, we find that the only evidence of Annis's emotional distress—her own testimony—is insufficient to warrant an award of compensatory damages for that

- 61 -

> injury. She has not alleged any physical manifestations of
> her emotional distress, and, despite the discrimination,
> she remained a lieutenant with the County police. . . .
> She testified that she needs and has had counseling, but
> introduced no affidavit or other evidence to corroborate
> her testimony. . . .   In short, her testimony fails to
> establish that she suffers from any concrete emotional
> problems.

*Id.* at 249 (internal citations omitted).

This Court subsequently clarified that *Annis* should not be read to require

physical symptoms of emotional distress to sustain an award of damages, but did

not abandon the critique of awards based on uncorroborated plaintiff testimony:

> The damage award "must be supported by competent
> evidence concerning the injury." A plaintiff's subjective
> testimony, standing alone, is generally insufficient to
> sustain an award of emotional distress damages.

*Patrolmen's Benevolent Ass'n. v. City of New York*, 310 F.3d 43, 55-56 (2d Cir.

2002) (citations omitted); s*ee also, Dejesus v. Village of Pelham Manor*, 282

F.Supp.2d 162, 178 (S.D.N.Y. 2003) ("it is still the case that in order to justify

recovery for emotional distress, Plaintiffs must present sufficient evidence that

they experienced 'concrete emotional problems' and mere subjective statements by

a plaintiff concerning feelings of anguish or humiliation, without any physical

effects of such distress, or corroborating evidence or other supporting evidence, are

insufficient.") (citation omitted).

- 62 -

Plaintiff did not even offer subjective statements to support a claim for an emotional injury caused by termination -- she actually testified to the contrary. And there is no other evidence supporting a concrete injury. There is no basis upon which a reasonable jury could have found Plaintiff met her burden of establishing actual emotional damages for sexual harassment.

Appellants respectfully submit that the judgment should be reversed and an order entered dismissing the sexual harassment causes of action.

## III.  THE DISTRICT COURT ERRED IN ONLY REDUCING THE SEXUAL HARASSMENT JURY AWARD TO $150,000

The district court held that the jury's award of $500,000 in compensatory damages for emotional distress on Plaintiff's NYSHRL and NYCHRL *quid pro quo* sexual harassment "deviates materially" from awards in comparable cases and ordered remittitur to $150,000 or a new trial. The court properly determined that the trial evidence reflected nothing more than "garden variety" emotional distress (A.2117), for which New York courts have permitted awards ranging from $10,000 to $150,000.

Even a $150,000 award -- the most a New York state or federal court has awarded for a garden variety case -- is excessive here. Unlike cases at that $150,000 level, Plaintiff's alleged distress was brief and transitory and marked by no physical manifestations (*i.e.,* nausea, sleeplessness, headaches). In remitting down only to the very top of the garden variety range ($150,000), even though the

- 63 -

injuries in cases at that level deviate materially from Plaintiff's, the district court effectively makes new, problematic law that eliminates the range and sets a $150,000 floor for garden variety cases.   One court has already cited the district court's decision, demonstrating the potential for a new, unintended trend.[20]

Respectfully, further remittitur to $30,000 is required.[21]

## A.   A New Trial Or Remittitur Is Proper If The Jury's Award "Deviates Materially" From Comparable Cases

New York has a codified standard for review of excessive jury awards:

> In reviewing a money judgment ... in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

CPLR §5501(c).

In *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415 (1996), the Supreme Court found that when considering Fed. R. Civ. P. 59 motions on the excessiveness of jury awards on state law claims, CPLR §5501(c) "deviates

---

[20]   In *Vera v. Alstom Power*, Civ. A. No. 3:12-cv-00382 (VAB), 2016 WL 3014614 (D.Conn. May 24, 2016) the court applied Connecticut law and decisions of this Circuit in finding $500,000 jury award for emotional distress in a sex discrimination and retaliation case excessive.   In *Vera,* plaintiff failed to present evidence of any physical manifestations from its garden variety emotional distress. The *Vera* court relied in part on the generosity of the court below, ordering a remittitur to only $125,000.

[21]   A district court's decision on remittitur is reviewed for abuse of discretion. *Stampf v. L.I.R.R.,* 761 F.3d 192, 204 (2d Cir. 2014).

- 64 -

materially" standard is substantive for diversity purposes, requiring its use instead of the more jury-deferential "shocks the conscience" standard:

> We therefore agree with the Second Circuit that New York's check on excessive damages implicates what we have called *Erie*'s "twin aims." Just as the *Erie* principle precludes a federal court from giving a state-created claim "longer life ... than [the claim] would have had in the state court," so *Erie* precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court.

*Id.* at 430-31 (internal citations omitted).

The CPLR § 5501(c) standard does not permit a reviewing court to sustain a damage award that is out of line with other awards for similar injuries, even if the award does not shock the conscience. *Fowler v. New York Transit Auth.*, 2001 WL 83228, at *10 (S.D.N.Y. 2001). Put another way:

> To determine whether a jury award is excessive within the meaning of § 5501(c), New York courts compare it with awards in similar cases. *Gasperini,* 518 U.S. at 425 (citing *Leon v. J & M Peppe Realty Corp.,* 596 N.Y.S.2d 380, 389 (1st Dep't 1993)); *Johnston v. Joyce,* 596 N.Y.S.2d 625, 626 (4th Dep't 1993).

*Stampf*, 761 F.3d at 204.

Even a $150,000 verdict in this case is excessive when compared to awards in similar cases; it was error not to remit the award down further.

**B.     The District Court Properly Found Plaintiff's Injury To Constitute No More Than "Garden Variety" Emotional Distress, For Which An Award Of $500,000 Is Excessive**

New York courts recognize three categories of emotional distress awards: "garden variety," "significant" and "egregious."   The type of evidence Plaintiff offered at trial falls within the "garden variety" category:

> In "garden variety" emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration.

*Caravantes v. 53rd St. Partners, LLC*, No. 09 CV 7821(RPP), 2012 WL 3631276, at *22 (S.D.N.Y. Aug. 23, 2012), citing *Olsen v. County of Nassau,* 615 F.Supp.2d 35, 46–47 (E.D.N.Y. 2009) (internal quotations and citations omitted). "Significant" and "egregious" emotional distress requires testimony from doctors or corroborating witnesses of psychiatric conditions that have significant impact on plaintiff's physical health.   *Id.*

Here, the district court properly found that Plaintiff offered little more than her own conclusory testimony that she felt used, weak, and ashamed.   Using quotations from *Olsen* describing factors present in the "garden variety" category, the court found:

> Plaintiff described her emotional distress in largely "vague or conclusory terms, without relating either the

- 66 -

severity or consequences of the injury" in a meaningful
way.   Whatever emotional distress she suffered as a
result of her termination appears to have been brief and
transitory.   There was no evidence of continued shock,
nightmares, sleeplessness, weight loss, or humiliation, or
of an inability to apply for a new position or to enjoy life
in general.   Plaintiff's claims of emotional distress were
likewise "not supported by any medical corroboration."
To the contrary, Defendants' expert -- the psychiatrist Dr.
Ziv -- testified that Plaintiff did not describe any
psychiatric symptoms -- even minor ones -- as a result of
Defendants' conduct, and Ziv concluded that Plaintiff did
not have suffer [sic] from any continued depression,
anxiety, phobias, or emotional distress as a result of
Defendants' conduct.    Plaintiff's failure to seek mental
health treatment -- other than on one occasion in March
2014, several months before trial -- is consistent with
Ziv's finding that Plaintiff suffered no long-term
emotional distress as a result of Defendants' conduct.

A.2119-20.

 In recent years, New York state and federal courts, like *Caravantes* and

*Olsen,* have cited a $30,000 to $125,000 range for garden variety emotional

distress cases.   Although not directly attributed in those cases, the high end of this

range likely was drawn from this Court's decisions in *Meacham v. Knolls Atomic*

*Power Lab,* 381 F.3d 56, 77-78 (2d Cir. 2004), *vacated on other grounds,* 544 U.S.

957 (2005) and *Patterson v. Balsamico,* 440 F.3d 104, 120 (2d Cir. 2006),

sustaining awards of $100,000 and $125,000 respectively.

 In a more recent case, *Lore v. City of Syracuse,* 670 F.3d 127 (2d Cir. 2012),

this Court sustained an award of $150,000.   The court below, thus, apparently

- 67 -

considered $150,000 to be the upper limit for garden variety cases: "an award of $150,000 constitutes 'the maximum that [can] be upheld . . . as not excessive' on her sexual harassment claims." (A.2128) (citing *MacMillan*, 873 F.Supp.2d at 560).

### C. The District Court's $150,000 Award Is Excessive; Courts Award No More than $30,000 For Cases Involving Comparable Injuries

Close analysis of cases in which plaintiffs were awarded damages for the same legal claims reveals that Plaintiff's case does not compare to cases in which more than $30,000 was awarded. The court below conducted this analysis when discussing its finding that this is a garden variety case (A.2117-2129), but abandoned the analysis when deciding to reduce the award to $150,000, the very top of the garden variety range.

The lower court failed to address the material differences between Plaintiff's alleged injury and injuries in cases in which awards where $100,000 or more were sustained. And the court disregarded multiple cases with comparable emotional injuries that resulted in awards of $30,000 or less because they involve discrimination other than sexual harassment or default judgments. Neither rationale for disregarding these comparable cases withstands scrutiny. The lower court does not, and cannot, cite a single comparable case in which $150,000 in damages for the legal claim at issue was sustained.

- 68 -

### 1. Injuries In Cases With Low Six-Figure Awards Are Materially Different From Plaintiff's Alleged Injury

In the garden variety cases this Court sustained at $100,000 or more (*Lore, Patterson,* and *Meachem*), plaintiffs did not merely complain of hurt feelings or other non-tangible distress. Those plaintiffs' distress had physical elements not present here, a distinguishing factor that makes the cases non-comparable.

In *Lore,* the only $150,000 garden variety case, plaintiff not only had significant physical manifestations (tension headaches, abdominal pain, insomnia), but evidence of actual psychiatric conditions -- anxiety and depression. 670 F.3d at 178. Respectfully, this Court likely was willing to consider $150,000 non-excessive because some evidence of psychiatric illness moved the case near or over the line from the garden variety emotional distress category into the "significant" distress category. Regardless, in the instant case, as the court below expressly found, there was no evidence of even a minor psychiatric condition or symptoms.

In *Patterson,* a hostile work environment racial discrimination case that included an assault, plaintiff was sprayed with mace, covered with shaving cream, and taunted with racial slurs. In declining to grant remittitur of a $100,000 jury award, the court noted plaintiff's physical manifestations: "testimony relating to his sleeplessness, headaches, stomach pains, and burning in his eyes from the use of mace in the attack." *Patterson,* 480 F.3d at 120.

- 69 -

*Meacham* involved twenty-six age discrimination claims under the ADEA and NYSHRL. After a jury verdict, the trial judge grouped together claims "[w]here plaintiffs offered no proof other than testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress," and limited damages in those cases to $125,000. 381 F.3d at 77. The court below used this very language to describe evidence that *not present* at trial here. There is no basis to award Plaintiff more when, even by her own account, she suffered less.

Indeed, the court below awarded Plaintiff here the same amount that was awarded to plaintiff in *Caravantes,* a sexual harassment case under Title VII, the NYSHRL and NYCHRL. Caravantes, a heterosexual restaurant worker, was subject to *quid pro quo* sexual harassment involving repeated, unwanted homosexual sexual encounters (oral and anal sex) with his supervisor for over a two year period, often daily. 2012 WL 3631276, at *6-7. His emotional distress caused trouble sleeping, nightmares, suicidal despair and an inability to have sexual relations with his wife -- testimony his wife corroborated. An expert psychologist concluded that Caravantes suffered from Major Depressive Disorder and Posttraumatic Stress Disorder. *Id.* at *23-24.

The *Caravantes* court found that the case fell in the "egregious" category of emotional distress claims. However, because the psychiatric conditions were

treatable, and because he was then working in a restaurant, the Court awarded $150,000 in compensatory damages.    *Id.* at *24.

The court below discussed the *Caravantes* decision in detail as support for its conclusion that, by comparison, the instant case is a garden variety case deserving of far less in damages.    (A.2121-22).    At the end of that discussion, the court below concluded:

> In sexual harassment cases in this Circuit where significant awards for emotional distress have been upheld -- even absent proof of long-term psychological damage -- the harassment had generally continued for years.

(A.2124).    But the court below went on to choose $150,000 -- the same amount awarded in *Caravantes* -- as being non-excessive for this case despite, *inter alia,* Caravantes having presented substantial expert testimony as to his psychological disorders and Plaintiff who was found to have none.    There is no legitimate basis for equating these two cases, but that is what the $150,000 award here does.

### 2.    Plaintiff's Alleged Injuries Are Comparable To Injuries In Cases With Awards Of $30,000 Or Less

Courts repeatedly have reduced or set damages for cases involving evidence of comparable emotional injuries at $30,000 or less.    In chronological order, these cases include:

- *McIntosh v. Irving Trust Co.*, 887 F.Supp. 662 (S.D.N.Y. 1995) -- reducing a $219,428 jury award to $20,000 in NYSHRL race discrimination case:

- 71 -

> [T]he Bank's treatment of him resulted in limited and
> short-lived physical manifestations of his mental distress
> during his employment. Specifically, he testified that he
> stayed home sick from work for several days and saw a
> doctor once because of ailments related to nervous
> tension—he felt weakness in his legs, had stomach
> cramps, had chest pains and felt "beaten down" mentally.

> The plaintiff testified that when he was terminated, he
> "was devastated," and that he was angry and depressed.
> He also testified that he avoided his family at holidays
> because he was embarrassed and ashamed and he
> testified to feelings of inadequacy because his wife had to
> support him.

*Id.* at 664 (citations omitted).    The *McIntosh* court noted plaintiff's failure to

testify in any detail about the magnitude or duration of any mental distress and lack

of evidence that he sought medical or psychological help either while employed or

thereafter.    *Id.* at 664-65.    The lower court here made identical findings on

Plaintiff's evidence.    The *McIntosh* court found the testimony conclusory and

similar to cases in which compensatory damages have been reduced substantially.

*Id.* at 666-67 (collecting cases with remittiturs to awards in the $5,000 to $15,000

range).

- *Fowler,* 2001 WL 83228 -- reducing a jury's emotional distress award

from $50,000 to $25,000 in a race and sex discrimination case under the NYSHRL.

"[T]he evidence of mental anguish is stronger than in the cases at the low end of

the 'garden variety emotional distress' damage spectrum," which it considered to

be from $5,000 to $30,000.    *Id.* at *13-14.    This case involved testimony of

- 72 -

physical manifestations -- headaches -- and that plaintiff had sought psychiatric treatment.   *Id.*   Even with those aggravating factors, not present here, the *Fowler* court did not allow a $50,000 award to stand.   *Id.* at *15.

- *Walia v. Vivek Purmasir & Assoc's, Inc.,* 160 F.Supp.2d 380 (E.D.N.Y. 2000) -- in default judgment context, declining to award $150,000 for emotional injuries and awarding $30,000 for sexual harassment under the NYCHRL.   Plaintiff's employer, Purmasir, asked her out repeatedly, continued to press for a relationship, and grabbed her from behind and squeezed her breasts. When Walia quit, Purmasir refused to provide her paycheck unless she agreed not to sue.   When she refused, Purmasir threatened to "publish things about her that would bring shame to her if she filed a lawsuit.   He told her that he would write that she was a 'whore . . . and nobody will marry [her].'"   *Id.* at 384.   Purmasir then told people in Walia's small community that she was a "whore" and "a slut, things like that," and that he told her not to come to work because she "came to work wearing a shirt with my buttons open all the way down, things like that, that I'm a whore."   *Id.*   Walia sued for sexual harassment, battery.   Purmasir defaulted.

Walia's emotional distress evidence was similar to what Plaintiff here alleges, although more severe.   Walia was "ashamed," and alleged that in the Indian community, her shame was especially a problem because people "blame the

- 73 -

woman." She claimed the retaliation against her turned into physical threats --

she would walk with someone else because she was frightened. She stopped

talking to people at school "because people were laughing at me," could not go to

classes as a student because she could not concentrate, and did not feel like

working. *Id.* at 385. She had been popular in her community, going to concerts

and seeing friends, but when people starting raising the problems with Purmasir,

she stopped. She also claimed to suffer from stomach aches, slept too much, and

on several occasions went to a psychologist for therapy. She claimed that she can

no longer trust anyone and that she moved away from her parents and does not

associate with the Indian community any more. Again, Plaintiff's evidence here

was far weaker.

- *Reiter v. MTA of N.Y.,* No. 01 Civ. 2762 (JGK), 2003 WL 22271223

(S.D.N.Y. Sept. 30, 2003) -- reducing a jury award of $140,000 in emotional

distress damages to $10,000 in Title VII retaliation claim:

> In sum, the plaintiff, while testifying to feelings of
> distress-being stressed, nervous, on edge, clammy-as well
> as the circumstances creating his distress, did not detail
> the severity, duration, or consequences of his mental
> suffering, which were relatively minor on all fronts. The
> evidence of his mental injury is largely vague and
> conclusory testimony, without any evidence of medical
> treatment, and there are no signs that his demotion
> disrupted his family or personal life. . . .

- 74 -

*Id.* at *11.   This description of the evidence of emotional distress, and its

shortcomings, comports with Plaintiff's alleged evidence in this case.

- *Levitant v. City of New York Human Res. Admin*., 914 F.Supp.2d 281

(E.D.N.Y. 2012) *aff'd*, 558 F. App'x 26 (2d Cir. 2014) -- rejecting jury's $250,000

award in Title VII discrimination case under more jury-deferential "shocks the

conscience" standard:

> The only evidence that plaintiff presented regarding
> noneconomic damages or emotional distress after
> August 12, 2003 was his own conclusory statement that
> he was seeking medical attention for chest pain and
> anxiety…. Plaintiff, however, did not present any
> medical evidence of those conditions and offered no
> detail regarding the causation, duration, severity, or
> consequences of those conditions, the frequency with
> which he sought medical treatment, or any medications
> that he was prescribed.

*Id.* at 309-11.

- *MacMillan v. Millennium Broadway Hotel,* 873 F.Supp.2d 546

(S.D.N.Y. 2012) -- reducing a award of $125,000 to $30,000 in race

discrimination-based hostile work environment case under federal law and

NYCHRL:

> There is no evidence that McMillan ever sought medical
> or psychological treatment, that he missed work, that he
> had any difficulty sleeping, that he lost his appetite, or
> that his alleged emotional distress had any physical
> manifestation or disrupted other aspects of his daily life.
> He remained at work throughout the period of alleged
> discriminatory acts.

- 75 -

* * *

> Such evidence, at best, demonstrates "garden variety"
> emotional distress. To the very limited extent that
> McMillan described his injury, he did so in "vague or
> conclusory terms" without "relat[ing] either the severity
> or consequences of the injury." His claims were likewise
> "not supported by any medical corroboration." *Olsen,*
> 615 F.Supp.2d at 46.

*MacMillan,* 873 F.Supp.2d at 561.

- *Rodriguez v. Express World Wide, LLC*, No. 12 CV 4572 (RJD), 2014
WL 1347369, at *7 (E.D.N.Y. Jan. 16, 2014) *report and recommendation adopted*,
2014 WL 1350350 (Mar. 31, 2014) -- setting emotional distress award at $10,000
in a sexual harassment case.   The court stated:

> Plaintiff's allegations of emotional distress are significant,
> but are stated as conclusions drawn by plaintiff herself,
> and do not address the duration of her emotional distress.
> Based on plaintiff's submissions and testimony, the
> unquestionable severity and intensity of the sexually
> harassing behavior, the brief duration of her employment,
> and the applicable case law, I find that an award of
> $10,000 is reasonable to compensate plaintiff for her
> emotional distress claim.

2014 WL 1347369, at *7 (collecting cases).

In case after case, courts considering injuries from discriminatory conduct
have found reasonable compensation for garden variety emotional distress claims
without evidence of significant severity or duration to be $30,000 or less.   These
are the cases that involve injuries comparable to Plaintiff's alleged injuries, some

- 76 -

of them with aggravating factors not even present here, and yet no more than

$30,000 was deemed appropriate.

### 3. The District Court's Bases For Disregarding All The Cases In The $30,000 Range Are Without Merit

After establishing that Plaintiff experienced only garden variety emotional

distress, the court below summarily disregarded most of the cases Appellants cited

as comparable:

> Defendants' argument that only a $30,000 award is
> appropriate is not persuasive, however.    Defendants rely
> -- for the most part -- on race and sex discrimination and
> retaliation cases, and not cases in which an employer
> pressured his subordinate to have sex, and then had sex
> with the employee, over the course of several months.

(A.2125).

The court below cited no authority for why compensatory damage awards

for violations of the NYSHRL or NYCHRL involving race or sex discrimination

should be treated differently than those that involve sexual harassment.

Moreover, the court below erroneously relied on the assumption that the alleged

sexual encounters all occurred "over the course of several months."    (A.2125).

Plaintiff made no such allegation -- she testified the alleged sexual encounters

occurred sometime between January 4 and January 23.    (A.1170-81)

The lower court appears to have made a qualitative judgment that certain

violations of the discrimination laws are more severe than others.    There is no

- 77 -

precedent for doing so.    Indeed, comparable sexual harassment cases, such as *Caravantes, Walia,* and *Rodriguez,* all considered evidence of emotional distress in other types of discrimination claims in their review.    The lower court did not, and could not, offer a defensible reason to differentiate awards for the same types of emotional injuries just because they result from different types of discrimination. That would be akin to differentiating between an assault with a baseball bat and assault with a frying pan that each result in the same injury.    Indeed, allowing such a distinction sends a dangerous message that race or sex discrimination is a less severe violation of the NYSHRL or NYCHRL than sexual harassment, a distinction these statutes fail to make.

The district court also summarily disregards *Walia* and *Rodriguez*, two sexual harassment cases where $30,000 or less was awarded for similar injuries, because the awards were determined by the court upon a default.    (A.2128). According to the district court, since juries have "broad discretion in measuring damages," "cases in which a court has estimated damages after a default are less persuasive here than cases that involve remittiturs of jury awards."    *Id.*    The court identifies no authority for disregarding judge-made awards, and indeed considered in detail the evidence and findings in *Caravantes,* a non-jury trial and relied on *Caravantes* as a benchmark for reducing the jury's award here. (A.2121).

- 78 -

Nor is there any reasoned basis for ignoring court-ordered damage figures. The purpose of remittitur is to make sure that an award is not excessive and does not "materially deviate" from other awards. Nothing about a court's analysis of evidence of particular injuries in a default or bench trial context materially differs from record analysis in a jury trial. If anything, a judge is less likely to "abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket" because judges are more familiar with principles of law and comparable awards. *Dotson v. City of Syracuse*, No. 5:04-cv-1388 (NAM/GJD), 2011 WL 817499, at *13 (N.D.N.Y. Mar. 2, 2011).

When considering remittitur, courts should look to comparable awards "allowed in analogous cases involving similar types of injuries." *Allam v. Meyers*, 906 F.Supp.2d 274, 286-87 (S.D.N.Y. 2012) (citations omitted). Nothing in the case law limits "analogous cases" to those involving jury awards. In New York, state courts applying the "deviates materially" standard have even looked to Division of Human Rights awards. *See, e.g., Gleason v. Callanan Indus., Inc.*, 203 A.D.2d 750, 751 (3d Dep't 1994). The *Walia* and *Rodriguez* judges performed the exact same function that a reviewing court performs in determining a non-excessive damages amount for a discrimination claim.[22]

---

[22] In *Walia*, an inquest was held. Plaintiff testified extensively about the harassment, reaction of her friends and family, physical symptoms, and medical treatment received for her symptoms, which were corroborated by hospital records

- 79 -

The district court also attempted to distinguish *Walia* and *Rodriguez* on the grounds that the harassment at issue differed in severity because "neither case involved a demand for sex that culminated in sexual intercourse." (A.2128). In other words, the court below focused on the alleged conduct of the defendant, and not on the evidence of emotional injury.

The severity of a defendant's conduct has, from time to time, played a role in analyzing whether emotional distress cases fit into the garden variety, significant, or egregious categories. But an award "deviates materially" from other awards if it does not compare to similar awards for *similar injuries*. *See Stampf*, 761 F.3d at 204. If a court has the power to rely on its own view of the relative severity of different discriminatory conduct when considering whether a group of cases all legally sufficient for a plaintiff to prevail are comparable, the obligation to compare the evidence of injury in such cases would largely disappear.

This Court should be especially wary of such a subjective comparison in this case. Here, the jury declined to find Mr. Wey's alleged conduct severe enough to warrant punitive damages and declined to call it a battery. The same jury was

---

and records from plaintiff's psychologist. 160 F.Supp.2d at 392 (A.2126). In addition, a magistrate made the initial findings. Thus, the district judge sat in the same posture as a judge reviewing a jury trial. In *Rodriguez*, plaintiff sued her former employee and its chief executive officer, Mendoza. After default judgment, the court held a hearing on damages at which both plaintiff and defendant Mendoza testified under oath. 2014 WL 1347369, at *1.

willing to award $16 million in defamation punitive damages.    It is hard to believe that the same jury could credit Plaintiff's claim she had been coerced to have sex with her employer, but award no punitive damages.    And yet that is the factual predicate upon which the district court rests a finding of reprehensibility sufficient to find this case non-comparable to *Walia* and *Rodriguez.*

Indeed, in *Walia,* the court *sustained* an award of punitive damages against defendant for improper touching of plaintiff.    If guided by the fact-finder's determination of reprehensibility, the conduct in *Walia* had to be considered more reprehensible than the conduct here.    Under the circumstances, a qualitative assessment about Mr. Wey's conduct, if permitted at all, certainly should not turn a case involving a minor emotional injury into one that is equated with far more severe injuries.    That is what the district court did here, and that should be rejected.

Even after the district court's decision here, New York courts that have considered awards for discrimination have continued to find injuries like Plaintiff alleges to deserve no more than $30,000.    *See Najnin v. Dollar Mountain, Inc.,* No. 14CV5758, 2015 WL 6125436 (S.D.N.Y. Sept. 25, 2015) ($25,000 awarded for sexual harassment and discrimination lasting a year where plaintiff testified she felt extremely uncomfortable, disgusted, shocked, intimidated, and distraught); *Drice v. My Merch. Servs., LLC,* No. CV 2015-0395(MKB), 2016 WL 1266948

- 81 -

(E.D.N.Y. Mar. 31, 2016) ($20,000 default judgment awarded for Title VII/NYCHRL claims for plaintiff who was sexually harassed and testified about feeling offended, disturbed, and humiliated, but failed to introduce medical or mental health records);   *New York State Div. of Human Rights v. Miranda*, 136 A.D.3d 1240, 1242 (3d Dep't 2016) (awarding $25,000 to plaintiff waitresses who were sexually harassed by head chef, causing one plaintiff to visit a psychologist and obtain anti-anxiety medication for extreme anxiety, stress, fear, and depression, and causing another plaintiff to feel upset, victimized and needing to contact a rape crisis counselor); *Roberts v. UPS, Inc*., 115 F.Supp.3d 344 (E.D.N.Y. 2015) (sustaining $25,000 award where plaintiff claimed NYCHRL hostile work environment and retaliation based on sexual orientation and suffered "garden variety" emotional distress); *Greathouse v. JHS Sec. Inc.,* No. 11 Civ. 7845 (PAE)(GWG), 2015 WL 7142850 (S.D.N.Y. Nov. 13, 2015) ($10,000 award to plaintiff who testified he felt withdrawn, anxious, nervous around people, and powerless after employer pointed a gun at him).

Awards continue to be granted or sustained at the high end of the "garden variety" range only where plaintiffs suffered physical manifestations of emotional distress or provided evidence of a psychiatric condition.   *See, e.g., Makinen v. City of New York*, No. 1:11-cv-07535(ALC)(AJP), 2016 WL 880194 (S.D.N.Y. Mar. 1, 2016) ($75,000 award to plaintiffs who suffered discrimination due to

- 82 -

perceived disability, where emotional distress manifested itself physically in the form of severe headaches, anxiety attacks, vision loss, anxiety, depression, panic attacks, hypervigilance, and sleeplessness); *Wharton v. Cty. of Nassau*, No. 10-CV-0265 (JS)(AYS), 2015 WL 4611974 (E.D.N.Y. July 30, 2015) (jury award in religious discrimination and retaliation case reduced from $375,000 to $60,000 where plaintiff, his wife, and his minister testified "at length" about plaintiff's emotional distress, including headaches, trouble sleeping, and being depressed); *Stevens v. Rite Aid Corp*., No. 6:13-CV-783, 2015 WL 5602949 (N.D.N.Y. Sept. 23, 2015) (in disability and wrongful discharge case, court reduced jury award from $900,000 to $125,000 to pharmacist who suffered "needle phobia" and whose distress manifested in weight loss, sleepless nights and nightmares, in addition to feeling distress).

The New York courts continue to draw a distinction between cases involving physical manifestations or psychiatric symptoms -- which can exceed $30,000 -- and cases that do not. This Court, respectfully, should order a further remittitur to no more than $30,000 and, if not accepted a new trial.

## IV. THE DISTRICT COURT ERRED IN FAILING TO ORDER A REMITTITUR OR NEW TRIAL ON THE JURY'S EXCESSIVE COMPENSATORY DAMAGES AWARD FOR DEFAMATION

Having waived the right to seek economic damages, Plaintiff could recover only non-economic damages for her defamation claim -- if she proved humiliation,

- 83 -

mental suffering and damage to reputation.    (*See* A.2130) (citing *Cantu v. Flanigan*, 705 F.Supp.2d 220, 227 (E.D.N.Y. 2010)).    The jury awarded $1,500,000 without indicating whether it was for mental or reputational injury.

Appellants moved for remittitur and a new trial on the defamation claim because the evidence of mental suffering was garden variety and because Plaintiff introduced no evidence of the existence of a professional reputation, much less loss of one.    Given cases involving similar injuries (and the possibility of an award for loss of a personal reputation), Appellants sought -- and now seek -- a remittitur to no more than $90,000 on the defamation claim: $70,000 for emotional distress and $20,000 for personal reputation damage.

The court below agreed that Plaintiff's emotional distress damages was garden variety.    But the court declined to find the $1,500,000 award excessive, finding without citation to authority that even though Plaintiff had presented no evidence of injury to business reputation, the jury could have awarded this amount based on career prospects.    And again, the district court sought to rationalize excessive, unsupported compensatory damages finding by referring to the alleged egregiousness of the defamation.

Courts cannot presume $1,500,000 lost reputation damages based on speculation that a plaintiff would have obtained a valuable business reputation in the future.    Such a ruling contradicts the well-settled premise that defamation

- 84 -

damages awards must be supported by competent evidence concerning the injury, none of which was presented here.    Also, Plaintiff expressly waived the right to presumed damages and the jury was instructed accordingly.    When this presumptive basis for supporting the $1,500,000 award is removed, the damages are plainly excessive for the alleged emotional distress and loss of personal reputation.    This Court should order remittitur to no more than $90,000 on the defamation claim and, if not accepted, a new trial.

**A.    As The District Court Found, Plaintiff Did Not Present The Type Of Evidence Required To Recover For Injury To Business Reputation On A Defamation Claim**

**1.    The Law Requires Evidence Of Existence Of A Business Reputation And How It Was Altered By Defamation**

In protecting the First Amendment, the Supreme Court expressly refuses to allow the "countervailing state interest" in compensating private individuals for injury to reputation to extend "further than compensation for actual injury."

*Gertz* 418 U.S. at 349:

> Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

*Id.* at 350.

This requirement also is embedded in the Restatement (Second) of Torts §621 comment b (1977) -- actual injury "includes impairment of reputation and

standing in the community, but this must be supported by competent evidence and cannot be presumed in the absence of proof." (quotation omitted). And it has been followed by courts in this Circuit and in New York, which look closely at actual evidence of damage to reputation when considering damages awards. New York courts will not simply accept a plaintiff's self-serving description of her business reputation.

For example, in *Massre v. Bibiyan,* No. 12 Civ. 6615 (KPF), 2014 WL 2722849 (S.D.N.Y. June 16, 2014), the court considered (in a default context) a $100,000 damages award from a false report on the internet that plaintiff engaged in a Ponzi scheme. The court rejected the claim for reputational injury. Even though Massre asserted he is a "successful businessman" and that the posting gave the impression that he is a "criminal, fraud, and scoundrel," he "submitted no evidence regarding his reputation prior to the posting, or about the current status of his reputation." *Id.* at *11. Of particular note, he provided no evidence of "how viewers' opinions of him may have been altered." *Id.*

In *Wolf Street Supermarkets, Inc. v. McPartland,* 108 A.D.2d 25 (4th Dep't 1985), plaintiff supermarket was defamed by distribution of handbills alleging discriminatory practices. Plaintiff claimed its reputation was harmed, and even demonstrated lost profits, but failed to present evidence that handbilling proximately caused by the losses. The court noted that plaintiff "could have

- 86 -

shown by direct testimony from persons in the community that the statements were understood by them to impeach the plaintiff's integrity or business methods causing them to shop elsewhere." The court found the $125,000 damages award unsupported because "no credible evidence proximately related any [lost] profits to the handbilling." *Id.*at 33-34.

Remittiturs or new trials are ordered where the record evidence of injury to business reputation fails to support findings of actual injury. *See Nellis v. Miller,* 101 A.D.2d 1002 (4th Dep't 1984) (where plaintiff's good reputation disputed, jury award of $150,000 reduced to $5,000); *Perfect Fit Indus. v. Acme Quilting Co.,* 494 F.Supp. 505, 509-10 (S.D.N.Y. 1980) (ordering new trial where $2,500,000 award for injury to reputation met "shocks the judicial conscience" standard -- "At no point in the trial did any witness testify that the allegedly defamatory communications had impaired Acme's reputation"); *O'Neil v. Peekskill Faculty Ass'n Local No. 2916,* 156 A.D.2d 514 (2d Dep't 1989) (reducing jury award of $200,000 to $130,000 for defamation because evidence reflected only that plaintiff lost contracts totaling $130,000 because of the false report).

The actual evidence requirement is so important to protection of First Amendment rights that even in cases where findings of defamation *per se* permits a presumption of "general damages," if those damages are to be substantial (more than "nominal"), they cannot be awarded without plaintiff having adduced

- 87 -

evidence supporting such damages.    *Fischer v. OBG Cameron Banfill LLP,* No.

08 Civ. 7707(RJH), 2010 WL 3733882 (S.D.N.Y. Sept. 24, 2010).    "Moreover,

the *amount* of damages will always be in issue ..., and evidence must be introduced

to demonstrate that the award should be more than nominal."    *Davis v. Ross,* 107

F.R.D. 326, 330 (S.D.N.Y. 1985) (citation omitted).

### 2.    No Evidence Of An Injured Business Reputation Was Introduced At Trial

Plaintiff offered no testimony from any witness -- not even herself -- that

anything negative happened in her professional life that was caused by alleged

defamatory statements in *The Blot Magazine*.    The court below essentially agreed

that Plaintiff failed to present such evidence.    In straining to find a basis to

support an award of substantial damages, the court below stated that "Plaintiff was

at the outset of her professional career" and had not yet established any reputation.

(A.2141).    The only evidence of a business reputation the court cited was:

> She was well educated, and had held a responsible
> position for a Norwegian marketing firm.    But she came
> to the United States in her mid-twenties with the goal of
> pursuing a career on Wall Street.

(A.2141).

Actually, Plaintiff graduated from a Swedish university and did not have any

prior United States business ties.    She was not a particularly strong student and

was working an entry-level job when these events occurred.    She failed to

- 88 -

demonstrate the drive, or even the intellectual curiosity, to accept an invitation to attend graduate business classes at Columbia University *for free*.   When put to the test of learning what she would need to know to become qualified for a substantial corporate position, she failed.

There is no authority for the proposition, generally, that establishing evidence of a college degree with purportedly bright prospects is enough to satisfy the evidentiary obligations of proof of actual injury.   But even if that were possible, this record hardly provides an evidentiary basis upon which to conclude that Plaintiff's prospects were brighter than those of any of the millions of young adults who graduate from college each year and hope to succeed.

And even if the jury so concluded, that would not be sufficient to meet the requirements of evidence of actual injury.   There is no evidence that after the alleged defamatory statements, Plaintiff lost an employment or business opportunity.   (A.1240-41).   The only trial evidence of her post-defamation business life is she has been employed full-time at Café Linne since summer of 2014.   (A.1119).   Plaintiff admitted no potential employer mentioned *The Blot Magazine* statements.   Plaintiff also presented no evidence -- either through her testimony or other witnesses -- that *anyone* has a lower opinion of her due to *The Blot Magazine* statements.   This is not surprising.   Even Plaintiff testified that the sensationalized format of the statements was "absurd."   (A.1123).

- 89 -

The courts -- *Massre, Wolf Street Supermarkets, Nellis, Perfict Fit Indus.* -- require evidence before permitting plaintiffs to recover for business reputation injury.   Plaintiff had the opportunity to present such evidence if it existed.   There is no such evidence in the record and certainly none to support a $1,500,000 award.

### B.  It Was Error For The District Court To Substitute A Speculative Presumption About Damage To Plaintiff's Future Reputation For Actual Evidence Of Injury

The district court attempted to evade the glaring evidentiary hole in Plaintiff's damages case, essentially contending that it could presume an injury for which no evidence was offered:

> It is not hyperbole or speculation to suggest that any substantial firm engaged in finance, marketing, or public relations -- the areas in which Plaintiff has worked and where her ambitions lie -- would, after reading such allegations as the result of a Google search, hesitate to interview such a   person, much less offer them a position. . . .Accordingly, it is idle to suggest that Bouveng's professional reputation has not been damaged by Defendants' defamatory statements.   It has been grievously damaged.

A.2142.

It may not be hyperbole, but respectfully, the lower court *is* speculating.   It presumes not only what potential future employers may think about *The Blot Magazine* articles, but also that Plaintiff would be hired solely because she graduated college graduate and had minor professional experience.

The lower court continued:

- 90 -

> To accept Defendants' arguments here would give a license to those with power and resources to disseminate defamatory falsehoods that destroy careers before they can become well established.

A.2142.

The lower court is suggesting that there are circumstances -- including Plaintiff's situation -- where courts can presume reputational injury from defamation. The lower court does not say so expressly, but by its reasoning and result, it advocates a change in the balance the Supreme Court struck in *Gertz* between First Amendment rights and the "countervailing state interest" in compensating private individuals for reputation injury, which the Supreme Court held could extend "no further than compensation for actual injury." Unless the Supreme Court changes the Constitutional balance, either a claim for business reputation injury is supported by record evidence or it is being presumed. Here, even the lower court concedes that only a presumption supports the $1,500,000 award.

In any event, the lower court's concern is misplaced. Applying the requirements of *Gertz* and its progeny here will not render new college graduates without remedy for defamation. Adhering to the principle that large awards are appropriate only where plaintiffs have an established business reputation would still permit other plaintiffs who are launching their careers to introduce evidence in support of their claim for damages. This would allow courts to consider each

- 91 -

plaintiff's likelihood of success and future earning potential on an individualized basis, depending on the evidence submitted.   Plaintiff here simply chose not to present evidence about the alleged impact alleged defamatory statements had on her professional life.   A remittitur here to the limited, if any, injury this Plaintiff actually *proved with evidence* will not inhibit other plaintiffs who do present evidence and do demonstrate how defamation actually hindered their professional lives.

### C.   Plaintiff Cannot Recover Presumed Damages Because The Jury Did Not Receive An Actual Malice Instruction

Plaintiff expressly waived the right to recover presumed damages for defamation *per se,* and the jury was instructed accordingly.   During trial, the court informed Plaintiff that seeking presumed damages would complicate the charge, requiring the court to "give serious consideration as to whether I have to give an actual malice instruction."   (A.1225-38 & 1230-32).   The court apparently was referencing that *Gertz* requires plaintiffs seeking presumed defamation damages to meet the "actual malice" standard even if the public person/public interest criteria are not present.   418 U.S. at 349-50.

Plaintiff elected not to seek   presumed damages.   (A.1362). Accordingly, the court gave no presumed damages instruction requiring proof of actual malice.   (A.1435).   The jury was instructed that it could not find for Plaintiff on the defamation claim unless it found "actual harm to her, meaning that

- 92 -

she suffered damages such as personal humiliation, mental anguish and suffering or damage to her reputation and standing in the community." (A.1436).

The lower court's post-trial holding conflicts with Plaintiff's stipulation and the jury charge. The lower court is interpreting the jury's award of $1,500,000 as, essentially, an award of presumed damages. But to permit such an award, the lower court was obligated, under *Gertz,* to instruct the jury that the evidence of defamatory intent had to meet an actual malice standard. Having not done so, it cannot permit a presumed damages award without doing harm to the First Amendment protections guaranteed by the *Gertz* rule.

### D. The Jury's Award Of $1.5 Million Also Should Be Rejected As Inherently Speculative

Even if this Court were inclined to allow a damages award based on presumed injury to business reputation, $1,500,000 is not supportable. If a jury was to credit Plaintiff for having some future earning potential abridged by defamation, there would have to be some non-speculative basis on which to determine an amount to compensate Plaintiff for that injury. The award would have to bear some relation to Plaintiff's expected losses for a reasonable number of future years.

Plaintiff's failure to present any evidence of lost business reputation makes it virtually impossible to make reasonable, non-speculative calculations as to the value of such an injury. For example, Plaintiff offered no evidence as to what

- 93 -

types of jobs she, or any other recent college graduate with a degree from a foreign university, would be qualified for in New York in the marketing field or on Wall Street. Moreover, Plaintiff presented no evidence that she was a star student, had done anything in her marketing work to distinguish herself from others, or that she had the drive to out-perform others seeking a career on Wall Street.

Actually, she got a C+ in marketing at Hong Kong Baptist University and did not know the difference between the most basic financial instruments (stock and bond). (*See* A.2026 & 1195.) She failed to take advantage of one-on-one training in Wall Street issues and refused the rare opportunity to study *for free* at one of the world's most prestigious graduate business schools. (*See* A.1318-20). If anything, the evidence reflects someone who would *not* distinguish herself from other recent college graduates, let alone lose out on $1,500,000 in opportunities. Merely obtaining a degree is no *guarantee* someone will achieve success.

Mathematical calculations show the court below took an illogical leap in declining to find $1,500,000 excessive. It is well-settled that claims for damages cannot be speculative, and as the years go by, predictions about future earnings become more and more speculative. In the employment context, where plaintiffs of all ages seek front pay, courts are reluctant to award damages more than a few years into the future. *See, e.g., Thomas v. IStar Fin., Inc.,* 508 F.Supp.2d 252, 261 (S.D.N.Y. 2007) (finding front pay damages award for seven years after

- 94 -

termination unduly speculative); *Buckley v. Reynolds Metals Co.*, 690 F.Supp. 211, 216 (S.D.N.Y. 1988) (awards encompassing ten years or more are likely to be unduly speculative, given that the employee might or might not get raises, reductions, be fired or incapacitated).

If one were to assume it would be too speculative to award Plaintiff more than 10 years in front pay, or that it would take 10 years to repair her business reputation (generous assumptions), an award of $1,500,000 would rest on an assumption that Plaintiff lost approximately $195,000 annually for that ten year period, but for the alleged defamation.[23]  The only evidence in the record as to Plaintiff's earning potential is the $30,000 NYGG annual salary.   There is no logical, much less evidentiary, basis to conclude that Plaintiff would obtain and maintain such a consistently high-paying job.

The district court's decision, suggesting that "plaintiffs at this stage of their careers are more vulnerable and more worthy of a remedy than more established individuals who have the resources and business networks necessary to more effectively combat the falsehoods" (A.2142), runs contrary to New York defamation law.   If the district court's decision stands, it would set a precedent that reverses the well-established principle that plaintiffs must prove damages and

---

[23]  Assuming a lump sum award is the present value of a future stream of payments and assuming a generously low discount rate of 5%, the present value of $1,500,000 equals a stream of ten $195,000 annual payments.

would require substantial awards be presumed for all college graduates irrespective of the quality of their academic performance or professional performance at the early states of their careers.   Respectfully, without revision, this case will set a dangerous benchmark that an award of $1,500,000 is appropriate regardless of the damages proof presented at trial.

### E.    The Court Should Order Remittitur To No More Than $90,000 For Emotional Distress And Injury To Personal Reputation

Given the unavailability of damages for injury to business reputation as demonstrated above, this Court should find that $1,500,000 for other non-economic injuries -- emotional distress and loss of personal reputation or standing in the community -- deviates materially from cases involving comparable injuries and should be found excessive.   A remittitur to no more than $70,000 for Plaintiff's garden variety emotional distress, and no more than $20,000 for personal reputation injury, would be consistent with comparable injuries in other cases.

### 1.    Comparable Cases Require An Award At The Low End Of The Garden Variety Damages Range For Plaintiff's Alleged Emotional Distress From Defamation

The garden variety emotional distress cases cited in section III, *supra,* concern claims in the discrimination context, but the method of analysis -- assessing the severity or duration of alleged emotional distress through a review of the evidence presented -- applies equally to claims for emotional distress damages

- 96 -

for defamation (or any other legal claim). The *Walia* court, for example, addressed the emotional distress issue without distinguishing between sexual harassment and defamation claims.

The court below found in the case at bar:

> The evidence of emotional distress Plaintiff suffered as a result of Defendants' defamatory statements is similar in some respects to the evidence concerning the emotional distress she suffered as a result of Wey's sexual harassment. Some of the testimony Plaintiff offered -- for example, that she was "humiliated" and "embarrassed" by the Blot articles -- is vague and conclusory.

A.2132.

The court below confirmed that the evidence was based on Plaintiff's feelings. As to the psychiatric testimony, the court below interpreted Dr. Ziv's testimony that Plaintiff was at first "upset" as evidence of "emotional distress," but conceded that Dr. Ziv did not support the notion that any distress continued. *Compare* A.2120 (Dr. Ziv's testimony that Plaintiff was at first upset) *with* A.2131 (court below using much stronger phrase "emotional distress").

On such evidence, New York courts do not sustain awards for substantial damages. *Walia* is a similar case and instructive. Walia testified there, like Plaintiff here, that false statements about her promiscuity caused deleterious effects on her life -- lost connections with family and friends and avoidance of her community. 160 F.Supp.2d at 385-86. Walia, unlike Plaintiff here, also

- 97 -

testified to physical manifestations from emotional distress (stomach aches, blood in her stool), and sought therapy.   *Id.*   She also had difficulties with boyfriends as a result of the defamation.   The court found $30,000 to be an appropriate award for these emotional injuries arising from both the sexual harassment and defamation.

Also comparable is the injury in *Rossignol v. Silvernail,* 185 A.D.2d 497 (3d Dep't 1992).   The defendant had made accusations, for several years, that Rossignol, the boyfriend of defendant's ex-wife, was physically and sexually abusing one of defendant's children.   The statements were delivered directly to persons who could have an immediate and significant impact on the plaintiff's life: state and local social services agencies and to plaintiff's employer.   The jury awarded $800,000 in compensatory damages, the trial court reduced the award to $85,000, and the appellate division sustained the reduction, holding:

> As regards the compensatory damages award . . . the record does support the presence of injury commensurate with the court's reduced award.   Plaintiff was the victim of a 2 ½ year ordeal orchestrated by defendants during which time his professional and personal integrity were called into question.   He was labeled a child abuser -- one of the most loathsome labels in society -- and accused of having sexual intercourse with and performing deviate sexual acts upon a four-year-old child in addition to beating her and indiscriminately injecting her with needles.   The physical and psychological ramifications attendant to his addressing, defending and dealing with these baseless accusations are well established in the record, as is the fact that such charges

- 98 -

> are difficult to escape, especially in the small community
> where plaintiff lives and practices his profession.

*Id.*at 499-500.    Unlike the instant case, there was evidence that the defamatory

statement had reached places and persons that had a significant impact on

plaintiff's life.    And the duration and severity of the Rossignol's injury, surely

exceeding the evidence of injury to Plaintiff here, was held to warrant no more

than $85,000.

In *Weldy v. Piedmont Airlines,* No. 88-CV-0628, 1995 WL 350358

(W.D.N.Y. May 30, 1995), the court reduced a $150,000 defamation award based

on emotional distress injury to $30,000.    Weldy's employer had broadcast he was

being terminated for "aggravated assault" on another employee.    The *Weldy* court

found that while plaintiff's testimony that he was "hurt," and "scared and upset"

because he did not think anyone would hire him because of the aggravated assault

allegation was a sufficient showing for the plaintiff's humiliation and

embarrassment, "there was no evidence that such had any substantial and enduring

effect so as to justify an award of $150,000."    *Id.* at *3.    Again, the evidence is

similar here -- conclusory testimony as to what Plaintiff felt and thought, with no

evidence of any substantial or enduring effect.

The court below considered these cases and concluded:

> [E]vidence of the emotional distress suffered as a result
> of the Defendants' defamatory statements cannot support
> a $1.5 million compensatory damages award.    As in

- 99 -

> *Rossignol,* Plaintiff "is not suffering from any traumatic medically corroborated physical or psychological conditions attributable" to Defendants' defamatory statements.   And as in *Weldy,* there is no evidence here that the "embarrassment" and "humiliation" about which Plaintiff testified "had any substantial and enduring effect."

A.2134 (internal citations omitted).

Having found another basis to substantiate the jury's award, the district court did not consider a remittitur amount for the alleged defamation emotional distress damages.   Respectfully, $70,000 or less is appropriate.   Cases in the defamation context simply fail to result in six-figure damages awards absent proof of a significant injury to plaintiff's business reputation.

The highest emotional injury awards appear to be in the $30,000 to $85,000 range, with the high end reflecting a level of evidence more weighty than the evidence Plaintiff presented at trial.   *See Angel v. Levittown Union Free School Dist. No. 5,* 171 A.D.2d 770, 773 (2d Dep't 1991) (sustaining reduction of defamation emotional distress award from $15,000 to $5,000 where "plaintiff has failed to present evidence, other than his own self-serving testimony which was not corroborated by expert medical testimony as to his emotional distress"); *Nellis,* 101 A.D.2d at 1003 (reducing $150,000 defamation award to $5,000 where "[t]he only proof of injury is plaintiff's self-serving testimony which was never corroborated by expert medical opinion, that the news release caused him to become

- 100 -

emotionally upset and 'uptight' and that as a result he visited a doctor who prescribed medication."); *Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 928 (2d Cir. 1987) (sustaining a $75,000 award for mental anguish and loss of consortium for defamation based upon plaintiff's testimony that it caused the erosion of her marriage). An award of anything more than $70,000 for the emotional distress component of the defamation claim would not be supportable.

### 2. Plaintiff Is Entitled To At Most a Modest Award For Injury To Her Personal Reputation Or Standing In The Community

Plaintiff presented scant evidence of any loss of personal reputation, or of standing in the community. She presented no evidence of what her reputation or standing actually was or how it was injured. No witness testified that anyone's views of Plaintiff had been diminished by *The Blot Magazine* articles -- not even Plaintiff herself. The district court did point out, however, that Plaintiff offered testimony about the effect of the defamatory statements on her personal relationships, including the loss of friends and strained relationships with family members. (A.2132). The jury could have included some compensation for these alleged losses in its award.

There are few cases in New York addressing damage to personal reputation at all, much less what is reasonable compensation. Where it has been discussed, the awards are in the low five-figure range. In *Walia,* the defendant made

- 101 -

statements calling plaintiff a "whore" and a "slut" to members of the small Indian community in which she lived, arguably similar to the types of statements in *The Blot Magazine* that could conceivably have injured Plaintiff's personal reputation in this case.    Also similarly, plaintiff in *Walia* decided not to subject herself to the discomfort she claimed she would have of being in her small community.    Unlike Plaintiff, however, Walia testified that she had difficulties with a boyfriend as a result of the defamation.    The court awarded only $20,000 "to compensate her for the harm done to her reputation and her standing in the community."    160 F.Supp.2d at 394-95.

In *Dalbec,* plaintiff's maiden name was used by a magazine publishing a "swinger's ad" in a small rural community where she and her husband resided. The evidence was that the plaintiff was "a mother of two, enjoyed an excellent reputation among her family, friends and neighbors there."    828 F.2d at 923. After the publication, she was "deluged with telephone calls soliciting sexual favors."    Her relationship with her husband and children suffered.    *Id.*    A second publication, purportedly a retraction, was also defamatory.    After trial on her defamation claim, the jury awarded $65,000 for loss of reputation, and this Court sustained the award.

Here, Plaintiff offered no evidence of any personal reputation or standing in the community, much less an "impeccable" one.    Nor has she offered any

- 102 -

evidence of how that reputation actually was injured.    Her case stands in stark

contrast to the evidence in *Dalbec,* a case where the plaintiff's claims center

around personal injury in a small community.    Indeed, Plaintiff's evidence is not

even as strong as the evidence in *Walia*, another small community case, where

plaintiff testified about an injury to a personal relationship with her boyfriend

being caused by defamation.    If any award for personal reputational injury is to be

sustained, it should be no greater than the $20,000 awarded in *Walia.*

## V.    THE DISTRICT COURT ERRONEOUSLY USED THE ENTIRE COMPENSATORY AWARD, AND NOT EACH DEFENDANT'S *PRO RATA* SHARE, WHEN    COMPUTING REMITTITUR OF PUNITIVE DAMAGES UNDER A 1:1 PUNITIVE/COMPENSATORY RATIO

The district court properly held that the jury's award of $16,000,000 in

punitive damages for a defamation claim upon which the jury awarded $1,500,000

in compensatory damages was unconstitutionally disproportionate under *BMW of*

*North America, Inc. v. Gore,* 517 U.S. 559 (1996), and its progeny.    Relying on

this Court's reasoning in *Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140 (2d Cir.

2014), given that the compensatory award was imprecise (the nature of the injury

Plaintiff alleged was emotional and reputational damage), and high when

compared with similar cases, the district court determined a 1:1 ratio was required.

(A.2145-56).

The district court used the entire compensatory award of $1,500,000 for each defendant when computing punitive damages that should be awarded under a 1:1 ratio. It did so even though defendants were jointly and severally liable for compensatory damages and each defendant, ultimately, will not be required to pay that entire amount.

Neither the Supreme Court nor this Court have expressly addressed the proper manner for computing proportionality in this context. All four circuit courts of appeal that have addressed the issue have rejected the lower court's approach. Appellants submit that this Court should adopt the Eighth Circuit's analysis and apply a rule that requires the punitive-compensatory ratio to be determined using the *pro rata* share of a jointly and severally liable defendant as the denominator.

Applying the 1:1 ratio the district court determined would require further remittitur of punitive damages to no greater than $500,000 for each of the three Appellants.[24] The remittiturs should be even lower should the Court reduce the compensatory damages award on the defamation claim for the reasons stated above -- to 1/3 of the reduced amount for each Appellant.

---

[24] Plaintiff makes no cross-appeal here and, thus, the 1:1 ratio finding has not been presented for review. Regardless, the district court's analysis in reaching the 1:1 ratio was proper and, respectfully, should be adopted in this Court's further analysis of the proper remittitur of the punitive damages awards.

- 104 -

## A. Four Circuits Have Rejected Use Of A Full Compensatory Award When Calculating A Punitive-Compensatory Damages Ratio For A Defendant Liable For A Portion Of The Damages

This Court has not yet expressly addressed the propriety of doing what the district court did here: computing a punitive-compensatory damages ratio using the full compensatory damages award for defendants who all cannot be required to pay the full compensatory damages. The Sixth, Eighth, Ninth, and Tenth Circuits appear to be the only circuits to have considered the issue -- the Sixth and Ninth Circuits in the joint and several liability context -- and all four rejected the district court's approach.

In *Grabinski v. Blue Springs Ford Sales, Inc.,* 203 F.3d 1024 (8th Cir. 2000), the Eighth Circuit analyzed the constitutionality of punitive damages awards entered against five defendants for fraudulently concealing that the car plaintiff purchased had been in an accident. The jury awarded compensatory damages of less than $10,000 against the defendants, jointly and severally, and punitive damages individually as to each defendant ranging from $10,000 to $100,000. *Id.* at 1026.

The Eighth Circuit rejected plaintiff's request to determine the punitive-compensatory ratio by dividing each defendant's punitive damages award by the entire actual damages award:

- 105 -

> This method assumes an impossibility, however, because it posits that each defendant will ultimately pay the full compensatory damages award.
>
> We believe, instead, that the more appropriate way of calculating the ratios is to divide the individual punitive damages awards by the individual *pro rata* shares of the actual damages.    Our method is preferable, we think, because the constitutionality of a punitive damages award against a particular defendant depends partly on the amount of actual damages payable by that defendant.

*Id.*

The Eighth Circuit, thus, expressly rejected the method the court below followed here, which also assumed an impossibility -- that Mr. Wey, FNL, and NYGG would each pay the full compensatory award of $1,500,000. Acknowledging that determining a ratio in cases where defendants are jointly and severally liable "is a matter of some difficulty, because it is not always possible to determine what each defendant will ultimately pay in compensatory damages," the court adopted a *pro rata* share approach as the preferred means to better approximate the actual damages payable by each jointly and severally liable defendant.

The one reported decision expressly addressing this issue in this Circuit, *Alla v. Verkay,* 979 F.Supp.2d 349 (E.D.N.Y. 2013), followed *Grabinski.*    In *Alla,* a jury awarded plaintiff $300,000 in compensatory damages, jointly and severally, against two police officers for the tort of false arrest, and $150,000 in punitive

101640256\V-1

damages against each defendant.    In considering the proportionality of the

punitive damages awards, the court wrote:

> As an initial matter, the Court must decide how to
> calculate the ratio given that Verkay and Dorson are
> jointly and severally liable for compensatory damages,
> but individually liable for punitive damages.    In the
> absence of any guidance from the Second Circuit, the
> Court follows the Eighth Circuit's approach of
> "divid[ing] the individual punitive damages awards by
> the individual *pro rata* shares of actual damages."
> *Grabinski v. Blue Springs Ford Sales, Inc.,* 203 F.3d
> 1024, 1026 (8th Cir. 2000).

*Alla,* 979 F.Supp.2d at 374.    The court also explicitly rejected the use of the entire

compensatory award, adopting the Eighth Circuit's reasoning that such an

approach "assumes an impossibility".    *Id.* at 374 n.13.

In *Planned Parenthood of Columbia/Willamette, Inc. v. American Coal. of

Life Activists*, 422 F.3d 949 (9th Cir. 2005), a group of abortion providers and

clinics brought statutory and RICO claims against anti-abortion activists for a

campaign of "terror and intimidation" that included the publication of posters

threatening abortion doctors and labeling them murderers.    In a complicated jury

verdict, the jury awarded compensatory damages for multiple plaintiffs, on

multiple acts, against multiple defendants jointly and severally.    *Id.* at 960.

For purposes of a constitutionality analysis, the trial court arrived at ratios by

comparing the total joint and several liability for each defendant for compensatory

damages, across multiple plaintiffs, with that defendant's liability for punitive

- 107 -

damages. In comparing total compensatory amount to individual punitive damages amount, this was the same approach taken by the district court in the instant case. Just as the Eighth Circuit had ruled, the Ninth Circuit rejected this approach, finding that it had "the distorting effect of making some ratios appear closer to a constitutional level than they truly are." *Id.* at 961. The court reduced the total punitive damages award accordingly, but instead of allocating the reduction *pro rata* across the defendants (the method used in *Grabinski* and *Alla*), it divided the total, but smaller, punitive damages award in the same proportions the jury used in its verdict. *Id.* at 963-965.[25]

Two other circuits have rejected an approach that calculates a punitive-compensatory ratio as the district court did here, although in the context of a comparative negligence award. In *Clark v. Chrysler Corp.*, 436 F.3d 594, 606 n.16 (6th Cir. 2006), the court rejected the use of a ratio based on a full compensatory award when a ratio based upon the defendant's individual liability could be used -- it would improperly punish the defendant for conduct that the jury determined to be the fault of plaintiff or the other defendant. Similarly, in *Lompe v. Sunridge Partners*, *LLC,* 818 F.3d 1041, 1068 (10th Cir. 2008), the court rejected the lower court's calculation because it did not compare the proportion of

---

[25] As discussed in the argument immediately below, Appellants respectfully contend that the *pro rata* approach to allocation is the one that should be adopted and applied here.

punitive damages assessed against each defendant with only that defendant's individual portion of the total compensatory damages.

While determining a proper ratio for each defendant in these cases was easier than in a joint and several liability case, both of these cases cited *Grabinski* and rejected the type of approach taken by the court below because it would be unfair to punish a defendant for more than what could fairly be considered that defendant's wrongful conduct.   *See Lompe,* 818 F.3d at 1068 n.26 ("[a]t least two federal circuits have ruled that calculating the punitive-to-compensatory ratio by using the full compensatory award when a defendant is only liable for a portion of the damages is improper"), citing *Chrysler,* 436 F.3d at 606 n.16 and *Grabinski,* 203 F.3d at 1026.

The court below used the total compensatory award for the ratio it applied to each defendant without comment; it did not advocate a rationale for the propriety of the calculation.   Every circuit that has considered that approach to determining punitive-compensatory ratios has rejected it.   This Court should do so as well.

**B.    The Court Should Adopt The Eighth Circuit's *Pro Rata* Share Approach To Dividing The Compensatory Award Amongst Jointly And Severally Liable Defendants**

While the Eighth and Ninth Circuits agree that the proportionality of punitive damages awards against jointly and severally liable defendants should not be based on the entire compensatory award, the courts employed different methods

- 109 -

for allocating the remittitur amongst the defendants: a *pro rata* share method and a method that replicates the jury's allocation of punitive damages amongst the defendants.   These methods would result in different remittiturs here.[26]

With neither court comparing these two possible methods, or discussing a rationale behind choosing one over the other, it appears that no circuit court expressly has considered which approach is more appropriate.   Respectfully, the Eighth Circuit's *pro rata* rule better reflects what a court seeks to accomplish in addressing unconstitutionally disproportionate punitive damages awards and should be adopted here.

The Ninth Circuit's allocation may seem to have some cosmetic appeal because it appears to be honoring the jury's apportionment of punitive damages. But the jury's apportionment, if anything, reflects the jury's assessment of the first "guidepost" the Supreme Court articulated in *BMW v. Gore* -- reprehensibility.   It is fair to conclude, for example, that the jury awarded a greater amount of punitive

---

[26]  Under the Eight Circuit's *pro rata* approach, and applying the 1:1 ratio adopted by the district court, with a $1,500,000 compensatory award, punitive damages of more than $500,000 for each defendant would be unconstitutional -- or less if this Court reduces the compensatory award for the reasons stated above.   Under the Ninth Circuit's approach, the 1:1 ratio would be used to determine a total punitive damages amount of $1,500,000, which would then be allocated in the same proportions as the jury's total punitive damages award of $16,000,000: 10/16ths for Wey ($937,500 or less), 5/16ths for FNL ($468,750 or less), and 1/16th for NYGG ($93,750 or less).

- 110 -

damages against Mr. Wey because it found his conduct more reprehensible that of other defendants.

The punitive-compensatory ratio, however, concerns only the *second* guidepost: disparity between harm and the punitive damages awarded. *Gore,* 517 U.S. at 575. A reviewing court considers this proportionality issue separately from the reprehensibility issue. And both the Eighth and Ninth Circuits declined to use the total compensatory amount awarded in calculating ratios for each defendant because they were focused on what each defendant would actually pay. Since it is a certainty that each defendant will *not* pay the entire award, using the entire award would be improper.

With the focus of the analysis on attempting to approximate how much each defendant will pay in *compensatory damages*, the jury's views of comparative reprehensibility are not relevant. With no ability to predict exactly how much compensatory damages each defendant will pay, the safest and best approximation, one that does the best in assuring that no defendant ends up with an unconstitutionally disproportionate share, is achieved using the *pro rata* share method. Accordingly, Appellants respectfully request that this Court remit the punitive damages to an amount equal to 1/3 of the compensatory award for defamation -- at most, $30,000 each if the compensatory award is remitted as Appellants request or $500,000 each if it is not remitted at all.

- 111 -

## <u>CONCLUSION</u>

For all the aforementioned reasons, Appellants respectfully request that this Court: 1) as to the defamation judgment, reverse the judgment and remand for a new trial or in the alternative remit the compensatory award to no more than $90,000 and the punitive award to no more than $90,000 distributed *pro rata*; 2) as to the sexual harassment judgment, reverse the judgment and order judgment entered for the Appellants or in the alternative, remit the compensatory award to no more than $30,000; and 3) award such other relief as is just and proper.

Respectfully submitted,

DENTONS US, LLP

By: /s/Glenn Colton
Glenn Colton
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
E-mail: glenn.colton@dentons.com

*Attorneys for Defendants-Appellants*

- 112 -

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Glenn Colton, an attorney of record for Defendants-Appellants Benjamin

Wey, NYG Capital, LLC, and FNL Media, LLC., do hereby certify that the

foregoing brief complies with the type-volume limitation set forth in FRAP

32(a)(7). The total number of words in the foregoing brief, exclusive of the

corporate disclosure statement, table of contents, table of citations, and this

certificate, is 25,902.

Dated:   New York, New York
          October 4, 2016


                       Dentons US LLP


                       By: <u>/s/Glenn Colton</u>
                       Glenn Colton

101640256\V-1