# 16-1376-cv

# United States Court of Appeals

### *for the*

## Second Circuit

———————◆———————

HANNA BOUVENG,

*Plaintiff-Appellee,*

– v. –

NYG CAPITAL LLC, doing business as New York Global Group, Inc. doing
business as FNL Media LLC, BENJAMIN WEY, FNL MEDIA LLC,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE

BENEDICT P. MORELLI
PERRY FALLICK
MORELLI LAW FIRM
*Attorneys for Plaintiff-Appellee*
777 Third Avenue, 31st Floor
New York, New York 10017
(212) 751-9800

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT .................................................................... 1

LACK OF JURISDICTION ......................................................................... 4

STATEMENT OF THE CASE ...................................................................... 16

    Nature of the Case and Relevant Procedural History ............................. 16

ARGUMENT ............................................................................................. 16

    I.    THE DEFAMATION JUDGMENT SHOULD BE UPHELD .......... 16

        A.    The District Court Correctly Applied a Negligence
            Standard .............................................................................. 16

        B.    The Appellants' Statements Accusing Appellee of
            Extortion and Blackmail Were Not Opinion ........................... 19

        C.    The District Court Did Not Err in Finding that Multiple
            Statements Were *Per Se* Injurious to Appellee's Trade
            or Profession ....................................................................... 22

    II.    PLAINTIFF PRESENTED SUFFICIENT EVIDENCE TO
        SUPPORT HER SEXUAL HARASSMENT CLAIM ...................... 25

        A.    Appellee's Battery Claim and Submission Theory *Quid*
            *Pro Quo* Sexual Harassment Claim Do Not Rise and
            Fall Together, Because the Two Causes of Action Have
            Different Elements ................................................................ 25

        B.    Appellee Firmly Rejected Wey's Sexual Advances and
            Wey Terminated Her Employment as a Result ....................... 30

    III.    THE EVIDENCE SHOWED THAT APPELLEE
        SUFFERED SIGNIFICANT EMOTIONAL DISTRESS AS
        A RESULT OF WEY'S SEXUAL HARASSMENT ...................... 34

    IV.    THE DISTRICT COURT WAS CORRECT NOT TO
        ORDER A *REMITTITUR* OR NEW TRIAL ON THE
        JURY'S COMPENSATORY DAMAGES AWARD FOR
        DEFAMATION ...................................................................... 41

i

V.    THE DISTRICT COURT CORRECTLY USED THE
       ENTIRE COMPENSATORY AWARD WHEN
       COMPUTING *REMITTITUR* OF PUNITIVE DAMAGES...............50

VI.   CONCLUSION ...................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Acumen Re Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co.*,
769 F.3d 135 (2d Cir. 2014) ............................................................6

*Albert v. Loksen*,
239 F.3d 256 (2d Cir. 2001) ......................................................18

*Alexander v. Westbury Union Free Sch. Dist.*,
829 F. Supp. 2d 89 (E.D.N.Y. 2011).............................................26

*Bergerson v. N.Y. Office of Mental Health, Cent. New York Psychiatric Ctr.*,
652 F.3d 277 (2d Cir. 2011) ......................................................35

*Brewer v. Cootes Drive LLC*,
98 F. App'x 41 (2d Cir. 2004)....................................................15

*Calhoun v. Cooper*,
206 A.D.2d 497, 614 N.Y.S.2d 762 (2d Dep't 1994) ............................42, 46

*Cantu v. Flanigan*,
705 F. Supp. 2d 220 (E.D.N.Y. 2010)........................................24, 42, 43, 46

*Caravantes v. 53rd St. Partners, LLC*,
No. 09 CIV. 7821 RPP, 2012 WL 3631276
(S.D.N.Y. Aug. 23, 2012)..............................................................35

*Celle v. Filipino Reporter Enterprises Inc.*,
209 F.3d 163 (2d Cir. 2000) .................................................. 17-18

*Clarke v. Pacifica Foundation*,
WBAI, No. 07 CV 4605(FB), 2011 WL 4356085
(E.D.N.Y. Sept. 16, 2011) ............................................................26

*Dawkins v. Williams*,
511 F. Supp. 2d 248 (N.D.N.Y. 2007) ........................................21

*DeNubilo v. United States*,
343 F.2d 455 (2d Cir. 1965) .........................................................8

*DirecTV, Inc. v. Lewis*,
No. 03 Civ. 6241-CJS-JWF, 2005 WL 1006030
(W.D.N.Y. Apr. 29, 2005).............................................................20

*Dotson v. City of Syracuse*,
No. 5:04-CV-1388 NAM/GJD, 2011 WL 817499
(N.D.N.Y. Mar. 2, 2011), *aff'd*, 549 F. App'x 6 (2d Cir. 2013) ..................40

*Father Belle Cmty. Ctr. v.
New York State Div. of Human Rights on Complaint of King*,
221 A.D.2d 44, 642 N.Y.S.2d 739 (4th Dep't 1996) ...................................26

*Frechette v. Special Mags.*,
285 A.D. 174, 136 N.Y.S.2d 448 (3d Dep't 1954) .......................................41

*G.I. Holdings, Inc. v. Baron & Budd*,
179 F. Supp. 2d 233 (S.D.N.Y. 2001) ..........................................................20

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)......................................................................................18

*Greene v. United States*,
13 F.3d 577 (2d Cir. 1994) ....................................................................16, 51

*Hageman v. City Investing Co.*,
851 F.2d 69 (2d Cir. 1988) ..................................................................*passim*

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995) ....................................................................... 7-8

*In re Martin-Trigona*,
763 F.2d 135 (2d Cir. 1985) ..........................................................................8

*Info. Res., Inc. v. Dun & Bradstreet Corp.*,
294 F.3d 447 (2d Cir. 2002) ..........................................................................6

*Int'l Controls Corp. v. Vesco*,
535 F.2d 742 (2d Cir. 1976) ..........................................................................5

*Jin v. Metro Life Ins. Co.*,
310 F.3d 84 (2d Cir. 2002) ..........................................................................33

*Kahn v. Chase Manhattan Bank, N.A.*,
91 F.3d 385 (2d Cir. 1996) .......................................................................6, 7

*Kahn v. Objective Solutions. Int'l*,
86 F. Supp. 2d 377 (S.D.N.Y. 2000) ...........................................................26

*Kamerman v. Steinberg*,
891 F.2d 424 (2d Cir. 1989) .................................................................*passim*

*Karibian v. Columbia Univ.*,
  14 F.3d 773 (2d Cir. 1994) ...................................................................*passim*

*Kelly v. City of N.Y.*,
  391 F. App'x 69 (2d Cir. 2010) ....................................................................15

*Kerik v. Tacopina*,
  64 F. Supp. 3d 542 (S.D.N.Y. 2014) ............................................................21

*King v. Macri*,
  993 F.2d 294 (2d Cir. 1993) .........................................................................52

*Krauss v. Globe Intl.*,
  251 A.D.2d 191 (1st Dep't 1998) ...........................................................18, 19

*Liberman v. Gelstein*,
  80 N.Y.2d 429 (1992) ....................................................................................17

*Lynch v. New York Times Co.*,
  171 A.D. 399, 157 N.Y.S. 392 (1st Dep't 1916) .................................... 41-42

*MacMillan v. Millennium Broadway Hotel*,
  873 F. Supp. 2d 546 (S.D.N.Y. 2012) ........................................35, 36, 38, 40

*McFadden v. Sanchez*,
  710 F.2d 907 (2d Cir. 1983) .........................................................................52

*Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*,
  746 F. Supp. 2d 575 (S.D.N.Y. 2010) ...........................................................35

*Menghi v. Hart*,
  745 F. Supp. 2d 89 (E.D.N.Y. 2010) .............................................................39

*Meritor Sav. Bank, FSB v. Vinson*,
  477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) ............................28, 29

*Mugavero v. Arms Acres, Inc.*,
  680 F. Supp. 2d 544 (S.D.N.Y. 2010) ...........................................................38

*Olsen v. Cnty. of Nassau*,
  615 F. Supp. 2d 35 (E.D.N.Y. 2009) .............................................................35

*Osorio v. Source Enterprises, Inc.*,
  No. 05 Civ. 10029(JSR), 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007)....24, 39

*Patrolmen's Benevolent Ass'n of City of N.Y. v. City of N.Y.*,
  310 F.3d 43 (2d Cir. 2002) ...........................................................................33

*Phillips v. Bowen*,
    278 F.3d 103 (2d Cir. 2002) ........................................................39

*Quinby v. WestLB AG*,
    2008 WL 3826695 (S.D.N.Y. 2008) ............................................39

*Ramirez v. New York City Off-Track Betting Corp.*,
    112 F.3d 38 (2d Cir. 1997) ..................................................... 39-40

*Raplee v. City of Corning*,
    6 A.D.2d 230, 176 N.Y.S.2d 162 (4th Dep't 1958) ....................52

*Rodriguez v. Anderson*,
    633 F. App'x 7 (2d Cir. 2015) ....................................................15

*Sadowski v. Falanga*,
    29 F. App'x 668 (2d Cir. 2002) ....................................................6

*So v. Wing Tat Realty, Inc.*,
    259 A.D.2d 373, 687 N.Y.S.2d 99 (1st Dep't 1999)....................24

*Stern v. Cosby*,
    645 F. Supp. 2d 258 (S.D.N.Y. 2009) ........................................17

*Thomas v. iStar Fin., Inc.*,
    508 F. Supp. 2d 252 (S.D.N.Y. 2007) ........................................52

*U.S. Fire Ins. Co. v. Nat'l Gypsum Co.*,
    101 F.3d 813 (2d Cir. 1996) ................................................16, 51

*United Nat. Ins. Co v. Waterfront New York Realty Corp.*,
    994 F.2d 105 (2d Cir. 1993) .................................................. 27-28

*United States v. Jackson*,
    180 F.3d 55 (2d Cir. 1999) ........................................................21

*Vasbinder v. Scott*,
    976 F.2d 118 (2d Cir. 1992) ......................................................52

*Weldy v. Piedmont Airlines, Inc.*,
    985 F.2d 57 (2d Cir. 1993) ...................................................18, 19

*Yammine v. DeVita*,
    43 A.D.3d 520, 840 N.Y.S.2d 652 (3d Dep't 2007) ........24, 41, 49

*Yesner v. Spinner*,
    765 F. Supp. 48 (E.D.N.Y. 1991)................................................19

**Statutes & Other Authorities:**

Fed. R. Civ. P. 50 ............................................................................3

Fed. R. Civ. P. 54(b) ................................................................*passim*

Fed. R. Civ. P. 59 ............................................................................3

Fed. R. Civ. P. 59(a)(1)(A) ............................................................3

# PRELIMINARY STATEMENT[1]

This action arises out of Plaintiff-Appellee Hanna Bouveng's (hereinafter referred to as "Appellee" or "Ms. Bouveng") former employment by Defendants-Appellants NYG Capital LLC d/b/a New York Global Group ("NYGG"), FNL Media LLC ("FNL Media" or "FNL"), and Benjamin Wey (collectively referred to hereinafter as "Appellants").

During the course of her employment, Ms. Bouveng was subjected to ongoing sexual harassment by Benjamin Wey. When Ms. Bouveng refused to further succumb to Wey's unwanted sexual advances, she was subjected to retaliation, including, but not limited to, the termination of her employment. Appellants' ongoing retaliation against

---

1 At the outset, it must be noted that Appellee's motion to extend the time to file the instant opposition is still currently pending before this Court. That unopposed 3-page motion was filed with Appellants' consent and was solely seeking a two-week extension of time to file the within opposition brief from January 3 until January 17, 2017. Said motion was electronically filed on December 21, 2016, or thirteen full days prior to the current deadline of January 3, 2017. With the deadline to file approaching and no decision from the Court, Appellee made multiple attempts to contact the Court to obtain information and guidance on when, or if, a decision on the motion was forthcoming prior to the current deadline. Appellee asked that said motion and the upcoming deadline be brought to the attention of the Court so that Appellee would have adequate time to prepare the within opposition and the appeal could be fully and fairly decided on the merits. Surprisingly, Appellee's requests were all denied. Appellee spoke with the case manager on multiple occasions, an administrative attorney, and even electronically filed a letter to the Court on December 29, 2016, but to no avail. Appellee was not provided with any substantive information on when or even if a decision on the motion could be expected prior to the current deadline. Therefore, in order to comply with the current deadline, Appellee submits the within opposition brief.

Ms. Bouveng also included Mr. Wey's stalking of Ms. Bouveng in her home country of Sweden, his persistent harassment of Ms. Bouveng, as well as her family, friends, lawyers and other prospective witnesses, and Appellants' repeated defamation of Ms. Bouveng, among others. (*See* Complaint, A.40-89). The evidence showed —and the jury found —that Ms. Bouveng was subjected to a harmful, materially adverse employment action because she rejected Wey's unwanted sexual advances.

To make matters worse, the evidence showed that because Ms. Bouveng engaged counsel regarding Appellants' *quid pro quo* sexual harassment and retaliation, Appellants embarked upon a prolonged pattern of misconduct designed to destroy Ms. Bouveng's reputation. Specifically, Appellants —through the online publication of a plethora of outrageous, false, and defamatory statements —engaged in an elaborate and deliberate scheme to destroy Ms. Bouveng's professional and personal reputations. The evidence clearly showed that Appellants' statements were false and that Appellants were at least negligent in verifying the accuracy of their statements. In fact, Appellants failed to use any care, let alone reasonable care, to verify the accuracy of their claims. Instead, the evidence showed that Appellants acted with malice.

Ms. Bouveng brought an action alleging claims of: (1) *quid pro quo* sexual harassment under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL"); (2) retaliation under the NYSHRL and

NYCHRL; (3) defamation; and (4) assault and battery. Following a ten-day trial, a jury returned a verdict in Ms. Bouveng's favor on all claims except the assault and battery claims. As to compensatory damages, the jury awarded Ms. Bouveng (1) $500,000 on her *quid pro quo* sexual harassment claims under the NYSHRL and NYCHRL against all Defendants; (2) $1.5 million on her defamation claim against all Defendants; and (3) $1.00 on her retaliation claims under the NYSHRL and NYCHRL. As to punitive damages on her defamation claim, the jury awarded Ms. Bouveng: (1) $10 million against Wey; (2) $1 million against NYGG; and (3) $5 million against FNL Media. On Ms. Bouveng's NYCHRL retaliation claim, the jury awarded her $1.00 against each Defendant.

Defendants then moved under (1) Fed. R. Civ. P. 50 for judgment as a matter of law; (2) Fed. R. Civ. P. 59(a)(1)(A) for a new trial as to liability; and (3) Fed. R. Civ. P. 59 for a new trial or a *remittitur* concerning the damage awards. Defendants' motion for judgment as a matter of law or for a new trial as to liability were both denied. The District Court reduced the (1) compensatory damage award on the NYSHRL and NYCHRL *quid pro quo* sexual harassment claims to $150,000; (2) punitive damage award on the defamation claim against Wey to $1.5 million; and (3) punitive damage award on the defamation claim against FNL Media to $1.5 million. On April 11, 2016, Ms.

3

Bouveng accepted the *remittitur* and an Amended Judgment totaling $5,650,004.00 in damages was entered on May 10, 2016.   (SPA.114-115).

The within appeal should be dismissed for lack of jurisdiction.   However, Appellee respectfully submits that in the event that this Court finds it has jurisdiction to hear the instant appeal, the Court should not disturb the well-reasoned judgments of the District Court and should affirm the decision of the District Court below, should deny Appellants' baseless request for a new trial on defamation, and should deny all of Appellants' additional requests for relief.

## LACK OF JURISDICTION

This Court does *not* have jurisdiction over the instant appeal because the subject of the appeal is a non-final order of the District Court for which the Appellants refused to obtain Fed. R. Civ. P. 54(b) certification.   As Plaintiff-Appellee's breach of contract claim remains pending before the District Court, and because the Appellants utterly failed to even seek a Rule 54(b) certification from the District Court, the within appeal is premature, and dismissal of the instant appeal for lack of appellate jurisdiction is required.

Under Fed. R. Civ. P. 54(b), when any claim for relief is pending before the District Court, a judgment is not deemed final unless so certified by the District Court.   Here, the District Court continues to have jurisdiction over this action, and thus, without a Rule 54(b) certification from the District Court, the instant appeal is not ripe.   During

Appellee's counsel's numerous conversations with Appellants' counsel prior to the within appeal being filed, it could not be more evident that the Appellants were fully aware of the jurisdictional issues and that Rule 54(b) was the appropriate mechanism to resolve those issues.   However, the Appellants inexplicably and conspicuously make absolutely no mention of Fed. R. Civ. P. 54(b) in their statement of jurisdiction or anywhere else in their brief.   The reason for this is clear.   Appellants are aware that they failed to move for a certification in violation of Federal Rule of Civil Procedure 54(b), despite being fully informed that it was appropriate, and, in fact, required that they do so.

Federal Rule of Civil Procedure 54(b) states, in pertinent part:

> When an action presents more than one claim for relief…the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties *only if the court expressly determines that there is no just reason for delay*. Otherwise, *any order or other decision, however designated, that adjudicates fewer than all the claims…does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities*.

Fed. R. Civ. P. 54(b) (emphasis added).   The strict compliance with this rule pertaining to certification of finality is a matter of the greatest importance.   *See Int'l Controls Corp. v. Vesco*, 535 F.2d 742, 747 (2d Cir. 1976).   "A 'final decision' [or judgment] generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."   *Id.* (citation omitted).   "If the district court enters judgment on something less than a final disposition of an entire claim, the Rule 54(b) judgment is

improper, and the court of appeals is without jurisdiction to hear the appeal.   Such a non-final ruling is an inherently interlocutory order that may not be made appealable under Rule 54(b)."   *Info. Res., Inc. v. Dun & Bradstreet Corp.,* 294 F.3d 447, 451–52 (2d Cir. 2002).

   "This Court's jurisdiction is defined by statute and generally is limited to appeals from final judgments of the district court pursuant to 28 U.S.C. § 1291 and from certain interlocutory orders pursuant to 28 U.S.C. § 1292."   *Kahn v. Chase Manhattan Bank, N.A.*, 91 F.3d 385, 387 (2d Cir. 1996); *see also Sadowski v. Falanga*, 29 F. App'x 668, 670 (2d Cir. 2002) ("A district court order is appealable only as to a final decision under 28 U.S.C. § 1291 or FRCP 54(b), as to a certified interlocutory order under 28 U.S.C. § 1292(b), or as to an order encompassed by 28 U.S.C. § 1292(a) or the collateral order doctrine"); *see also Acumen Re Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co.*, 769 F.3d 135, 139 (2d Cir. 2014).   When a district court's decision does not fall into one of the categories listed above, it is not appealable, and this Court, lacking jurisdiction, is required to dismiss any appeal from such a decision.   *See Sadowski*, 29 F. App'x at 670.   Here, the Court lacks jurisdiction to hear this appeal because the Amended Judgment (SPA.114-115) does not end this litigation with respect to all claims or all Appellants as Ms. Bouveng retains her rights to assert additional damages against both Benjamin Wey and NYGG via her

breach of contract cause of action that is currently pending in the District Court.   This

appeal should be dismissed on that basis alone.

The Memorandum Opinion & Order of the Honorable Paul G. Gardephe, dated

March 31, 2016 (SPA.3-113), did not dispose of all the Appellee's claims against each of

the Appellants because Appellee's breach of contract claim against both Wey and NYGG

is still pending in the District Court[2].   Moreover, the District Court did not certify its

March 31st Opinion & Order by making an express determination that there was no just

reason for delay or by directing entry of judgment pursuant to Rule 54(b).   Because the

March 31st Opinion & Order did not dispose of all claims against all parties and because

there was no Rule 54(b) certification, the March 31, Opinion & Order remains

interlocutory and is not appealable.   *See e.g., Kahn v. Chase Manhattan Bank, N.A.*, 91

F.3d 385, 387–88 (2d Cir. 1996); *see also HBE Leasing Corp. v. Frank,* 48 F.3d 623, 632

---

2 By letter dated April 14, 2016, Plaintiff-Appellee informed the District Court that she
wished to proceed with her Breach of Contract claim, Count 13 of the Second Amended
Complaint ("SAC"), which had been severed by Order dated June 5, 2015.   (Dkt. 306).
On May 23, 2016, Plaintiff-Appellee moved for leave to amend the operative SAC for the
sole purpose of setting forth breaches of contract committed by Defendants-Appellants Wey
and NYGG that occurred since the filing of the SAC and which entitle Ms. Bouveng to
further liquidated damages pursuant to contract.   (Dkt. 316-318).   That motion is still
currently pending before the District Court despite being filed more than seven-months ago.
For the avoidance of doubt, even if the motion to amend were subsequently to be denied,
Plaintiff-Appellee still maintains a viable breach of contract cause of action against both
Wey and NYGG that was adequately pled in the SAC.

7

(2d Cir. 1995) (holding that order that did not resolve all the claims in the action was interlocutory and was not appealable because there was no Rule 54(b) certification); *In re Martin-Trigona*, 763 F.2d 135, 139 (2d Cir. 1985) (dismissing appeal for lack of jurisdiction where the defendant appealed from an order disposing of only a portion of the case and the district court had not certified the appeal pursuant to Rule 54(b)); *DeNubilo v. United States,* 343 F.2d 455 (2d Cir. 1965) (dismissing appeal for lack of jurisdiction where plaintiffs appealed from an order denying their motion to amend their complaint and the district court had not certified the appeal pursuant to Rule 54(b)).

The sole reason that can be garnered for Appellants' utter refusal to move for the appropriate Rule 54(b) certification is that Appellants remain inexplicably bitter that Appellee's breach of contract cause of action —Count 13 of the Second Amended Complaint —was severed by the Honorable Paul G. Gardephe prior to trial. Specifically, Appellants have stated that they refuse to seek the appropriate Rule 54(b) certification from the District Court because Appellee "made the mess" by seeking to sever her own cause of action and then succeeded in convincing the Court that it was appropriate to do so. It is undisputed and Appellants even admit that the "breach of contract claim severed from trial of the other claims remains pending below." (Brief for Defendants-Appellants at 3.) In reality, it is the Appellants who have "made the mess" by failing to follow the clear Federal Rules and move for certification pursuant to Rule 54(b).

8

Appellants' own personal feelings regarding a decision of the District Court to sever a cause of action do not provide a sufficient excuse for ignoring the unequivocal Federal Rules of Civil Procedure and do not exempt the Appellants from following said rules, specifically Rule 54(b). It is incumbent on the Appellants, as the appealing party, to ensure that jurisdiction is proper so that the valuable time and resources of this Court and the litigants are not wasted. The Appellants have wholly failed to do so. Despite being fully aware that this Court does not have jurisdiction over the instant appeal, the Appellants filed a brief in which they made no mention whatsoever of Rule 54(b). The absence of any discussion regarding Rule 54(b) is particularly noteworthy because Appellants' counsel had previously represented to Appellee's counsel that the Appellants' brief would note the potential jurisdictional issues under Rule 54(b). As they have shown throughout the course of this litigation, Appellants mistakenly believe that the law does not apply to them. Appellee respectfully submits that this Court should not condone such behavior and should once again remind Appellants that they are not above the law.

Nevertheless, in Appellants' brief, presumably because they know jurisdiction is not proper, Appellants unequivocally represented to this Court that they "remain willing to have this appeal dismissed without prejudice if all collection activity is suspended." (Brief for Defendants-Appellants at 5.) In direct response to said offer, on December 12, 2016, counsel for Appellee spoke with counsel for Appellants and informed them that

9

Appellee was willing to accept that offer and stipulate to dismiss the appeal without prejudice and suspend all collection activity until all matters were fully resolved in the District Court.   Surprisingly, despite Appellee agreeing to all of Appellants' stated conditions, and Appellants being fully aware that the within appeal is not ripe, Appellants revoked their offer and stated they were no longer willing to stipulate to dismissal of the within appeal.

In support of their meritless argument that this Court has jurisdiction to hear the within appeal, the Appellants ignore their failure to move for certification pursuant to Rule 54(b) or otherwise demonstrate that the decision is final, and instead argue that *Hageman v. City Investing Co.*, 851 F.2d 69 (2d Cir. 1988) and *Kamerman v. Steinberg*, 891 F.2d 424 (2d Cir. 1989) empower this Court to hear their improper interlocutory appeal.  However, the Appellants' reliance on *Hageman* and *Kamerman* is misplaced because those cases are inapplicable here and readily distinguishable from this action.  In *Hageman*, this Court was faced with the question of "whether, <u>in a consolidated action</u>, a judgment that does not dispose of all claims is a final decision within the purview of section 1291 absent certification under Fed.R.Civ.P. 54(b)." *Hageman*, 851 F.2d at 71 (emphasis added).  The Court held:

> When there is a judgment <u>in a consolidated case</u> that does not dispose of all claims which have been consolidated, there is a strong presumption that the judgment is not appealable absent Rule 54(b) certification.   In highly unusual

circumstances, a litigant may be able to overcome this presumption and convince us that we should consider the merits of the appeal immediately, rather than waiting for a final judgment.

As to the instant case, we conclude that the presumption against appealability is controlling. Although Hageman of course was not aware of the rule we establish today, on the facts in this case we are convinced that he would not have been able to meet the burden necessary to establish appealability. Although Hageman's lawsuits were commenced separately, it appears that they could originally have been brought as one action because the crux of both actions is that he was wrongfully terminated from Home. In addition, Home is a defendant in both actions, and is relying in both actions on the defense that Hageman's discharge was based on poor job performance. Furthermore, there is no indication that the cases were consolidated only for limited purposes. Finally, we do not think that Hageman will be harmed by our refusal to hear his appeal at this time. Although we understand his desire to have his appeal decided as expeditiously as possible, we do not believe that his personal interest in his action outweighs the public interest in promoting judicial economy by avoiding piecemeal appeals. We therefore conclude that we should grant the defendants' motion to dismiss the appeal for lack of appellate jurisdiction.

*Id.* (internal citation omitted). Accordingly, on its face, *Hageman* deals exclusively with the appealability of orders deciding some, but not all of the claims in consolidated actions, and in such actions only permits this Court to hear otherwise premature appeals under "highly unusual circumstances."

Similarly, *Kamerman* involved the appealability of an order that dismissed a complaint in its entirety on the merits in a case that had been consolidated with several class actions. *Kamerman*, 891 F.2d at 428–29. The plaintiff appealed and argued that this Court should hear the appeal on the merits even though the other consolidated cases

11

remained pending in the district court because: "(1) the case on appeal [was] the only one of the consolidated cases that present[ed] derivative claims; (2) the judgment on appeal decide[ed] all such claims in favor of all defendants; and (3) the district court clearly intended final judgment to be entered with respect to those claims." *Id.* at 429–30. This Court agreed that the circumstances were "highly unusual" pursuant to *Hageman* and in so holding, cited the district court's opinion which demonstrated that it expressly intended final judgment to be entered:

> Since our decision disposes of the final remaining claim in the Kamerman derivative suit, this Court grants summary judgment on the derivative complaint in full <u>and will enter final judgment for the Defendants on all claims contained in 84 Civ. 4550. An order to that effect will accompany this opinion.</u>

*Id.* at 430 (emphasis added). Accordingly, in *Kamerman*, like *Hagemen*, the Court applied the "highly unusual circumstances" standard in the context of a consolidated case and concluded that that test permitted it to entertain the otherwise premature appeal because the district court clearly evinced an intention to enter a final judgment in the appealed decision. *Id.*

Appellants cite only *Hageman* and *Kamerman* in support of their argument that this Court has jurisdiction; they do not cite a single case applying the "highly unusual circumstances" standard to an order in a non-consolidated action. Unlike *Hageman* and *Kamerman*, this is not a consolidated action. Rather, it is a single case in which the

12

District Court issued a judgment deciding some, but not all of Ms. Bouveng's claims, and in which the Appellants failed to obtain Rule 54(b) certification. As the within case is not part of a consolidated action, *Hageman* and *Kamerman*, and the "highly unusual circumstances" test set forth in those cases, are not applicable here.

Even if *Hageman* and *Kamerman* were applicable, the Appellants have not overcome the "strong presumption that the judgment is not appealable absent Rule 54(b) certification," as they have wholly failed to demonstrate that "highly unusual circumstances" exist here to warrant this Court's consideration of their premature appeal. In *Hageman*, the Court concluded that there were no "highly unusual circumstances" because the claims that remained to be decided in the district court were against the same defendant taking the appeal and because those claims had the same factual predicate as the claims that were the subject of the appeal. *See Hageman*, 851 F.2d at 71. Moreover, the *Hageman* Court noted that the Appellant would not suffer undue prejudice in having to wait until the final decision on all of the inter-related claims to appeal. *Id.* Here, as in *Hageman*, the claim that remains to be decided in the District Court (Ms. Bouveng's breach of contract claim) has the same factual predicate as the claims decided in the District Court's July 9, 2015 Judgment and March 31, 2016 Memorandum Opinion and Order. Indeed, Ms. Bouveng's breach of contract claim is premised upon the Appellants' blatant, repeated breach of an agreement between the parties requiring the Appellants to

13

cease ongoing defamation and harassment of Ms. Bouveng and her family, friends, and lawyers. As the claim yet to be decided in the District Court has the same factual premise as the claims the Appellants now attempt to prematurely appeal, there is no basis for concluding that highly unusual circumstances exist here. The Appellants argue, without explanation or support, that Ms. Bouveng's motion to sever her contract claim in the District Court constitutes a "highly unusual circumstance" warranting immediate consideration of the within interlocutory appeal. However, that is a red herring argument. Neither *Hageman* nor *Kamerman* suggest that a plaintiff's request to sever a claim constitutes a "highly unusual circumstance" warranting immediate consideration of a premature interlocutory appeal.

Nor will the Appellants be prejudiced in having to wait to appeal the District Court's decision until there is a final decision on all of Ms. Bouveng's related claims. Appellants argue that they are prejudiced because Ms. Bouveng has commenced collection efforts. Notably, however, despite a representation to this Court in their brief that they would voluntarily dismiss this appeal without prejudice if Ms. Bouveng ceases collection efforts and despite Appellee's express offer to Appellant's counsel to cease such efforts, the Appellants have refused to dismiss the within appeal. As Ms. Bouveng has offered to cease collection efforts, the Appellants cannot credibly claim undue prejudice. Accordingly, there is no "highly unusual circumstance" that would justify this

14

Court's consideration of the Appellants' premature appeal and their appeal should be dismissed for lack of appellate jurisdiction. *See Rodriguez v. Anderson*, 633 F. App'x 7 (2d Cir. 2015); *see also Kelly v. City of N.Y.*, 391 F. App'x 69, 70 (2d Cir. 2010).

Nor does *Kamerman* mandate a finding of "highly unusual circumstances" here. In *Kamerman*, the district court expressly stated that it would enter final judgment for the Defendants on all claims contained in the subject case and that "an order to that effect [would] accompany [the] opinion," but then inadvertently failed to issue such an order. *Kamerman*, 891 F.2d at 430. There is no similar or comparable language in the District Court's decision here. Appellants "assert that the district court intended to enter a final judgment, but inadvertently failed to say so," but they provide absolutely no basis for that assertion. In *Kamerman*, the district court <u>did</u> expressly say that it intended to issue a final judgment. As there is no indication here that the District Court intended to enter a final judgment but inadvertently failed to do so, *Kamerman* (even if applicable) is readily distinguishable.

Accordingly, the Appellants' reliance on *Kamerman* is misplaced, and their argument that this Court has jurisdiction should be rejected. *See Brewer v. Cootes Drive LLC*, 98 F. App'x 41, 43 (2d Cir. 2004) (rejecting the appellants' argument that "highly unusual circumstances" existed and noting that, "in contrast to the situation in *Kamerman*, there is no indication that the district court clearly intended for the dismissals of the

15

complaints to count as final judgment") (internal quotation omitted). As the Appellants have wholly failed to provide any basis by which this Court may consider the within premature appeal, this appeal should be dismissed for lack of jurisdiction.

## STATEMENT OF THE CASE

### Nature of the Case and Relevant Procedural History

For the sake of brevity and for a complete recitation of the relevant facts of this case and the relevant procedural history, the Court is respectfully referred to the Memorandum Opinion & Order of the Honorable Paul G. Gardephe, U.S.D.J., and dated March 31, 2016. (SPA.1-41.)

## ARGUMENT[3]

### I.    THE DEFAMATION JUDGMENT SHOULD BE UPHELD

#### A. The District Court Correctly Applied a Negligence Standard.

In the unlikely event that this Court finds that jurisdiction is proper and that the instant appeal is ripe, the overwhelming evidence showed that Appellants' statements

---

3  Any arguments raised by Appellants for the first time on this appeal should be disregarded by the Court.  *See U.S. Fire Ins. Co. v. Nat'l Gypsum Co.*, 101 F.3d 813, 817 (2d Cir. 1996) (argument that was not raised below would not be heard where claim did not present manifest injustice or type of purely legal issue that could lead to disregard of general rule that issue could not be raised for first time on appeal); *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994) ("it is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.").

regarding Appellee were false and that Appellants were negligent in verifying that accuracy of any of those statements.   Appellants' failed to use *any* care, much less reasonable care, to verify the accuracy of any of their unsubstantiated and patently false claims.   In fact, the evidence showed that Appellants acted with malice.

Appellee agreed prior to trial to limit her defamation claim to statements that constitute defamation *per se* under New York law.   "The New York Court of Appeals has recognized four categories of statements as defamatory *per se*: (1) those that accuse the plaintiff of a serious crime; (2) those that 'tend to injure another in his or her trade, business or profession'; (3) those that accuse the plaintiff of having a 'loathsome disease'; or (4) and those that impute 'unchastity of a woman.'"   *Stern v. Cosby*, 645 F. Supp. 2d 258, 288 (S.D.N.Y. 2009) (citing *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992)). Appellee ultimately agreed to narrow her proof from thousands of defamatory statements to only 66 defamatory statements contained in six Blot articles.   In addition to proving that each statement constituted defamation *per se*, Appellee was required to prove that (1) the statement "concern[s] the plaintiff"; (2) one or more of the Defendants communicated the statement to someone other than Plaintiff; (3) the statement is false – i.e. not "substantially true"; (4) one or more of the Defendants acted at least negligently in publishing the statement; and (5) Plaintiff suffered damages as a result of the publication of the statement.   *See Celle v. Filipino Reporter Enterprises Inc.*, 209 F. 3d 163, 176 (2d

17

Cir. 2000) (citations omitted).

The District Court correctly rejected Appellants' unsupported argument that a "grossly irresponsible" standard applied and correctly instructed the jury using a negligence standard because it is undisputed that Appellants' defamatory statements were not even arguably within the sphere of legitimate public concern. *See Krauss v. Globe Intl.*, 251 A.D.2d 191, 194 (1st Dep't 1998) (in a case involving a private plaintiff and a matter of private concern, "plaintiff need show only that defendants were negligent in publishing the story"); *see also Albert v. Loksen*, 239 F.3d 256, 270 n.12, 271 (2d Cir. 2001) ("declin[ing] to decide whether…negligence or some other level of fault is applicable" in a defamation action involving a private plaintiff and a matter of private concern); *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 64 (2d Cir. 1993) (implying that *Chapadeau* does not apply to suit by private plaintiff suing for defamation in course of discharge from private employment).

Appellee was never a "general public figure" for the purposes of libel law, *i.e.*, one who has obtained "general fame or notoriety in the community, and pervasive involvement in the affairs of society." *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974). Nor was Ms. Bouveng a limited public figure regarding a particular issue or subject because she never voluntarily injected herself into a public controversy with a view toward influencing it. *Id.* at 351. "Significantly, in order to be considered a public

18

controversy for this purpose, the subject matter must be more than simply newsworthy." *Krauss*, 251 A.D.2d at 192 (citations omitted). "Instead, it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Id.* (citations and internal quotations omitted).

Here, the Appellants have set forth no viable rationale that would transform the subject matter of their articles from mere lies involving a private plaintiff and a matter of private concern to anything which could be considered even arguably within the sphere of legitimate public concern. Appellee was a private plaintiff suing for defamation related to her discharge from private employment. *See Weldy*, 985 F.2d at 64 (holding that the discharge of an employee by a private airline was not a matter of public concern); *Yesner v. Spinner,* 765 F. Supp. 48, 52–53 (E.D.N.Y. 1991) (holding that statements in letter to state agency accusing court reporter of "modifying transcripts" were "a matter of purely private and not public concern," and thus that the plaintiff may recover "presumed damages" without a showing of "actual malice"). As such, the statements were found to have been about a purely private matter outside the scope of the *Chapadeau* standard[4].

### B. The Appellants' Statements Accusing Appellee of Extortion and Blackmail Were Not Opinion.

---

4 Notwithstanding the foregoing, the evidence at trial clearly showed that Appellants' acted *at least* in a grossly irresponsible manner in publishing the defamatory statements, in fact, the evidence showed Appellants acted with actual malice.

19

It is uncontroverted that Appellants' published articles in *The Blot* accusing Ms. Bouveng of extortion and blackmail on numerous occasions.   Appellants' assertion that Ms. Bouveng's *quid pro quo* sexual harassment claim and her counsel's letters of representation and Complaint concerning the same were nothing more than an extortion plot is belied by the evidence and the jury's verdict.   The jury was entitled to conclude — and did conclude —that Wey repeatedly made unwanted sexual advances towards Ms. Bouveng, and fired her after she refused to have sex with him again.   The jury found Wey's initial testimony that he perceived Appellee's counsel's April 29 letter as an attempt to extort money *based upon a claim of forced sex* particularly damning since the letter did not mention sex, rape, or sexual harassment.   Further, Appellants' unsupported argument that they did not act negligently in publishing statements accusing Ms. Bouveng of extortion and blackmail is belied by the facts and the case law.

"Threats of litigation, and even threats of meritless litigation or the actual pursuit of such litigation, have been held not to constitute acts of extortion [under the Hobbs Act]." *G.I. Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 259 (S.D.N.Y. 2001); *see also DirecTV, Inc., v. Lewis*, No. 03 Civ. 6241-CJS-JWF, 2005 WL 1006030, at *5 (W.D.N.Y. Apr. 29, 2005) ("Threats of litigation, even economically ruinous litigation, even unmeritorious litigation, do not constitute extortion [under the Hobbs Act]."   "[A] lawsuit filed by wrongful means is not 'wrongful,' as defined by the Hobbs Act, and courts would

20

be wary of holding that the filing of a meritless lawsuit is…extortionate lest every unsuccessful lawsuit lead to an extortion claim and thus chill resort to the courts." *Kerik v. Tacopina*, 64 F. Supp. 3d 542 (S.D.N.Y. 2014) (citation and internal quotations omitted).

Here, Appellee's counsel's April 29, 2014 letter and May 7, 2014 email and draft complaint do not constitute criminal extortion as defined under federal or New York law. The letter and email do no threaten that Appellee or her counsel will "go to the press with [her] claims." *See Dawkins v. Williams*, 511 F. Supp. 2d 248, 260 (N.D.N.Y. 2007). Instead, these communications informed Wey that, if he did not contact Appellee's lawyers, Appellee intended to file a lawsuit against him —"a step that was necessary to pursue… [a] legal remedy." *See id.* at 260 (emphasis omitted). The fact that the allegations in the lawsuit might embarrass or affect the reputation of Wey, his friends, or his family, does not convert Appellee's effort to enforce her legal rights into an extortion attempt. Accordingly, Appellee's counsel's references to potentially "embarrassing litigation" clearly have a "nexus to a plausible claim of right." *United States v. Jackson*, 180 F.3d 55, 71 (2d Cir. 1999).

It was also reasonable for the jury to find that Appellee satisfied her burden of proving the falsity of Appellants' statements accusing her of extortion. Appellants' acknowledge that Wey testified that he interpreted the May 7, 2014 email and draft

21

complaint as threatening that Appellee and her counsel would "file a false charge of rape with … law enforcement if [Wey] did not pay them money."  (SPA.67-68).  However, neither Appellee's counsel's April 29, 2014 letter, nor the May 7, 2014 email and draft complaint, state or even suggest that Appellee was contemplating filing a rape charge with law enforcement.   Accordingly, the jury was entitled to reject Wey's argument that these communications constitute a threat to seek a rape charge against Wey.   As noted earlier, the April 29 letter makes no reference whatsoever to rape or forced sexual conduct. Therefore, the District Court correctly concluded that a reasonable jury could find that Appellants were at least negligent in publishing statements that accused Ms. Bouveng of criminal extortion.

### C. The District Court Did Not Err in Finding that Multiple Statements Were *Per Se* Injurious to Appellee's Trade or Profession.

Appellants mistakenly argue that because Appellee was at the outset of her professional career, she did not suffer damage to her professional reputation as a result of Appellants' defamatory statements.   In fact, the opposite is true.   Ms. Bouveng was well educated and came to the United States in her mid-twenties with the goal of pursuing a career on Wall Street.   (SPA. 97).   She accepted a position at a Wall Street Investment firm, NYGG, serving as the Director of Corporate Communications, and was being groomed to take on the role of Marketing Director.   (SPA. 97).   While Ms. Bouveng was

22

at the outset of a promising professional career, she nonetheless suffered damage to her budding professional reputation as a direct result of Appellants' defamatory statements. In those defamatory statements, Appellants accuse Ms. Bouveng not only of sexual misconduct, prostitution, drug dealing, and alcoholism, but also a host of crimes — including visa fraud and bank fraud —and financial misdeeds victimizing her Wall Street employer.

Defendants maliciously chose falsehoods and lies that would do maximum damage to Appellee's burgeoning professional career, and then posted those lies online in order to disseminate those falsehoods as broadly as possible and in a manner that would almost definitely be seen by any potential employer contemplating hiring Ms. Bouveng.   Any employer engaged in finance, marketing, or public relations —the areas in which Appellee has worked or would seek to work —would most certainly do an Internet search prior to hiring Appellee, and as a result of Appellants' defamatory statements, would be hard pressed to interview, much less hire, Ms. Bouveng.   Accordingly, it is specious for Appellants to suggest that Ms. Bouveng's professional reputation has not been critically damaged by Appellants' defamatory statements.

The unique nature of this case warrants a significant compensatory damage award, despite the fact that Ms. Bouveng was at the outset of her professional career at the time Appellants' defamatory statements were published.   "New factual scenarios may arise

23

that warrant larger awards than those approved in prior cases." *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 226-27 (E.D.N.Y. 2010) (citing *So v. Wing Tat Realty, Inc.*, 259 A.D.2d 373, 374, 687 N.Y.S.2d 99 (1st Dept.1999) (review of damage awards "cannot be based upon case precedent alone, because comparison of injuries in different cases is virtually impossible."); *see also Osorio v. Source Enterprises, Inc.*, No. 05 Civ. 10029(JSR), 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) (in a case markedly similar to this one, the Court upheld the jury's award of $3.5 million in compensatory damages for damage to professional reputation).

Compensatory damage awards in defamation cases are — under New York law — "peculiarly within the jury's province," and the Court must use "prudence and restraint ... in the exercise of its discretion over these awards." *Yammine v. DeVita*, 43 A.D.3d 520, 521, 840 N.Y.S.2d 652, 654 (3d Dep't 2007) (internal quotation marks and citations omitted). Here, the jury considered Ms. Bouveng's standing in the community, the nature of the statements made, the extent to which the statements were circulated, the tendency of the statements to injure someone such as the Appellee, and all the other facts and circumstances of this case, including present harm to Appellee's reputation and the likelihood of future harm to her reputation. (SPA.100-01).

As aptly noted by the District Court, the consideration of the above-mentioned factors weighs in favor of a substantial compensatory award. A jury that was properly

instructed on the law concluded that $1.5 million would fairly compensate Ms. Bouveng for the emotional distress and reputational harm that she suffered, and was likely to suffer in the future, as a direct result of Appellants' defamatory statements, and the District Court agreed and rightly decided not to disturb the jury's award.

## II. PLAINTIFF PRESENTED SUFFICIENT EVIDENCE TO SUPPORT HER SEXUAL HARASSMENT CLAIM

The evidence clearly showed that Ms. Bouveng was subjected to a harmful, materially adverse employment action because she rejected Wey's unwanted sexual advances. Appellants' argue that since the jury rejected Ms. Bouveng's battery claim against Wey, it must have found the four instances of coerced sex in January 2014 were consensual, and, therefore, neither harmful nor offensive. From there, Appellants extrapolate that the jury could not have properly found them liable for *quid pro quo* sexual harassment since Ms. Bouveng's submission to Wey's sex acts was purportedly consensual. Appellee maintains that *all* of Wey's sexual advances were unwelcome, regardless of whether they rose to the level of harmful and offensive, including those that culminated in coerced sexual relations.

### A. Appellee's Battery Claim and Submission Theory *Quid Pro Quo* Sexual Harassment Claim Do Not Rise and Fall Together, Because the Two Causes of Action Have Different Elements.

"*Quid pro quo* sexual harassment occurs 'when submission to or rejection of improper or unwelcome sexual conduct by an individual is used as the basis for employment decisions affecting such individual.'" *Alexander v. Westbury Union Free Sch. Dist.*, 829 F.Supp.2d 89, 108 (E.D.N.Y. 2011) (quoting *Clarke v. Pacifica Foundation*, WBAI, No. 07 CV 4605(FB), 2011 WL 4356085, at *9 (E.D.N.Y. Sept. 16, 2011)).   "The issue in a *quid pro quo* case is whether the supervisor has expressly or tacitly linked tangible job benefits to the acceptance or rejection of sexual advances; a *quid pro quo* claim is made out whether the employee rejects the advances and suffers the consequences or submits to the advances in order to avoid those consequences." *Father Belle Cmty. Ctr. v. New York State Div. of Human Rights on Complaint of King*, 221 A.D.2d 44, 50, 642 N.Y.S.2d 739 (4th Dept. 1996) (citing *Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir. 1994)).

"'Tangible employment actions' include 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Alexander*, 829 F.Supp.2d at 108 (quoting *Clarke*, 2011 WL 4356085, at *9). "[E]mployment decisions predicated upon the existence or termination of consensual romantic relationships [, however,] do not [constitute *quid pro quo* sexual harassment]." *Kahn v. Objective Solutions. Int'l*, 86 F.Supp.2d 377, 380 (S.D.N.Y. 2000).   Title VII is not intended "to

26

punish the victims of sexual harassment who surrender to unwelcome sexual encounters. Such a rule would only encourage harassers to increase their persistence." *Karibian*, 14 F.3d at 778.

So too at bar, the evidence established there was only one willing participant in the sexual encounters between Ms. Bouveng and Wey, and that Ms. Bouveng only succumbed to Wey's unwelcome sexual advances because she feared she would otherwise lose her job. Here, the jury was properly instructed and the Appellants do not challenge the Court's charge. Accordingly, Plaintiff can prevail on her *quid pro quo* sexual harassment claims by proving either that (1) she submitted to Wey's unwelcome sexual advances in order to avoid employment-related consequences (the "submission theory") or (2) she rejected Wey's unwelcome sexual advances and suffered employment-related consequences as a result (the "rejection theory").

Appellants incorrectly argue that no reasonable jury could have concluded that Ms. Bouveng submitted to unwelcome sexual conduct, but also found against Appellee on her battery claims. As the District Court correctly found, Appellee's battery claim and her submission theory *quid pro quo* sexual harassment claim do not rise and fall together, because the elements of these causes of action are different. In order to find Wey liable for battery, the jury had to find that Wey intentionally touched Appellee in an offensive way <u>without her consent</u>. *See United Nat. Ins. Co v. Waterfront New York Realty Corp.*,

27

994 F.2d 105, 108 (2d Cir. 1993) ("A 'battery' is an intentional wrongful physical contact with another person without consent." (emphasis added) (citations omitted)).  By contrast, in order to prevail on her *quid pro quo* sexual harassment claims, Appellee was not required to prove that her sexual relations with Wey were non-consensual.  "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit.... The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'"  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (in a Title VII sexual harassment case, rejecting district court's finding that no actionable harassment occurred because, " '[i]f [plaintiff] and [her supervisor] did engage in an intimate or sexual relationship ..., that relationship was a voluntary one'"). Accordingly, a jury finding that Wey did not commit battery—because Appellee agreed to have sexual intercourse with him—is not inconsistent with the jury's verdict finding Wey liable on Appellee's *quid pro quo* sexual harassment claims.

While Appellee needed to prove that Wey's conduct towards her was non-consensual in order to prevail on her battery claim, "[t]he correct inquiry [for her sexual harassment claims] is whether [Appellee] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary" or consensual.  *Meritor Sav. Bank, FSB*, 477 U.S. at 68.  Based on the

28

evidence at trial, a reasonable jury could conclude that Wey's sexual advances towards Ms. Bouveng were unwelcome, and that he knew they were unwelcome. (SPA.46).

Appellee testified that, during their November 2013 trip to Boston, she told Wey that she "didn't want to do anything" when he attempted to have sex with her, and that she slept on the couch the following night to avoid his advances. (SPA.46 citing Trial Tr. (Dkt. No. 236) at 921, 923). Similarly, during their trip to Dubai, Appellee ignored Wey and pretended to be asleep when he attempted to have sex with her. (SPA 46 citing *id.* at 931). Appellee also testified that, during their second sexual encounter, she pulled away when Wey "tried to kiss [her]." (SPA.46 citing Trial Tr. (Dkt. No. 294) at 964). Appellee also testified that she did not kiss Wey, hug him, or reciprocate in any way when they had sex. (*Id.*) Accordingly, a reasonable jury could find that Appellee "by her conduct indicated that the alleged sexual advances were unwelcome." *Meritor*, 477 U.S. at 68, 106 S.Ct. 2399.

A reasonable jury could also conclude that Appellee submitted to Wey's unwelcome sexual advances in order to protect her job. (SPA.46). Appellee testified that she was afraid to reject Wey's advances because she "didn't want to upset him." (SPA.46 citing Trial Tr. (Dkt. No. 236) at 931). Appellee "saw how he could get [en]raged at the office[,] [t]hat he would scream to people," and she thought that if she objected to Wey's sexual advances "he would get angry, kick [her] out or ... fire [her],

29

revoke [her] visa." (SPA.46 citing *id*. at 931–32; *see also id.* at 936 (she "couldn't just say no ... [because] he would definitely fire [her]." He would kick [her] out of the apartment. He would ... revoke [her] visa.))

### B. Appellee Firmly Rejected Wey's Sexual Advances and Wey Terminated Her Employment as a Result.

Next, Appellants mistakenly argue that the evidence did not establish sexual harassment based upon Appellee's rejection of Wey's unwelcome sexual advances. The District Court found that the termination of Appellee's employment at NYGG on April 22, 2014, was a "tangible employment action" on which Appellee could base her rejection theory *quid pro quo* sexual harassment claim. (SPA.48). Accordingly, under a "rejection theory," Appellee was required to prove that she rejected Wey's sexual advances, and the he terminated her employment, at least in part, because she had rejected his advances.

The Second Circuit recognizes that *quid pro quo* sexual harassment claims are established where an employee avoids or resists her supervisor's sexual advances, rather than literally saying the word "no." *Karibian, supra*, 14 F.3d at 779 (focus of analysis in *quid pro quo* sexual harassment claims must be on the harasser's prohibited conduct rather than the victim's reaction). In *Karibian*, the plaintiff claimed she was coerced into an ongoing sexual relationship with her supervisor that he called consensual.

30

Nevertheless, the plaintiff's claims that her "work assignments, raises and promotions depended on her continued responsiveness to [her supervisor's sexual demands" and that he "implicitly threatened to fire her and to damage her career if she did not comply" established a viable *quid pro quo* sexual harassment case. *Karibian, supra*, 14 F.3d at 775-76. So too in the case at bar.

Here, there is evidence that after Appellee and Wey had sex four times during January 2014, she explicitly rejected his requests for sex, and took action to ensure that they would not have sex again. (SPA.49). Appellee testified that, on February 2, 2014, Wey came to her apartment and told her he "wanted to have sex." (SPA.49 citing Trial Tr. (Dkt. No. 240) at 1205). Appellee "told him no." (*Id.*) And over the next several months, Appellee began spending her spare time with her friends Chauvet and Koluman, in order to ensure that Wey would not be able to pressure her to have sex again. (SPA.49 citing Trial Tr. (Dkt. No. 294) at 965).

Despite Appellee's rejection of Wey "to his face" on February 2, 2014, and the steps she took to avoid spending time with him outside of work, Wey continued to pursue her. (SPA.49). Indeed, on April 21, 2014—the day before her termination—Wey told Appellee that "he always wanted to see [her]. He always wanted to spend time with [her]. He wanted to have sex with [her]. He wanted to hug [her]. He wanted to kiss [her]." (SPA.50). Wey urged Appellee to stick close to him, because he was "the top dog on

31

Wall Street." (*Id.*) He also made clear to Appellee that there would be consequences if she continued to reject his advances: Wey told Appellee that "if [she] didn't start to spend more time with him he would have to start to look for someone else." (*Id.*) Wey also set a deadline for Ms. Bouveng to comply: "he said that if [she did not] show him tangible love[,] he's kicking [her] out by August 1." (*Id.*)

The next morning, Wey went to Ms. Bouveng's apartment and found James Chauvet in her bed. (SPA.50 citing Trial Tr. (Dkt. No. 232) at 517-18). Wey asked Chauvet, "did you fuck her?" and then immediately called Ms. Bouveng down from the offices of Cambridge Alliance Capital, screaming "you fucking bitch. I'm gonna revoke your visa today. I want you out of the apartment today. You're no longer hired by New York Global Group." (SPA.50 citing Trial Tr. (Dkt. No. 294) at 979-80; Trial Tr. (Dkt. No. 240) at 1227-28).

Based on the above, a reasonable jury could conclude, as the District Court correctly held, that Wey fired Ms. Bouveng when it became clear to him that she had rejected his sexual advances. Appellee explicitly told Wey that she did not want to have sex with him and communicated to Wey through her behavior that she did not want to spend time with him outside of work. In conclusion, there is ample evidence that Wey terminated Ms. Bouveng's employment in retaliation for her sexual rejection of him.

Appellants also argue that Appellee offered "no evidence" at trial that she suffered emotional injury from being terminated. Appellants are again incorrect. A reasonable jury could conclude —based on the evidence at trial —that Ms. Bouveng suffered significant emotional distress as a result of her termination from NYGG. Appellants disingenuously suggest that because Appellee may have felt relief immediately after Appellants' terminated her employment, and because she waived economic damages, she did not prove any damages arising from her termination. It is well established that a plaintiff need not demonstrate actual economic loss to prove *quid pro quo* sexual harassment. *See Jin v. Metro Life Ins. Co.*, 310 F.3d 84, 97 (2d Cir. 2002) (plaintiff had viable *quid pro quo* sexual harassment claim where she avoided economic harm by succumbing to supervisor's sexual advances); *Karibian, supra*, 14 F.3d at 774 (district court erred in ruling *quid pro quo* sexual harassment plaintiff had to show actual economic loss).

First, the "objective circumstances of the [termination] itself" as discussed above indicate that it likely caused emotion distress. *See Patrolmen's Benevolent Ass'n. of City of N.Y. v. City of N.Y.*, 310 F.3d 43, 55 (2d Cir. 2002). Moreover, other witnesses also corroborated Appellee's account of her emotional distress. (SPA.51-52.) Appellee's termination also ruined her dreams of working in marketing or public relations in New York and she was forced to return to Sweden and take a job as a waitress. (SPA.52). In

33

sum, there was ample evidence that Ms. Bouveng suffered emotional distress as a result of her termination from NYGG.

## III. THE EVIDENCE SHOWED THAT APPELLEE SUFFERED SIGNIFICANT EMOTIONAL DISTRESS AS A RESULT SEXUAL OF WEY'S HARASSMENT

The jury awarded Appellee $500,000 in emotional distress damages on her *quid pro quo* sexual harassment claims. The jury reasonably found Appellants liable for their *quid pro quo* sexual harassment of Ms. Bouveng, and reasonably found that Ms. Bouveng suffered "significant," ongoing, and protracted emotional injury as a direct result of Appellants' ongoing and egregious misconduct. The evidence at trial demonstrated that Appellee suffered "significant" emotional distress as a consequences of Wey's relentless sexual harassment during her employment and, at the time of her termination, that impacted her both personally and professionally. This impact was not only attested to by Appellee, but observed by her family, friends, and co-workers. Appellant's own expert, Dr. Ziv, even confirmed that Ms. Bouveng's emotional distress was ongoing. Based upon the evidence, the jury rightly concluded that Ms. Bouveng suffered "significant" if not "egregious" emotional distress as a consequence of Wey's sexual harassment[5].

---

5 The District Court held that the emotional distress evidence established "garden variety" emotional distress and ordered remittitur to $150,000 on Appellee's NYSHRL and NYCHRL *quid pro quo* sexual harassment claims. Appellee submits that $150,000 is the absolute minimum that should be awarded in this case, and, in fact, the jury's original award

"A plaintiff who prevails on a claim of sexual harassment under ... the NYSHRL or the NYCHRL[] may recover compensatory damages[ ] for 'emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.'" *Caravantes v. 53rd St. Partners, LLC*, No. 09 CIV. 7821 RPP, 2012 WL 3631276, at *22 (S.D.N.Y. Aug. 23, 2012) (quoting *Bergerson v. N.Y. Office of Mental Health, Cent. New York Psychiatric Ctr.*, 652 F.3d 277, 286 (2d Cir. 2011); citing *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F.Supp.2d 575, 600–01 (S.D.N.Y. 2010)).  "The precise amount of compensatory damages in any given case 'depends on a unique set of facts and circumstances.'"  *Id.* (quoting *Olsen v. Cnty. of Nassau*, 615 F.Supp.2d 35, 45 (E.D.N.Y. 2009) (citation omitted)).  Appellee submits that the unique set of facts and circumstances in this case supported the jury's award of $500,000 emotional distress damages on Appellee's *quid pro quo* sexual harassment claims.

A compensatory damage award for emotional distress in an employment discrimination action may be based on testimonial evidence alone and is *not* preconditioned on whether the plaintiff underwent treatment, psychiatric or otherwise. *MacMillan v. Millennium Broadway Hotel*, 873 F.Supp.2d 546, 560 (S.D.N.Y. 2012) (Gardephe, J.).  The Court is not required to remit a large non-economic damages award,

---

of $500,000 was proper due to the "significant" emotional distress Appellee was forced to endure.

even where evidence of emotional damage consists *solely* of plaintiff's testimony. *Id.* at 560-61. Instead, *remittitur* is appropriate if, and only if, the Court is convinced the jury's award was *entirely out of proportion to the plaintiff's injury*, and was motivated by sympathy rather than evidence of harm. *Id.* Here, Ms. Bouveng's injury was not only evidenced by her own substantial and persuasive testimony, but also by her visit to a therapist, and through the corroborating testimony of several witnesses.

Normally, in "garden variety" emotional distress claims, the "evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms" and does so "without relating either the severity or consequences of the injury." *Id.* In contrast, here, Ms. Bouveng spoke eloquently at length concerning her feelings of shock, anxiety, disgust, and fear stemming from Wey's persistent unwanted sexual advances. Appellee testified that —when she submitted to Wey's sexual advances for the first time — she "felt so used and weak and ... was so ashamed that [she] let [it] happen." (SPA.74 citing Trial Tr. (Dkt. No. 236) at 934). After each subsequent sexual encounter, Ms. Bouveng "just felt more and more weak. That [she] didn't mean anything. That everything that [she] felt and thought, that it didn't matter. [She] felt useless" and "ashamed." (SPA.74). Ms. Bouveng's testimony was corroborated by family, friends and co-workers who observed the impact Wey's sexual harassment had on her. For example, Chemme Koluman testified that Plaintiff seemed

36

"more stressed than usual" in February 2014, at about the time that Plaintiff decided to stop having sex with Wey.   (SPA.74 citing Trial Tr. (Dkt. No. 230) at 360; Trial Tr. (Dkt. No. 236) at 935 –36).

There is also evidence that Ms. Bouveng suffered emotional distress as a result of her termination from NYGG, which — a reasonable jury could have found — was caused by her rejection of Wey's sexual advances.   Appellee testified that Wey's conduct at that time left her "in shock." (SPA.74 citing Trial Tr. (Dkt. No. 294) at 980).   Wey, Koluman, and Weiss testified that Appellee seemed, "angry," "upset," and "stressed" as a result of her termination.   (SPA.74-74 citing Trial Tr. (Dkt. No. 228) at 272-73, Trial Tr. (Dkt. No. 230) at 367; Trial Tr. (Dkt. No. 234) at 623-24).   Wey's anger, screaming, use of profanity, and violent behavior on the day of Ms. Bouveng's termination (*see* SPA.75 citing Trial Tr. (Dkt. No. 294) at 979-80, 982), and the surrounding circumstances, tend to support the evidence indicating that Appellee suffered emotional distress as a result of her termination.   (SPA.75).

Appellee also testified that the flurry of emails Wey sent to her family and friends — which accused her of consorting with a "naked, dirty, totally drunk" "homeless black man," "par[tying] like crazy," and leading a "double life" — were "embarrassing" and "scary." (SPA.75 citing Trial Tr. (Dkt. No. 294) at 985). Appellee felt that Wey was "[t]rying to humiliate [her] in front of [her] family," and "trying to make [her] look bad in

37

front of everyone [she] know[s] in order to isolate [her]." (SPA.75). Appellee also felt "stressed ... out" because of "the impact and effect [Wey's emails] had on [her] father." (SPA.75). Appellee testified that Wey's emails "affected [her] a lot and ... got [her] really upset, stressed, scared that [Wey] would keep on contacting [her father]." (SPA.75).

"Garden variety" emotional distress claims typically lack the extraordinary circumstances and extremely offensive conduct found in this case. "Significant" emotional distress claims "differ from garden-variety claims in that they are based on more substantial harm *or more offensive conduct*," and are *sometimes* supported by evidence of treatment by a healthcare professional or medication, and testimony from other, corroborating witnesses. *See MacMillian, supra,* 873 F.Supp.2d at 560-61 (emphasis added). Here, not only was there evidence of psychological counseling and testimony from corroborating witnesses, but the evidence showed that Wey regularly persisted in virulently offensive *quid pro quo* sexual harassment, culminating in the sudden termination of Ms. Bouveng. Significant awards —albeit lesser ones —have been affirmed based on far less offensive conduct. *See Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010) (Gardephe, J.) (affirming $175,000 emotional distress award to employee who suffered anxiety and insomnia following retaliatory

internal investigation and termination since action was more offensive than commonly seen in garden-variety cases).

In *Osorio*, the Court affirmed a significantly higher compensatory damage award to a plaintiff in a case at least as egregious as this one. There, the Southern District affirmed a $4 million emotional distress award for defendants' retaliation, based primarily on the plaintiff's testimony that she felt depressed, anxious and embarrassed in front of others after she was fired. *Osorio v. Source Enterprises, Inc.*, No. 05 Civ. 10029(JSR), 2007 WL 683985, at *5 (S.D.N.Y. Mar. 2, 2007). This was so despite the fact that the plaintiff's underlying sexual harassment and gender discrimination case failed. *Id. See also Quinby v. WestLB AG*, 2008 WL 3826695, at *3-4 (S.D.N.Y. 2008) ($300,000 for garden variety emotional distress based on plaintiff's testimony that she felt stressed, shocked and devastated following her firing, and that she had headaches and hives); *Phillips v. Bowen*, 278 F.3d 103, 111-12 (2d Cir. 2002) (affirming $400,000 emotional distress award in retaliation case based largely upon testimony of plaintiff, her boyfriend, and co-workers, despite absence of economic loss, physical injury and medical testimony); *Menghi v. Hart*, 745 F. Supp. 2d 89, 109 (E.D.N.Y. 2010) (allowing $500,000 in compensatory damages to arrestee who received sexually harassing phone calls from police officer after he obtained her personal information); *Ramirez v. New York City Off-*

*Track Betting Corp.*, 112 F.3d 38, 40 (2d Cir. 1997) ($500,000 emotional distress award in Title VII retaliation case).

Here, the District Court acknowledged that "Wey's behavior —in the context of an employment relationship —was outrageous."  (SPA.75).   Therefore, Appellants' argument that only a $30,000 award is appropriate is not persuasive and should be disregarded.   Appellants rely on cases involving race and sexual discrimination and retaliation, and not cases —such as here —in which an employer pressured his subordinate to have sex, and then had sex with the employee over the course of several months.

"[I]n calculating [a] *remittitur*, the court must use the least intrusive — and most faithful to the jury's verdict — method of reduc[ing] the verdict only to the maximum that would be upheld by the trial court as not excessive."  *MacMillan*, *supra*, 873 F.Supp.2d at 559–60 (internal quotation marks and citations omitted).   A Court should respect the jury's "broad discretion in measuring damages."  *Dotson v. City of Syracuse*, No. 5:04-CV-1388 NAM/GJD, 2011 WL 817499, at *13 (N.D.N.Y. Mar. 2, 2011), *aff'd*, 549 F. App'x 6 (2d Cir. 2013).   Therefore, any cases the Appellants rely upon in which a court has estimated damages after a default judgment are less instructive than cases that involve *remittitur*s of jury awards.   It is respectfully submitted that the jury's award of $500,000

40

was appropriate, but, at a minimum, the District Court's award of $150,000 should be upheld.

## IV. THE DISTRICT COURT WAS CORRECT NOT TO ORDER A *REMITTITUR* OR NEW TRIAL ON THE JURY'S COMPENSATORY DAMAGES AWARD FOR DEFAMATION

The jury properly awarded Appellee $1.5 million in compensatory damages on her defamation claim.   Appellee was permitted to recover on her defamation claim for emotional distress and damage to her reputation.   The jury heard persuasive evidence that Appellants' ongoing defamation was extremely distressful to Ms. Bouveng.   Ms. Bouveng testified persuasively concerning the impact Appellants' defamatory statements had on her sense of well-being.   The testimony of other witnesses corroborated how threatening and distressful Appellants' defamation was.   The evidence also proved Appellants' ongoing defamatory rampage has had a profound impact on Ms. Bouveng's psyche.

"The unique nature of [defamation] cases is well established.   "In actions for other torts there is generally ... some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part."" *Yammine v. DeVita*, 43 A.D.3d 520, 521, 840 N.Y.S.2d 652 (3d Dep't 2007) (quoting *Frechette v. Special Mags.*, 285 A.D. 174, 178, 136 N.Y.S.2d 448 (3d Dep't 1954) (quoting *Lynch v.*

*New York Times Co.*, 171 A.D. 399, 401, 157 N.Y.S. 392 (1st Dep't 1916))).   "For that

reason, the amount of such damages is peculiarly within the jury's province[,] requiring

prudence and restraint by a trial court in the exercise of its discretion over these awards."

*Id.* (internal citations and quotation marks omitted); *see also Cantu v. Flanigan*, 705

F.Supp.2d 220, 227 (E.D.N.Y. 2010) ("Due to the uncertainties in calculating [non-

economic] damage awards [in defamation cases], New York courts have consistently held

that deference to the jury's findings is required in considering whether to reduce a jury's

award." (citing *Calhoun v. Cooper*, 206 A.D.2d 497, 497, 614 N.Y.S.2d 762 (2d Dep't

1994))).   "Jurors are uniquely positioned to assess the evidence presented at trial and

assign a monetary value to the plaintiff's non-economic damages."   *Cantu*, 705

F.Supp.2d at 227.   "Therefore, although this court cannot avoid its duty to conduct

section 5501(c) review of the jury's verdict, the discretion to reduce such an award should

be 'exercised sparingly' under New York law."   *Id*. (quoting *Calhoun*, 206 A.D.2d at

497, 614 N.Y.S.2d 762).

    "In calculating non-economic damages in a defamation case, including humiliation,

mental suffering and damage to plaintiff's reputation, a jury may properly consider a

number of factors."   *Id*. In this case, the jury was instructed to consider "[P]laintiff's

standing in the community, the nature of the statement made about [P]laintiff, the extent

to which the statement was circulated, the tendency of the statement to injure a person

42

such as [P]laintiff, and all of the other facts and circumstances in the case." (SPA.86 citing Trial Tr. (Dkt. No. 244) at 1629); *see also Cantu*, 705 F.Supp.2d at 227–28 (listing same factors)). "Additionally, the jury may consider all future harm to the Plaintiff's reputation, as well as any humiliation or mental anguish that plaintiff would suffer in the future." *Cantu*, 705 F.Supp.2d at 228 (citing *Calhoun*, 206 A.D.2d at 497, 614 N.Y.S.2d 762 (reversing trial court's decision and reinstating jury's award for "future compensatory damages" in a defamation case)).

Here, Appellee's testimony at trial established that she suffered significant injury as a result of Appellants' defamatory statements. Ms. Bouveng testified that she felt "humiliated" and "embarrassed" by the defamatory statements on The Blot website, including the claim that she was a "sex slave to a pimp." (SPA.86). Ms. Bouveng expressed concern that if she were to "apply for a job ... [her] future employers would see [these statements.]" (SPA.86 citing Trial Tr. (Dkt. No. 294) at 1018-19). Ms. Bouveng also testified that she found it "creepy and scary" that Wey would write such statements, and that it made her angry that Wey "just gets to continue to try to break [her] down or destroy [her] life." (*Id.*)

Ms. Bouveng also testified that she did not feel comfortable returning to her small hometown of Vetlanda, because the Blot articles "portray[ ] [her] like [she is] some kind of prostitute," and "[i]t would be just too embarrassing to try to explain everything."

43

(SPA.87).    Appellee also testified that her relationship with her aunt, Helena Bouveng,

has been damaged as a result of the Blot statements.    She and her aunt "don't talk as

much as before, and [her aunt] [doesn't] want to be involved."   (*Id.*)    Appellee suffered

emotional distress because of Wey's efforts in the Blot articles to make her aunt — a

member of the Swedish parliament —"look bad," "all because of [Plaintiff]."   (*Id.*)

Appellants' expert Dr. Ziv confirmed that Ms. Bouveng had suffered emotional distress as

a result of the defamatory Blot articles, particularly from the allegations about prostitution

and drug use.   (SPA.87 citing Trial Tr. (Dkt. No. 228) at 252-53).    Appellee also told Dr.

Ziv that she was upset that the Blot headlines and images appeared first in the results of

Google searches of her name.   (*Id.*)   In sum, Appellee offered detailed testimony about

the effect of the defamatory statements on her personal relationships, including the loss of

friends and strained relationships with family members.   The defamatory statements have

discouraged Appellee from socializing and returning to her hometown, and have hurt her

confidence in applying for jobs.

　　　Prior to Appellants' malicious defamatory campaign, Ms. Bouveng had a pristine

personal and professional reputation.   However, from the moment Appellants terminated

Ms. Bouveng, they set out to erase the reputation she had established.   Appellants

engaged in a daily campaign of Internet-based defamation against Ms. Bouveng that

lasted for approximately ten months, during which time over 50,000 viewers visited The

Blot website each month. Appellants' defamatory statements about Ms. Bouveng were published so prominently and so often that the first thing potential employers would find when conducting an Internet search for Appellee were Appellants' defamatory articles. Appellants also used search engine optimization techniques to ensure that Blot articles concerning Ms. Bouveng would appear high on any search engine result, thus maximizing the damage to Appellee's reputation. (SPA.90). In an effort to ensure that Blot articles would appear first in response to a search of Ms. Bouveng's name, Appellants even went so far as to arrange for phony and fabricated "comments" to be made on Blot articles about her. (SPA.90).

The Blot articles themselves are replete with egregiously defamatory statements about Plaintiff, referring to her as, *inter alia*, a "sex slave," "extortionist," "street walker," "fraudster," "fugitive," and "cocaine dealer's honey," and accusing her of "attempt[ing] to extort US$1 billion out of [Wey]," "defraud[ing] JP Morgan Chase bank," "blackmailing an American in a mafia-style shakedown," being "kicked out of America," and "vying for the attention of drug dealers and male patrons [at a nightclub] ready to pay for some 'special services' at a price." (SPA.90-91). The Blot articles also include many images of Appellee, her family, and her friends, together with defamatory statements or images. For example, one of the Blot articles features a photograph of Appellee and James Chauvet superimposed on a photograph of a white powdery substance on a tabletop, and

45

bears the caption "BUSTED." (SPA.91).

Appellants' defamatory statements are far more extensive — both in terms of dissemination and duration — than the defamation at issue in the Appellants' cited cases. Here, the defamatory statements in the Blot were not only outrageously egregious in nature, but also reached hundreds of thousands of people, and appeared on the first page of search results when Ms. Bouveng's name was searched for over the course of a ten month period prior to trial. (SPA. 91). The jury may also have correctly concluded that the Blot's defamatory statements about Appellee would not disappear from the Internet any time soon. The jury was entitled to take into account "all future harm to the plaintiff's reputation, as well as any humiliation or mental anguish that plaintiff would suffer in the future." *Cantu*, 705 F.Supp.2d at 228 (citing *Calhoun*, 206 A.D.2d at 497, 614 N.Y.S.2d 762). If the jury took future harm to reputation into account, based on the continued presence of Blot articles on the Internet, the jury's concern would have been well founded. As the District Court aptly predicted, a Google search of Appellee's name as recently as January 2, 2017, continues to yield links to Blot articles associating Appellee with criminal acts and other misconduct. (SPA.91).

As noted by the District Court, there is an aspect of accessibility and permanence here that cannot be ignored, and which reflects the change in the media now used to disseminate defamatory statements. (SPA.92-93). Once defamatory statements find

46

their way onto the Internet, they do not disappear, especially when the publisher refuses to remove them, despite a jury verdict finding the statements to be defamatory, as this case demonstrates. Based on the above, the District Court correctly concluded that it was reasonable for the jury to consider, *inter alia*, the media used to transmit, disseminate, and store the defamatory statements; the accessibility of this media to anyone with an interest in Ms. Bouveng—including a prospective employer; the permanence of this material; and the likelihood of future harm to reputation, all of which were demonstrated by the evidence in this case. Moreover, the jury instructions concerning compensatory damages for defamation gave broad latitude to the jury to consider all of these matters. (SPA.93).

This is true even though Appellee was at the outset of a promising professional career. Ms. Bouveng nonetheless suffered damage to her budding professional reputation as a result of Appellants' egregiously defamatory statements. In those defamatory statements, Appellants accused Ms. Bouveng not only of sexual misconduct, prostitution, drug dealing, and alcoholism, but also of a host of crimes —including visa fraud and bank fraud —and financial misdeeds victimizing her Wall Street employer. Specifically, Appellants accused Ms. Bouveng of extortion, blackmail, and defrauding her employer. (SPA.97-98).

Appellants carefully and maliciously chose falsehoods and lies that would do maximum damage to Appellee's burgeoning professional career, and then employed a

47

media that would disseminate those falsehoods and lies as broadly as possible, and in such a manner that they would likely be seen by anyone who was contemplating hiring Ms. Bouveng.   It is not hyperbole or speculation to suggest that any substantial firm engaged in finance, marketing or public relations — the areas in which Appellee has worked and where her ambitions lie — would, after reading such allegations as the result of a Google search, hesitate to interview such a person, much less offer them a position.   We live in a highly competitive, information-driven world, and most employers will not have the time or inclination to investigate whether such disturbing allegations are true.   They will simply move on to the next candidate.   Accordingly, it is idle to suggest that Ms. Bouveng's professional reputation has not been damaged by Appellants' defamatory statements.   It has been grievously damaged.   (SPA.98).

To accept Appellants' arguments here would give a license to those with power and resources to disseminate defamatory falsehoods that destroy careers before they can become well established.   It cannot be that a defendant can escape liability for causing such damage by choosing a victim who is at the outset of her career.   Indeed, there is a compelling argument that plaintiffs at this stage of their careers are more vulnerable and more worthy of a remedy than more established individuals who have the resources and business networks necessary to more effectively combat the falsehoods and lies that have damaged their professional reputations.   (SPA.98).

The unique nature of the instant case warrants a significant compensatory damage award, despite the fact that Appellee was at the outset of her professional career at the time Appellants' defamatory statements were disseminated. (SPA.99). In the internet age in which we live, an individual's online presence is as important—perhaps more important early on—than her physical presence. Acting out of pure malice and spite, Appellants' used the internet to ensure that no prospective employer would interview Ms. Bouveng, much less hire her, by intentionally disseminating scores of the most professionally damaging lies and falsehoods about her that they could conceive of. She is entitled to compensation for the damage Appellants' have caused to her professional reputation, and they will not be heard to complain that she has not listed the interviews she never obtained, or the jobs she lost, as a result of their egregiously defamatory falsehoods. Having caused the harm, Appellants cannot escape the liability. (SPA.99).

As stated previously, compensatory damage awards in defamation cases are — under New York law — "peculiarly within the jury's province," and the Court must use "prudence and restraint ... in the exercise of its discretion over these awards." *Yammine*, 43 A.D.3d at 521, 840 N.Y.S.2d 652 (internal quotation marks and citations omitted). Here, the jury considered "[P]laintiff's standing in the community, the nature of the statement[s] made about [P]laintiff, the extent to which the statement[s] w[ere] circulated, the tendency of the statement[s] to injure a person such as [P]laintiff, and all of the other

49

facts and circumstances in the case," including the existence of present harm to reputation and the likelihood of future harm to reputation.   (SPA.100-101).

A consideration of these factors here justifies a substantial compensatory award.   A jury that was properly instructed on the law concluded that $1.5 million would fairly compensate Ms. Bouveng for the emotional distress and reputational harm she suffered, and was reasonably likely to suffer in the future, as a result of Appellants' outrageously defamatory statements, which were deliberately disseminated in a fashion to cause maximum damage to Appellee's reputation.   Under the circumstances of this case, the Court should not disturb the jury's well considered judgment or that of the District Court. (SPA.101).

## V.    THE DISTRICT COURT CORRECTLY USED THE ENTIRE COMPENSATORY AWARD WHEN COMPUTING *REMITTITUR* OF PUNITIVE DAMAGES

As set forth above, the jury reasonably concluded that Appellants' conduct was reprehensible, and reasonably found Ms. Bouveng suffered serious emotional injury and damage to her reputation as a consequence of Appellants' defamation.  The jury properly determined Appellants should be punished for their ongoing, malicious defamation.  The jury awarded Appellee $10 million in punitive damages on her defamation claim as against Wey; $1 million in punitive damages as against NYGG; and $5 million in punitive damages against FNL Media.  (SPA.106).  The District Court left the $1 million in

50

punitive damages against NYGG on Appellee's defamation claim undisturbed. Appellee subsequently accepted a *remittitur* to $1.5 million of the punitive damage award against Wey and a *remittitur* to $1.5 million of the punitive damage award against FNL Media. Appellants now argue, for the first time on appeal, that this Court should apply a rule, that is non-existent in the Second Circuit, which would require the punitive-compensatory damages ratio to be determined using the *pro rata* share of a jointly and severally liable defendant as the denominator.

Prior to the instant appeal, Appellants have never argued that it was improper for the District Court to instruct the jury that it could issue separate punitive damage awards as to each defendant, or that it was improper for the jury to impose separate punitive damage awards on each defendant. In fact, Appellants requested that the verdict sheet list the defendants separately for purposes of awarding punitive damages. (SPA.106 n.30 citing Trial Tr. (Dkt. No.242) at 1518). This new argument, raised by Appellants for the first time on this appeal, should be disregarded by the Court. *See U.S. Fire Ins. Co. v. Nat'l Gypsum Co.*, 101 F.3d 813, 817 (2d Cir. 1996) (argument that was not raised below would not be heard where claim did not present manifest injustice or type of purely legal issue that could lead to disregard of general rule that issue could not be raised for first time on appeal); *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994) ("it is a well-established general rule that an appellate court will not consider an issue raised for the

51

first time on appeal."). Moreover, the Second Circuit has acknowledged that "New York favors individual assessment of punitive damages." *McFadden v. Sanchez*, 710 F.2d 907, 914 (2d Cir. 1983) (citing *Raplee v. City of Corning*, 6 A.D.2d 230, 233, 176 N.Y.S.2d 162 (4th Dep't 1958))[6]. Even if the Court were to consider Appellants' newly formed argument —it should not —Appellee proposes that dividing each individual punitive damages award by the entire compensatory damages award would be the better approach. Based on the facts of this case, such an approach would not assume an impossibility as the facts have clearly established that Appellants are all controlled by Benjamin Wey and are alter egos of one another. Therefore, for all practical purposes, each defendant, through Wey, will ultimately pay the full compensatory damages award.

In sum, Appellants' argument, raised for the first time on appeal, should be disregarded and the District Court's punitive damages award should not be disturbed. The

---

6 In cases in which defendants argue that a remittitur is necessary as to punitive damage awards against multiple defendants, courts routinely address each award separately. *See, e.g., King v. Macri*, 993 F.2d 294, 298–99 (2d Cir. 1993) (reducing punitive damages against one defendant from $175,000 to $100,000 and against another defendant from $75,000 to $50,000); *Vasbinder v. Scott,* 976 F.2d 118, 122 (2d Cir. 1992) (reducing punitive damages awards of $150,000 against each defendant to $20,000 as to one defendant and $30,000 as to the second defendant, in light of their different financial condition); *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 255, 262-64 (S.D.N.Y. 2007) (reducing punitive damages against one defendant from $1.6 million to $190,000, but leaving undisturbed the punitive damage award against another defendant).

District Court determined that Appellants' conduct was at the extreme end of the spectrum and that a large punitive damage award was necessary to deter Appellants' from engaging in this type of conduct in the future. (SPA.110). Considering all the circumstances, the District Court concluded that a punitive damage award yielding a ration of no more than 1:1 as to each defendant was appropriate. (SPA.111). The District Court correctly determined that none of the cases cited by Appellants' is comparable in terms of the extent, scope, nature, and dissemination of the defamatory statements at issue here. (SPA.111). Appellants' use of the Internet to lodge repeated and extensive attacks against Ms. Bouveng, as well as their malicious intent in doing so, requires a significant punitive damage award. (SPA.111).

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully submitted that Appellants' appeal be dismissed for lack of jurisdiction, or alternatively, that the District Court's Order which forms the basis of this appeal be affirmed in its entirety.

Dated:     New York, New York
           January 3, 2017      Respectfully submitted,

<u>By: s/s *Benedict P. Morelli*</u>
Benedict P. Morelli
Perry S. Fallick
**MORELLI LAW FIRM, PLLC**
*Attorneys for Plaintiff-Appellee*
777 Third Avenue, 31st Floor
New York, New York 10017
Tel: (212) 751-9800
Fax: (212) 751-0046

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate

Procedure, the foregoing brief is in 14-Point Times Roman proportional font

and contains 35.3: 8 words and thus is in compliance with the type-volume

limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate

Procedure.

Dated:      New York, New York
            January 3, 2017


            s/ Benedict P. Morelli
            _____